# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SAMMIA PRATT, )
~~c/o Legal Services Center of Harvard Law School~~ )
~~122 Boylston St.~~ )
~~Jamaica Plain, MA 02130,~~ )
)
ALICIA DAVIS, and ) Civil Action No. 20-1501-TNM
~~c/o Legal Services Center of Harvard Law School~~ )
~~122 Boylston St.~~ )
~~Jamaica Plain, MA 02130,~~ )
)
BRITTANY SAULSBERRY, ) **AMENDED**
~~c/o Legal Services Center of Harvard Law School~~ ) **INDIVIDUAL AND CLASS**
~~122 Boylston St.~~ ) **ACTION COMPLAINT FOR**
~~Jamaica Plain, MA 02130,~~ ) **DECLARATORY AND**
) **INJUNCTIVE RELIEF**
~~MARISOL CASTILLO,~~ )
~~c/o Legal Services Center of Harvard Law School~~ )
~~122 Boylston St.~~ )
~~Jamaica Plain, MA 02130,~~ )
)
~~CHARLENE ESPADA,~~ )
~~c/o Legal Services Center of Harvard Law School~~ )
~~122 Boylston St.~~ )
~~Jamaica Plain, MA 02130,~~ )
)
~~and~~ )
)
~~HEATHER BIANCHI,~~ )
~~c/o Legal Services Center of Harvard Law School~~ )
~~122 Boylston St.~~ )
~~Jamaica Plain, MA 02130,~~ )
)
individually and on behalf of all others similarly )
situated, and )
MARISOL CASTILLO and HEATHER BIANCHI, )
)
Plaintiffs, )
)
v. )
)
ELISABETH DeVOS, )
)
)

1

in her official capacity as Secretary of the United )
States Department of Education, ~~and~~ UNITED )
STATES DEPARTMENT OF EDUCATION, )
~~Office of the Secretary~~ )
~~400 Maryland Ave. SW~~ )
~~Washington, DC 20202,~~ )
)
~~and~~ )
)
~~UNITED STATES DEPARTMENT OF~~ )
~~EDUCATION,~~ )
~~400 Maryland Ave. SW~~ )
~~Washington, DC 20202,~~ )

Defendants.

_____

## INTRODUCTION

1.     Under the Higher Education Act (HEA), 20 U.S.C. § 1087e(h), and its implementing regulations, student loan borrowers who can show that the school they attended engaged in certain wrongful acts or omissions have a defense against repayment of their federal student loan debt through a process known as "borrower defense" to repayment. The borrower defense process has taken on heightened importance given widespread revelations of situations in which for-profit colleges and universities have misled and deceived vulnerable students, persuading, sometimes coercing, them to take out federal student loans to attend programs that provided minimal educational value.

2.     This lawsuit, brought pursuant to the Administrative Procedure Act (APA), challenges the latest effort by defendant United States Department of Education (ED) to deny borrowers relief under the borrower defense process. Plaintiffs bring this action to challenge a rule adopted by ED on December 10, 2019, and clarified by ED on August 4, 2020—the Partial Relief Rule, *see* Exh. A; Exh. E—and its application to them. The Partial Relief Rule wrongfully denies

student loan borrowers who have successfully established a claim through the borrower defense process most of the relief to which they are entitled on their federal student loans.

3.      Under the Partial Relief Rule, the vast majority of student borrowers receive only partial or no relief from their federal student loan debt, despite having successfully established a borrower defense claim. Pursuant to the Rule, ED ~~determines relief solely by comparing~~"impute[s]" to borrowers the median earnings of recent graduates of either the program the borrower attended—regardless of whether the borrower graduated or when the borrower attended the program—or of other "similar" programs. ED then determines the amount of relief it will award solely by comparing the earnings it imputed to the borrower against the median earnings of recent graduates in unspecified programs classified as similar to the program the borrower attended. The Rule does not take into account factors that ED is required to consider under governing regulations, such as the cost of the program for claims based on a substantial misrepresentation. The Rule also does not consider other factors, such as the reasonable expectation a borrower would have based on the school's representations, the number of students who drop out of the school, the range of incomes of the schools' graduates, geographical differences between schools, whether the comparison programs themselves engaged in predatory behavior, or the borrower's individual circumstances. Instead, the Rule uses earnings as the sole measure of the value of an education.

4.      The Partial Relief Rule adopts a flawed formula, providing borrowers with full debt relief only when the ~~median~~ earnings ~~data from their program~~ED imputes to them are two standard deviations below ~~that~~ the median earnings of comparison programs. The formula assumes that the data will fall along a normal distribution pattern, but the earnings data do not.

5.      Although ED refers to the methodology in the Partial Relief Rule as establishing a "rebuttable presumption," borrowers do not have the opportunity to "rebut" anything before ED issues a determination that, under the governing regulations, is "final as to the merits of the claim and any relief that may be granted on the claim" and removes their loans from forbearance. 34 C.F.R. § 685.222(e)(5). Borrowers get the opportunity to have individualized information considered only by invoking a reconsideration process that follows a final decision and that requires the borrower to provide new evidence that was not previously submitted to the agency.

6.      Because it adopts a formula that fails to account for relevant factors and does not actually measure the harm a student suffers as a result of a school's wrongful acts, ignores regulatory requirements, and applies an incorrect statistical test to unrepresentative and flawed data, the Partial Relief Rule is arbitrary, capricious, and contrary to law. *See* 5 U.S.C. § 706(2)(A). Moreover, the Partial Relief Rule was adopted without public consultation, a negotiated rulemaking, and notice and an opportunity for public comment, as required by the HEA, 20 U.S.C. § 1098a, and the APA, 5 U.S.C. § 553. Accordingly, the Court should vacate the Partial Relief Rule and relief determinations that were made pursuant to it.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction under 28 U.S.C. § 1331.

8.      Venue is proper in this district because defendant U.S. Department of Education resides in this judicial district, and because a substantial part of the acts or omissions giving rise to the claim occurred in this judicial district. 28 U.S.C. § 1391(c)(2), (e)(1).

## PARTIES

9.      Plaintiff Sammia Pratt is a natural person who resides in Apopka, Florida. ED applied the Partial Relief Rule in determining the amount of relief to afford Ms. Pratt on her successful borrower defense claim.

10.     Plaintiff Alicia Davis is a natural person who resides in Orlando, Florida. ED applied the Partial Relief Rule in determining the amount of relief to afford Ms. Davis on her successful borrower defense claim.

11.     Plaintiff Brittany Saulsberry is a natural person and an active duty member of the United States Navy. Her permanent residence is in Cedar Hill, Texas. ED applied the Partial Relief Rule in determining the amount of relief to afford Ms. Saulsberry on her successful borrower defense claim.

12.     Plaintiff Marisol Castillo is a natural person who resides in Dorchester, Massachusetts. Ms. Castillo has a pending meritorious borrower defense application within the scope of the Partial Relief Rule.

13.     Plaintiff Charlene Espada is a natural person who resides in Queens, New York. Ms. Espada has a pending meritorious borrower defense application within the scope of the Partial Relief Rule.

14.13.  Plaintiff Heather Bianchi is a natural person who resides in Lake Forest, California. Mrs. Bianchi has a pending meritorious borrower defense application within the scope of the Partial Relief Rule.

15.14.  Defendant Elisabeth DeVos is the Secretary of Education and charged with the supervision and management of all decisions and actions within the U.S. Department of Education. Plaintiffs sue Secretary DeVos in her official capacity.

~~16.~~15.  Defendant U.S. Department of Education is an agency of the United States within the meaning of the APA. It is responsible for overseeing and implementing rules for the federal student loan program.

## FACTS

### *Statutory Background*

~~17.~~16.  Title IV of the HEA, 20 U.S.C. § 1070 *et seq.*, establishes the largest stream of federal postsecondary student aid, including the Federal Family Education Loan (FFEL) and Direct Loan programs. Federal student loans are an important source of financing for individuals who otherwise would not be able to afford higher education.

~~18.~~17.  Under the FFEL program, private lenders issued student loans, which were then insured by guaranty agencies and in turn reinsured by the Department. 20 U.S.C. § 1078(b)–(c). As of July 1, 2010, no new loans can be made under the FFEL program.

~~19.~~18.  Under the Direct Loan Program, ED lends money directly to eligible student borrowers for use at "participating institutions of higher education selected by the Secretary of Education." 20 U.S.C. § 1087a(a).

~~20.~~19.  All schools that receive Title IV aid must enter into a Program Participation Agreement with ED. *See* 20 U.S.C. § 1094. The HEA provides that, unless otherwise specified, direct loans must have the same terms, conditions, and benefits as FFEL loans. 20 U.S.C. § 1087e(a)(1).

~~21.~~20.  In granting ED authority to implement Title IV, Congress mandated an unusual amount of public involvement. First, ED is required to involve the public "in the development of proposed regulations" under Title IV, including by obtaining the "advice of and recommendations from" individuals and groups "involved in student financial assistance programs" under Title IV.

6

20 U.S.C. § 1098a(a)(1). The Act then requires ED to submit draft regulations to a negotiated rulemaking process, unless the Secretary determines that doing so is "impracticable, unnecessary, or contrary to the public interest" and publishes a basis for that determination in the Federal Register. *Id*. § 1098a(b). After a negotiated rulemaking, ED must publish in the Federal Register for public comment any proposed rule on which negotiators reach consensus, or may publish a proposed rule developed by ED if negotiators do not reach consensus.

***Regulatory Background***

~~22.~~21.  Borrowers of FFEL and Direct Loans can assert a right to a discharge of their federal student loans on the basis of their school's misconduct—i.e., a borrower defense to repayment.

~~23.~~22.  By regulation, a holder of a FFEL loan is "subject to all claims and defenses that the borrower could assert against the school with respect to that loan" if a sufficiently close relationship existed between the school and the lender. 34 C.F.R. § 682.209(g).

~~24.~~23.  "[T]he right of FFEL borrowers to bring claims and defenses … was adopted from the FTC's Holder Rule provision." ED, Final Rule, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 81 Fed. Reg. 75926, 75956 (Nov. 1, 2016) (2016 Rule). "The Holder Rule requires certain credit contracts to include a contractual provision that establishes that the holder of such a contract is subject to all claims and defenses which the debtor could assert against the seller of the goods or services obtained with the proceeds of the contract." *Id*. at 75937.

~~25.~~24.  In 1993, Congress added a provision to the HEA that requires the Secretary of Education to "specify in regulations which acts or omissions of an institution of higher education

a borrower may assert as a defense to repayment of" direct loans. 20 U.S.C. § 1087e(h).

26.25.  Pursuant to this directive, in 1994, ED promulgated regulations relating to borrower defenses to repayment. Those regulations provided that, "in any proceeding to collect on a Direct Loan, the borrower may assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law." ED, Final Rule, William D. Ford Federal Direct Loan Program, 59 Fed. Reg. 61664, 61696 (Dec. 1, 1994) (1994 Rule).

27.26.  The 1994 Rule provided that, if "the borrower's defense against repayment" was successful, the Secretary would notify the borrower that the borrower was "relieved of the obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay." *Id*. The 1994 Rule also provided that the Secretary could afford the borrower additional relief—beyond extinguishing the obligation to repay the loan—if the Secretary determined such relief was appropriate under the circumstances. *Id*. The 1994 Rule was "based upon the right of FFEL borrowers to bring claims and defenses, which in turn was adopted from the FTC's Holder Rule." 2016 Rule, 81 Fed. Reg. at 75956.

28.27.  In 2016, ED promulgated new regulations "to establish a more accessible and consistent borrower defense standard and clarify and streamline the borrower defense process to protect borrowers and improve the Department's ability to hold schools accountable for actions and omissions that result in loan discharges." 2016 Rule, 81 Fed. Reg. at 75926.

29.28.  The 2016 Rule established a new standard for borrower defenses, providing that a borrower has a borrower defense if:

      a. "the borrower, whether as an individual or as a member of a class, or a governmental agency, has obtained against the school a nondefault, favorable

8

contested judgment based on State or Federal law in a court or administrative tribunal of competent jurisdiction," 34 C.F.R. § 685.222(b);

b. "the school the borrower received the Direct Loan to attend failed to perform its obligations under the terms of a contract with the student," *id*. § 685.222(c); or

c. "the school or any of its representatives … made a substantial misrepresentation in accordance with 34 CFR part 668, subpart F, that the borrower reasonably relied on to the borrower's detriment when the borrower decided to attend, or to continue attending, the school or decided to take out a Direct Loan," *id*. § 685.222(d)(1).

~~30.~~29.  The 2016 Rule provided that the new standards apply to direct loans first disbursed on or after July 1, 2017. *See id*. § 685.222(a)(2). The standard in the 1994 Rule—which looked to whether the school's acts or omissions "would give rise to a cause of action against the school under applicable State law"—continues to apply to direct loans first disbursed before July 1, 2017. *See id*. § 685.206(c)(1).

~~31.~~30.  In addition to containing standards for determining whether a borrower has a defense to repayment, the 2016 Rule also contained procedures for determining the amount of relief to award the borrower. *See id*. § 685.222(i). These procedures apply to borrowers who have asserted borrower defenses under the standard in the 1994 Rule as well as to borrowers who have asserted borrower defenses under the standards in the 2016 Rule. *See id*. § 685.206(c)(2).

~~32.~~31.  The regulations provide that the "official deciding the claim determines the appropriate amount of relief to award the borrower, which may be a discharge of all amounts owed to the Secretary on the loan at issue and may include the recovery of amounts previously collected by the Secretary on the loan, or some lesser amount." *Id*. § 685.222(i)(1). The regulations then

specify factors to be considered in determining the amount of relief to award to borrowers asserting borrower defenses. *Id*. § 685.222(i)(2).

~~33.~~32.  For a borrower defense brought on the basis of a substantial misrepresentation, the official deciding the claim must "factor the borrower's cost of attendance to attend the school, as well as the value of the education the borrower received, the value of the education that a reasonable borrower in the borrower's circumstances would have received, and/or the value of the education the borrower should have expected given the information provided by the institution, into the determination of appropriate relief." *Id*. § 685.222(i)(2)(i). The official may also consider other relevant factors. *Id*. "Value will be assessed in a manner that is reasonable and practicable," and a borrower "may be granted full, partial, or no relief." *Id*.

~~34.~~33.  For a borrower defense based on a judgment against the school, where "the judgment awards specific financial relief, relief will be the amount of the judgment that remains unsatisfied," subject to certain limits imposed by the regulations and other reasonable considerations. *Id*. § 685.222(i)(2)(ii). "Where the judgment does not award specific financial relief, the Department will rely on the holding of the case and applicable law to monetize the judgment." *Id*.

~~35.~~34.  Finally, for a borrower defense based on a "breach of contract, relief will be determined according to the common law of contracts," subject to certain limits imposed by the regulations and other reasonable considerations. *Id*. § 685.222(i)(2)(iii).

~~36.~~35.  On September 23, 2019, ED promulgated a rule regarding borrower defenses for repayment of loans first disbursed on or after July 1, 2020. *See* ED, Final Rule, Student Assistance General Provisions, Federal Family Education Loan Program, and William D. Ford Federal Direct

Loan Program, 84 Fed. Reg. 49788-01 (Sept. 23, 2019). That rule does not apply to any of the Plaintiffs.

***ED's Previous Positions on Relief Calculations***

37.36.  Before 2015, ED received relatively few borrower defense claims.

38.37.  At least as far back as October 2000, ED's Office of General Counsel (OGC) took the position that, in determining the appropriate relief for a borrower defense claim, ED was required to determine the amount of damages the borrowers could recover from the school under state law and then use that amount to offset their loan obligations.

39.38.  In 2015, Corinthian Colleges (Corinthian), a large for-profit college chain, closed after years of documented misconduct, leading to a flood of borrower defense claims. From the time ED began processing claims relating to Corinthian until January 2017, ED approved more than 25,000 borrower defense claims. ED granted a full discharge of the loans in all of the cases, as well as refunds of loan payments already made where applicable.

40.39.  On January 19, 2017, OGC issued a memorandum concluding that the amount of relief awarded should be based on the state law that gives rise to the legal claim.

41.40.  Later that year, on December 14, 2017, the Acting General Counsel issued a new memorandum setting out a different position: that the HEA and ED's regulations allow the Secretary to assess relief in her complete discretion.

42.41.  That same month, ED announced that it would use a tiered methodology for determining relief for certain categories of Corinthian students. *See Borrower Defense Relief Methodology for CCI Claims* (Dec. 15, 2017), https://www2.ed.gov/documents/press-releases/borrower-defense-relief-methodology-cci.pdf (Average Earnings Rule). Under the Average Earnings Rule, ED would compare the average earnings of borrower defense applicants

from the borrower's program to the average earnings of students at programs with the same Classification of Instructional Programs (CIP) code and credential level that had passing debt-to-earnings ratios under the Gainful Employment (GE) regulations. Only borrowers that had attended programs whose students earned less than half of students at similar GE-passing programs would receive a complete discharge. Otherwise, the Department would discharge only 10%-50% of borrowers' loans. Borrowers that had attended programs whose applicants earned on average 90% or more of those in the programs used as comparisons were afforded only a 10% discharge.

43.42.   Impacted borrowers challenged the Average Earnings Rule and sought a class-wide preliminary injunction. On May 25, 2018, the U.S. District Court for the Northern District of California found that the borrowers had demonstrated a likelihood of success on the merits on their argument that the Secretary of Education's implementation of the Average Earnings Rule violated the Privacy Act and was causing irreparable harm, and it enjoined ED from using the rule. *See Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077 (N.D. Cal. 2018).

***The Partial Relief Rule***

44.43.   On December 10, 2019, ED issued a memorandum adopting a new methodology for determining the amount of relief ED would afford certain borrowers with successful borrower defense claims (the Partial Relief Rule). *See* Exh. A.

44.    On August 4, 2020, ED issued a revised version of the December 10, 2019 memorandum, *see* Exh. E, with edits "for accuracy and clarity, including for technical corrections," *id*. at 1.

45.    ED did not undertake public consultation, negotiated rulemaking, or notice-and-comment procedures before adopting the Partial Relief Rule.

46.    The Rule applies to borrowers with successful borrower defense claims except for most claims based on Corinthian's misrepresentation of the rates at which its graduates were placed into jobs.

47.    The Rule purports to ascertain the "harm suffered by a successful [borrower defense] applicant as a result of the misconduct" that gave rise to the borrower defense claim by ~~comparing~~imputing to the borrower the median earnings of graduates of the program ~~a~~the borrower attended and then comparing the imputed earnings to the median of the median earnings of graduates of programs with the same 4-digit CIP code and credential level at other schools ("comparison programs"). Exh. A at 4, 5. In the revised memorandum, ED clarified that rather than using the median earnings of the specific program a borrower attended, under certain circumstances it may impute earnings data from a "similar" program.  Exh. E at 4.

48.    The Rule does not make clear whether the comparison programs are *all* programs with the same 4-digit CIP code and credential level at other schools, or a subset.

49.    For programs that are non-operational and for which there are 2014 earnings data as a result of the GE regulations, 34 CFR part 668, subpart Q, the Partial Relief Rule looks to the GE earnings data to determine both the borrower defense applicant's program earnings and the earnings for the comparison programs. For programs ~~for which there are no 2014 earnings data, the methodology uses~~that are operational, for which there are 2014 GE earnings data, and for which there are no other publicly available data, ED will use the 2014 GE earnings data. For programs for which there are no 2014 GE earnings data, ED will use "earnings data from other publicly available sources," such as "data currently being disclosed on the Department's website as part of the College Scorecard." Exh. ~~A~~E at ~~7~~8. For programs ~~that are operational, the methodology uses the most recent~~for which both GE and College Scorecard data~~.~~ are available at

the 4-digit CIP code level, ED will use the College Scorecard data if the borrower was enrolled in the program on or after the date the College Scorecard was implemented.  Otherwise, the 2014 GE data will be used.

50.     For programs for which there are no earnings data for the credential or at the 4-digit CIP level, ED "will use earnings from graduates of similar programs based on the 4-digit CIP code, but at the next highest credential level to impute borrower and comparison group earnings."  *Id*. at 8–9. "If sufficient data are not available to make that determination, then the Department will review program level outcomes for other programs offered by the institution (and the relevant comparison group) using the 2-digit CIP code and credential level (or the next higher credential level if available, and, if not, the next lower credential level)." *Id*. at 9.

50.51.  Under the methodology prescribed in the Partial Relief Rule, ED does not afford any relief to borrowers with successful borrower defense claims who attended non-Corinthian schools if the median earnings of graduates ofED imputes to the programs they attendedborrowers are equal to or exceed the median of the median earnings of graduates of comparison programs. *See* Exh. A at 6.

51.52.  ED grants borrowers who attended Corinthian institutions and filed their borrower defense applications by November 12, 2019, only 10% relief on their successful borrower defense claims if the median earnings of graduates ofED imputes to the programs they attendedborrowers are equal to or more than the median of the median earnings of graduates of comparison programs. *See* Exh. A at 6, 13. ED affords such borrowers no relief if they did not file their claims by November 12, 2019. *See id*. at 13.

52.53.  ED grants borrowers 25, 50, or 75 percent relief if the median earnings of graduates ofED imputes to the programs they attendedborrowers are less than the median of the median

14

earnings of graduates of comparison programs but greater than two standard deviations below the median of the median earnings of the comparison programs. Whether ED grants 25, 50, or 75 percent relief depends on how far the ~~median~~ earnings ~~of graduates of their program~~ED imputes to the borrowers fall below the median of the median earnings of comparison programs. If the ~~median~~imputed earnings ~~of graduates of the borrower's program~~ are less than .67 standard deviations below that of comparison programs, the borrower receives 25% relief; if they are between .67 and 1.33 standard deviations below, the borrower receives 50% relief; and if they are between 1.33 and 2 standard deviations below, the borrower receives 75% relief. *See* Exh. A at 6; Exh. B (ED calculations for Corinthian programs).

~~53.~~54.  ED grants full relief to borrowers on their successful borrower defense claims only if the ~~median~~ earnings ~~of graduates of~~it imputes to the ~~programs they attended~~borrowers are two standard deviations below the median of the median earnings of the comparison programs. *See* Exh. ~~A~~E at ~~3~~4.

~~54.~~55.  In December 2019, ED provided charts applying the Rule to Corinthian programs and programs at ITT Educational Services, Inc. (ITT). *See* Exh. B; Exh. C (ED calculations for ITT programs). Of 150 Corinthian programs for which ED provided calculations, only borrowers that had attended three programs qualified for full relief. *See* Exh. B. No ITT borrowers qualified for full relief. *See* Exh. C.

~~55.~~56.  For many programs, earnings two standard deviations below the median of the median earnings of the comparison programs would be below the annual earnings of a full-time minimum-wage worker. *See* Exh. B. Thus, borrowers who attended those programs would not receive full relief on their borrower defense claims unless the median earnings of graduates of the

program they attended (or of the other programs whose earnings ED imputed to them) was below the minimum wage.

56.57.  For some programs, including almost 40% of the Corinthian programs for which ED provided data in December 2019, earnings two standard deviations below the median of the median earnings of the comparison programs would be a negative number. *See* Exh B. Thus, no matter how little value students received from those programs, ED would award full relief to borrowers who attended those programs only if the median earnings of graduates of the program (or of other programs whose earnings ED imputed to the borrowers) were negative—a mathematical impossibility.

57.58.  In justifying the Rule, ED stated that, "[i]n a normal distribution, approximately 68% of the data points in the sample will fall within one standard deviation above and one standard deviation below the median" and "[a]pproximately 95% of all data points in the sample will fall within two standard deviations from the median," and that "[t]herefore, median earnings at or below the earnings that are two standard deviations from the median should result in full relief to successful BD applicants since it is at this point where differences between data points is considered to be statistically significant." Exh. A at 6.

58.59.  ED did not acknowledge that median earnings of graduates of higher education programs do *not* fall within normal distributions.

59.60.  Under basic statistical principles, the two-standard-deviation approach is not appropriate given this fact.

60.61.  ED also ignored that the standard deviation is based on the mean of a group of numbers. The Partial Relief Rule does not acknowledge this fact, nor does it explain why ED

selected median earnings instead of mean earnings or how that selection affects the appropriateness of the standard deviation formula.

61.62.  The Partial Relief Rule states that it "focus[es] on the harm that is actually attributable to the program the applicant was enrolled in by comparing earnings information for that program to a group of similar comparable programs offered by other institutions that the applicant might have otherwise attended." Exh. A at 4.; Exh. E at 6. However, the Partial Relief Rule does not take into account or acknowledge a number of factors that are important to determining the amount of harm a student borrower suffered as a result of a school's wrongful acts or omissions, nor does it explain why these factors are not important to consider.

62.63.  The Partial Relief Rule does not take into account whether the borrower would have attended any program at all absent the school's wrongful behavior and, thus, whether the borrower would have incurred any student loan debt absent that behavior.

63.64.  The Partial Relief Rule does not take into account the cost of the program the borrower attended, either on its own or in comparison to the cost of the comparison programs.

64.65.  The Partial Relief Rule does not take into account the value of the education the borrower received as compared to the value of the education a reasonable borrower would have expected to receive given the representations made by the school.

65.66.  The Partial Relief Rule does not take into account the amount the borrower would have earned without enrolling in the program and whether or not the program increased the borrower's potential earnings.

66.67.  The Partial Relief Rule does not take into account any facts specific to a borrower, such as whether a borrower was able to obtain employment in her field after completion of the

program or whether the borrower was able to earn a greater income because of the program compared to the borrower's pre-program income.

67.68.  The Partial Relief Rule also does not take into account or acknowledge a number of additional factors that might cause graduates of a program to have higher incomes than graduates of comparison programs—or at least higher than two standard deviations below that of comparison programs—that are not a sign of the program's value, nor does it explain why the methodology it adopts is appropriate in light of these factors.

68.69.  The Partial Relief Rule does not take into account or acknowledge the existence of federal, state, or local minimum wages that set a floor for earnings.

69.70.  The Partial Relief Rule does not take into account or acknowledge the fact that comparison programs may themselves have engaged in predatory behavior or lack educational value thus making a comparison to those groups a poor indicator of whether a program has educational value.

70.71.  The Partial Relief Rule acknowledges that "median earnings could differ based on the part of the country in which graduates are employed, the socioeconomic level of students prior to enrollment, the age and gender of the students (which could influence the likelihood that graduates would choose part-time work over full-time work) or the selectivity of the institution," Exh. A at 6, but does not take any of these factors into account in its earnings comparison.

71.72.  The Partial Relief Rule does not take into account or acknowledge a number of factors that ED is required by regulation to consider in determining the appropriate amount of relief to award a borrower, nor does it explain why ED ignores these factors.

72.73.  Although the 2016 Rule required an official deciding a borrower defense based on a substantial misrepresentation to factor in the borrower's cost of attendance to attend the school, the Partial Relief Rule does not take the cost of attendance into account.

73.74.  Although the 2016 Rule required an official deciding a borrower defense based on a judgment against the school to consider the financial relief awarded by the judgment or, if no specific financial relief is awarded, the holding of the case and applicable law, the Partial Relief Rule does not take these factors into account.

74.75.  Although the 2016 Rule required an official deciding a borrower defense based on a breach of contract to determine relief according to the common law of contracts, the Partial Relief Rule does not take the common law of contracts into account.

75.76.  Moreover, although ED long understood the standard in the 1994 Rule to require it to look to state law to determine relief for a successful borrower defense claim, the Partial Relief Rule does not take state law into account. And although the 1994 Rule provided that a borrower with a successful borrower defense claim would be relieved of the obligation to repay "all or part of the loan," the Partial Relief Rule will result in many borrowers whose loans originated before July 1, 2017 receiving no relief on their claim.

76.77.  The Partial Relief Rule does not look at the earnings of the student borrower claimant. Instead, it "impute[s]" to borrowers the median earnings of graduates of the program they attended, or other "similar" programs, generally without regard to when they attended the program or which campus they attended. The Partial Relief Rule does not include any analysis of the spread of earnings at a program. Moreover, it ignores many reasons why the median earnings of graduates of the program a borrower attended are not a reasonable proxy for a particular borrower's earnings or the earnings the school prepared the borrower to receive. For example, it

19

ignores that, by definition, half of graduates earn less than the median and that not all students at a school are necessarily harmed to the same degree by a school's wrongful behavior.

77.78.  The Partial Relief Rule looks only at the earnings of graduates of the borrower's program, (or the other programs whose earnings ED imputes to the borrower), instead of all people who attended the program. This introduces a selection bias into the data because many people who are affected by a school's predatory behavior drop out of the program when they realize how little value they are receiving. For example, according to data from the Integrated Postsecondary Education Data System (IPEDS), the median reported graduation rate across all ITT campuses in 2015 was about 33%, meaning that only one out of every three students who started a program at ITT finished it.

78.79.  The earnings data used by the Partial Relief Rule is also not representative of all borrowers because the Rule looks only at the most recent earnings data available for the program (for College Scorecard data) or to 2014 data (for GE data), but a borrower may have attended the program many years ago.

79.80.  Moreover, for a large number of programs, the Partial Relief Rule does not take into account any data related to the particular program the borrower attended in determining how much relief to award a borrower. In spreadsheets it released in December 2019, ED indicated it lacked data for 90 Corinthian programs and 3 ITT programs. *See* Exh. B; Exh. C. Similarly, according to the technical documentation for the College Scorecard data, median earnings for over 70% of fields of study are suppressed for privacy reasons and therefore not reportable to the public. *Technical Documentation: College Scorecard Data by Field of Study* (Nov. 20, 2019), at 7, https://collegescorecard.ed.gov/assets/FieldOfStudyDataDocumentation.pdf.  Under the Partial Relief Rule, when ED lacks earnings data for a program, it will use earnings data of graduates of

other programs with the same 4-digit CIP code but at the next highest credential level. The earnings data of a program that a borrower did not attend does not measure the value of the program the borrower did attend.

80.81.  The Partial Relief Rule fails to acknowledge ED's own statements that the "earnings portion" of the GE data was "subject to significant errors," ED, Final Rule, Program Integrity: Gainful Employment, 84 Fed. Reg. 31392, 31409 (July 1, 2019), or explain why it is nonetheless appropriate data to use for determining relief for borrower defense claimants.

**The Finality of Determinations Under the Partial Relief Rule**

81.82.  Although the Partial Relief Rule claims to set forth a "rebuttable presumption," Exh. A at 5, under governing regulations, the determination based solely on the earnings comparison is "final as to … any relief that may be granted on the claim," 34 C.F.R. § 685.222(e)(5), and puts any remaining balance on the loan back into repayment.

82.83.  The Partial Relief Rule does not provide borrowers with the opportunity to challenge the determination based solely on the earnings comparison before receiving the determination. The only method the Partial Relief Rule provides for challenging the amount of relief awarded pursuant to the earnings-based methodology is through the reconsideration process described in 34 C.F.R. § 685.222(e)(5)(i). *See* Ex. A at 5. That reconsideration process follows a final determination. *See* 34 C.F.R. § 685.222(e)(5).

83.84.  The reconsideration process requires the "identification of new evidence in support of the borrower's claim," which is defined as "relevant evidence that the borrower did not previously provide and that was not identified in the final decision as evidence that was relied upon for the final decision." *Id*. § 685.222(e)(5)(i). However, because the agency tells borrowers to include information about the harm they experienced in their initial borrower defense application,

borrowers will seldom have "new evidence" to support reconsideration and may never have the opportunity to have their individual information about harm considered in the calculation of their relief.

84.85.  When ED receives a borrower defense application from a borrower who is not in default, it grants forbearance on the loan for which the borrower defense has been asserted. *Id*. § 685.222(e)(2)(i). If the loan is in default, ED stops collection activity. *Id*. § 685.222(e)(2)(ii)(A). When ED makes a determination that is final under 34 C.F.R. § 685.222(e)(5), if ED does not make a full discharge, a loan that is not in default is taken out of forbearance and collection activity can begin on a loan that is in default. Thus, if ED awards a borrower less than full relief under the methodology in the Partial Relief Rule, the borrower's loan will be taken out of forbearance or taken out of stopped collection before the borrower has the opportunity to "rebut" the determination.

85.86.  ED has been informing borrowers who receive determinations based on the Partial Relief Rule's methodology that it "will not place your federal student loans into forbearance or stopped collection activity when you file a request for reconsideration." *See* Exh. D (sample determination). Accordingly, once ED issues a determination based on the methodology in the Partial Relief Rule, the borrower's loan will remain in collection based on that determination even if the borrower moves for reconsideration.

***The Impact of the Partial Relief Rule on the Named Plaintiffs***

<u>Sammia Pratt</u>

86.87.  Plaintiff Sammia Pratt attended the for-profit school Florida Metropolitan University (FMU), which later became Everest University – North Orlando, from 2000 to 2003. FMU was owned and operated by Corinthian.

87.88.  Ms. Pratt began her higher education at Clark Atlanta University as the first person in her family to attend college. However, by her sophomore year, she struggled to afford tuition fees and she returned home to Florida to study biology at the University of Central Florida (UCF).

88.89.  Because she was working two jobs to support herself, after less than a year at UCF, Ms. Pratt decided to temporarily leave UCF to seek out a distance learning option. After seeing advertisements promising strong remote learning opportunities for FMU's online program, she transferred to FMU. She planned to complete several core credits required for her degree and ultimately transfer back to UCF to complete her bachelor's degree.

89.90.  FMU made numerous false representations to Ms. Pratt when she enrolled. FMU "enrollment specialists" assured her that its programs were fully accredited and that credits would "easily" transfer back to UCF or other Florida schools. FMU representatives also promised job placement services with corporate partners if she completed her degree with FMU. Ms. Pratt continuously corresponded with program directors while studying at FMU, who continued to falsely represent her ability to transfer credits.

90.91.  After taking out thousands of dollars in student loans to attend FMU, Ms. Pratt sought to transfer the credits she had completed back to UCF. She quickly learned that FMU did not have the type of accreditation that allows credits to be generally transferrable and that her FMU credits would not transfer to UCF or other schools. UCF told her that she would have to simply start over. When she complained to FMU, she was assured that "forthcoming" accreditation changes would allow her credits to transfer.

91.92.  Having already invested so much time and money, and unable to transfer her credits, Ms. Pratt decided to continue studying at FMU. FMU did not have a degree program in biology, but it offered to apply her core math and other credits to an accounting associate degree.

FMU told her that an associate degree would be more valuable because she could transfer the degree to another school. This turned out to be false; UCF and other area schools would not accept any FMU credits toward a bachelor's degree. Feeling that she had no other options, Ms. Pratt completed her associate degree in accounting at FMU in 2002 and graduated with a bachelor's degree in 2003.

92.93.  After Ms. Pratt graduated, it quickly became apparent that FMU would not provide her meaningful assistance in finding a job. Although FMU routinely advertised specific corporate partnerships and promised job placement services, FMU career counselors simply directed her to publicly available job search websites.

93.94.  Ms. Pratt found that employers did not want to hire her because they did not believe that FMU was accredited or that her degree had any value. Ultimately, she reached out to temp agencies—including agencies that she had worked with in high school and college to find odd jobs—in order to find short-term opportunities. Ms. Pratt worked several temp jobs over the next few years, some of which were in the accounting field, and some of which were not. Eventually, by her own initiative and with no help from FMU, she was put in touch with a small law firm and began working as a bookkeeper.

94.95.  Ms. Pratt initially borrowed over $25,000 to attend FMU. Because she could not find stable work after graduation, she could not afford to make meaningful dents on her loan balance, and interest has continued to accrue.

95.96.  Years later, Ms. Pratt sought to obtain a master's degree. Most schools, believing that she had not met the prerequisite of having a valid bachelor's degree, would not even consider her application. Eventually, after questioning her about FMU's accreditation, Nova Southeastern University accepted her solely based on her work experience. Nova Southeastern representatives

told her that FMU was not on the same "level" as other schools and that she would need to demonstrate additional qualifications to enroll in a master's degree program. She studied accounting at Nova Southeastern and graduated with a master's degree in 2008.

96.97.  Ms. Pratt found that potential employers were skeptical and concerned about her qualifications because she attended FMU. Eventually, she removed FMU from her LinkedIn profile. As a result of her significant efforts, and in spite of her FMU degree, Ms. Pratt ultimately found business analytics work. However, Ms. Pratt remains in significant debt on her FMU loans. She is the primary income earner in her household and is financially responsible for four children.

97.98.  Ms. Pratt submitted a comprehensive defense to repayment application (DTR) to ED in November 2015. Her DTR explained in detail FMU's misrepresentations regarding job placement, accreditation, credits transfer, and cost of the program.

98.99.  ED's Borrower Defense Unit (BDU) has recognized that Corinthian-operated Everest campuses "consistently misled prospective students about the transferability of credits earned at their campuses," and that "Everest's misrepresentations regarding the transfer of credits constitute 'unlawful' and 'fraudulent' business practices'" under the applicable state law. Memo from Borrower Defense Unit to Under Secretary Ted Mitchell RE: Recommendation for Everest/WyoTech Borrowers Alleging Transfer of Credit Claims (Oct. 24, 2016), at 1, 11. "Given the lack of value conferred by Everest credits and/or degrees," the BDU concluded that full borrower defense relief was appropriate for borrowers who attended Corinthian-operated Everest Campuses, including FMU, and who alleged that Corinthian misrepresented the transferability of credits. *Id*. at 10.

99.100.          Likewise, the BDU has recognized that Corinthian consistently made false and misleading representations "that all graduates obtained jobs after graduation or, relatedly, that

its students were guaranteed employment after graduation," and that these misrepresentations constitute unlawful or fraudulent business practices under applicable state law. Memo from Borrower Defense Unit to Under Secretary Ted Mitchell RE: Recommendation for Corinthian Borrowers Alleging That They Were Guaranteed Employment (Jan. 9, 2017), at 1, 8. The BDU recommended full relief for students enrolled at Everest Campuses who alleged that they were promised, guaranteed, or otherwise assured that they would receive a job upon graduation, or that all graduates obtain employment. *Id*. at 1.

~~100.~~101.    In February 2020, ED granted Ms. Pratt's DTR. Despite the detailed evidence of FMU's fraud and misrepresentation, ED granted Ms. Pratt only 10% relief on her federal student loans. ED acknowledged that she stated a claim that entitled her to relief, but, applying the Partial Relief Rule, ED awarded her only this minimal relief. The percentage of relief that ED provided to Ms. Pratt was the same percentage provided to all successful borrower defense claimants who attended her accounting program at Corinthian schools, regardless of the year or campus they attended.

<u>Alicia Davis</u>

~~101.~~102.    Plaintiff Alicia Davis attended FMU from 2006 to 2008. During her time at the school, FMU rebranded as Everest College. Ms. Davis studied for her bachelor's degree in the online criminal justice program.

~~102.~~103.    Ms. Davis first learned about FMU from seeing an advertisement. After she called FMU to ask about its degree programs, a representative presented a high-pressure sales pitch that entailed many false promises. Ms. Davis was optimistic that attending FMU would allow her to pursue her dreams. It never occurred to her that a school would lie to her.

~~103.~~104.        FMU made a number of misrepresentations to Ms. Davis. Among another things, representatives of FMU falsely represented that she would be able to get a job "anywhere" with a criminal justice degree, and specifically told her that she could get a job as a crime scene investigator, alluding to the television series "CSI," with a degree from the criminal justice program alone. FMU also told her that she would earn at least $35,000 annually, and that she would have "no problem" transferring credits.

~~104.~~105.        FMU representatives made further misrepresentations about the loans that Ms. Davis needed to take out. They told her that the cost of the program would be covered by Pell Grants and the remaining amount would be covered by scholarships the school offered. Pressured to enroll quickly, Ms. Davis was unaware that she was agreeing to borrow and repay federal loans when she filled out the paperwork provided by the financial aid office. Ultimately, Ms. Davis borrowed approximately $22,350 in FFEL loans to attend FMU.

~~105.~~106.        After Ms. Davis took classes for two years, FMU informed her that she could not remain enrolled unless she took out more loans. She could not afford to pay additional loans and had to withdraw.

~~106.~~107.        After it became clear that FMU had lied to her, Ms. Davis decided to start over. She earned an associate degree from Valencia Community College and a bachelor's and master's degree from UCF. Her credits from FMU did not transfer to these programs.

~~107.~~108.        Ms. Davis currently works as a contractor doing security analysis work. She was able to get this job in spite of her time at FMU, and only because of her other degrees. She does not list FMU on her resume and does not discuss it during job interviews.

108.109.      Ms. Davis currently owes about $37,000, including interest, on her FFEL loans from FMU. She has been unable to pay back these loans and fell into default in or around February 2016. ED has since threatened her with wage garnishment.

109.110.      Ms. Davis's debt from FMU has significantly affected her life. It has ruined her credit, leaving her unable to get an auto loan or a mortgage. Because of her credit history, she is also unable to get contract work with the federal government.

110.111.      Ms. Davis submitted a comprehensive DTR to ED in June 2016. Her DTR explained in detail FMU's misrepresentations regarding job placement, salary, accreditation, credits transfer, and cost of the program.

111.112.      In March 2020, ED granted Ms. Davis's DTR. Despite the detailed evidence of FMU's fraud and misrepresentation, ED granted Ms. Davis only 10% relief on her federal student loans. ED acknowledged that she stated a claim that entitled her to relief, but, applying the Partial Relief Rule, it awarded her only this minimal relief. The percentage of relief that ED provided to Ms. Davis was the same percentage provided to all successful borrower defense claimants who attended her criminal justice program at Corinthian schools, regardless of the year or campus they attended.

<u>Brittany Saulsberry</u>

112.113.      Plaintiff Brittany Saulsberry attended Everest College – Dallas from 2008 to 2009 and Everest College Phoenix – Online from 2009 to 2012.

113.114.      Ms. Saulsberry grew up in a low-income neighborhood in Dallas, Texas. She first learned about Everest College when it sent recruiters to speak at her high school. She recalls an Everest representative pitching the school as a "way out" of difficult circumstances for low-income students and promising that they would get jobs if they attended Everest.

114.115.    After finishing high school in 2006, Ms. Saulsberry joined the United States Navy. In 2008, she returned to the Dallas area as a reservist and began working as a security guard. She decided that she wanted to attend college.

115.116.    Ms. Saulsberry decided to reach out to Everest after seeing more of their advertisements promising accredited degrees and good jobs.

116.117.    When she spoke to representatives from Everest, they pitched the school to her as a "military-friendly" school. Everest representatives told her that she would receive military grants and that she would not have to take out private loans in order to attend. Everest representatives also promised her extensive career counseling and job placement guarantees.

117.118.    Ms. Saulsberry signed on quickly and was not given copies of much of the financial paperwork that she signed. She ultimately, without her awareness, took out numerous private loans in addition to federal loans.

118.119.    Ms. Saulsberry studied for her first year in a medical assistant degree program at Everest's campus in Dallas. During that time, several Everest counselors assured her that credits could be transferred to other schools.

119.120.    After a year, Ms. Saulsberry decided to continue her education with an online program. However, she quickly found out that Everest credits would not transfer to other (non-Everest) schools. She was told that credits from her first year would only fully transfer to Everest's online program in Phoenix. Not wanting to give up, she continued her education in that program, which was even more expensive than the in-person Dallas campus. She had to take out more loans to continue taking classes.

120.121.    Ms. Saulsberry studied in the Everest – Phoenix online program from 2009 to 2012. Because the medical assistant program was not available online, she switched

29

concentrations of study to the business program. She was called from the Reserves to active duty in 2011 and was deployed in Afghanistan the majority of that year.

121.122.     Ms. Saulsberry was unable to find a job in her field after graduating from Everest and coming off of active duty. Contrary to promises made by Everest, career services provided her with no job placement assistance and no connections. Solely by her own initiative, she found jobs as a postal worker and a teaching assistant in an unrelated field. It became clear to Ms. Saulsberry that Everest's program did not teach her the skills necessary to work in her field.

122.123.     In 2016, Ms. Saulsberry submitted a comprehensive DTR to ED. Her DTR explained in detail Everest's misrepresentations regarding job placement, accreditation, and cost of the program.

123.124.     Ms. Saulsberry paid off her private loans in full while deployed in Afghanistan. However, she currently has tens of thousands of dollars in federal student loans remaining, including interest, in connection with attending Everest.

124.125.     Today, Ms. Saulsberry is again serving on active duty with the Navy. Her student debt from Everest has worsened her credit and made it substantially more difficult for her to plan her financial future.

125.126.     In December 2019, ED granted Ms. Saulsberry's DTR. Despite the detailed evidence of Everest's fraud and misrepresentation, ED granted her only 25% relief on her federal student loans. ED acknowledged that she stated a claim that entitled her to relief, but, applying the Partial Relief Rule, it awarded her only this minimal relief. The percentage of relief that ED provided to Ms. Saulsberry was the same percentage provided to all successful borrower defense claimants who had attended her business program at Corinthian schools, regardless of the year or campus they attended.

<u>Marisol Castillo</u>

~~126.~~127.     Plaintiff Marisol Castillo attended the for-profit school Salter College in Malden, Massachusetts from 2007 to 2009.

~~127.~~128.     In early 2007, Ms. Castillo was working at GateGourmet/Aramark, making a modest income. She had heard that medical billing and coding was a good job and that people could sometimes work from home. She decided to call Salter, and a representative told her to come to the school to visit and learn more.

~~128.~~129.     When she visited Salter, she was told that they had a "health claims specialist" program that prepared students for medical billing and coding. They told her that the key part of the program was the externship, and that she would be placed in an externship with a local employer where she would get practical, hands-on training and real-world experience in medical billing and coding. They assured her that as long as she did a good job at the externship, she would be hired by that company. If the company was not hiring, they assured her that they would get her a job in the area through their network of partners.

~~129.~~130.     Salter representatives pressured Ms. Castillo to enroll immediately. They told her that she would earn a better salary in the medical billing and coding field than she had been earning at GateGourmet/Aramark, and she agreed to enroll within a day.

~~130.~~131.     When Ms. Castillo began studying at Salter, it became clear that the program was not teaching her what she needed to know in order to succeed. Although medical billing and coding largely involves work on computers, Ms. Castillo's classes did not provide much opportunity to use computers. Nonetheless, she worked hard and taught herself from the information that was available.

131.132.     When the time came for an externship, Salter did not place her at a medical billing and coding-related externship. Instead, she was placed at a community health center, where her only task was filing papers. She did not even have an opportunity to observe medical billing and coding.

132.133.     During the unpaid "externship," Ms. Castillo repeatedly contacted Salter to explain that her placement was not related to medical billing and coding. She was told that there were no openings for medical billing and coding, and to continue with the externship that she had or she would not receive her diploma. Salter never found her a different externship option in her field.

133.134.     Ms. Castillo's externship never offered her a job. Salter did not help her find a position doing medical billing and coding work, and although she looked for jobs in the field and contacted companies that were hiring on her own, she was not successful. Ms. Castillo has never worked in the medical billing and coding field.

134.135.     After she completed the Salter program, Ms. Castillo returned to work full time at GateGourmet/Aramark. She did not get a raise as a result of her Salter education.

135.136.     Ms. Castillo took out thousands of dollars in direct loans to attend Salter that she cannot afford to repay. Ultimately, her loans went into default and the government seized approximately $6,000 from her tax refunds. The effect of Ms. Castillo's debt from Salter on her and her family has been devastating. In the past year, she earned money driving for rideshare services like Uber and Lyft, but has been unable to find work due to the COVID-19 pandemic. She is currently unemployed.

136.137.     In December 2014, Massachusetts sued Salter and its parent company (collectively, Salter) for violations of the state Consumer Protection Act, Mass. Gen. Laws c. 93A.

Massachusetts alleged that Salter, among other things: misrepresented itself as "selective" when it was an open enrollment school; published job placement rates above 80% when the actual placement rates were materially lower; promised job placement services of value, but simply directed students to publicly available sources; and failed to fulfill promises to find students externships and place students at externships that led to employment. The case resulted in a consent judgment enjoining Salter's fraudulent conduct and requiring Salter to pay over $3.5 million toward student debt cancellation. In July 2019, Salter agreed to a settlement with the Massachusetts Attorney General's Office banning the company from operating or recruiting students in Massachusetts and granting an additional $1.6 million in student debt relief. Ms. Castillo did not receive any relief from the consent judgment or settlement.

137.138.      Ms. Castillo submitted a complaint about Salter to the Massachusetts Division of Professional Licensure (DPL) in 2015. An investigator sent a letter of inquiry to Salter regarding Ms. Castillo's externship experience. The DPL investigator interviewed personnel at her externship site, who acknowledged that the site did not perform or hire for any medical billing and coding work.

138.139.      In 2018, Ms. Castillo submitted a comprehensive DTR to ED. Her DTR explained in detail Salter's misrepresentations regarding job placement, particularly its misrepresentations about its externship program that induced her to enroll. The details in her DTR established that Salter violated Massachusetts consumer protection laws with respect to her. Moreover, the Massachusetts investigation and consent judgment demonstrate that Ms. Castillo has a meritorious borrower defense claim.

139.140.        Ms. Castillo has yet to receive a decision on her DTR. Given how few

borrowers receive complete relief under the Partial Relief Rule, ED is unlikely to award Ms.

Castillo full relief when it applies the Rule to her.

Charlene Espada

140.    Plaintiff Charlene Espada attended the for-profit school Sanford Brown Institute

(SBI) in New York, New York from 2005 to 2007.

141.    Before attending SBI, Ms. Espada worked as a project assistant at the Radiation

Oncology Department at NYU Medical Center. She first visited SBI with a co-worker who had

made an appointment to learn about its programs. When Ms. Espada visited SBI, she met with

several "advisors," who assured her that SBI was fully accredited. They also told her that course

credits from SBI would be transferable to other schools, in case she wanted to complete her

bachelor's degree elsewhere.

142.    SBI's advisors promised Ms. Espada that she would get a high paying job in the

diagnostic medical ultrasound field when she graduated and passed the board exam. They also

promised job placement services. When Ms. Espada told them that she was a single mother, they

responded that they knew being a single mother in an expensive city like New York was hard, but

that her life would become much better if she got a degree from SBI. They told her that her

daughter would look up to her.

143.    Ms. Espada completed the entire process of enrollment in SBI that evening. She

had to take out both federal and private student loans to pay for school. The SBI financial officer

told her that she did not qualify for private loans on her own, so she asked her mother to co-sign

those loans.

144.    The program at SBI did not teach Ms. Espada the necessary skills to work in her field. Classes were not challenging; professors would tell students the questions on the exams beforehand so that they would pass.

145.    SBI failed to place Ms. Espada in an externship at the end of her program. Ms. Espada reached out to her former employer, NYU Medical Center, to secure her own externship. Because she could not work a paying job during this externship, she had to leave her daughter with her mother in Florida.

146.    Ms. Espada did not get a job offer from NYU to work in her field after completing the externship. She found that she often could not answer questions that the technicians asked her, while students from similar programs at NYU and other schools were well-prepared. She felt embarrassed by how little she knew after taking classes at SBI.

147.    Worse still, during her externship Ms. Espada learned that her SBI program lacked accreditation with the American Registry for Diagnostic Medical Sonography. This meant that she was not eligible to take the board certification exam upon graduation. Instead, to take the exam, she would need to work a full year in the field. This left Ms. Espada in a "catch-22": she could not become certified without a full year of work, but no one in the field would hire her without certification.

148.    SBI never assisted Ms. Espada with job placement. When she contacted the career office, they did not provide her with any resources or a contact list of employers.

149.    Unable to find work in sonography, over the next several years, Ms. Espada worked several jobs as a secretary. She gave up looking for sonography jobs altogether, and removed SBI from her resume to avoid embarrassing discussions with employers.

150.   Ms. Espada ultimately decided to go back to school in Florida in 2009 for a certification in practical nursing. When she did so, she tried to have her SBI credits transferred to the College of Central Florida, but found out that they were not transferrable.

151.   Ms. Espada became a licensed practical nurse in 2011 and a registered nurse in 2019. She now works as a nurse at a hospital in Brooklyn, New York.

152.   Ms. Espada currently owes over $16,000 in federal student loans and tens of thousands more in private loans in connection with her SBI attendance. Her SBI debt has ruined her credit and made it difficult for her to get an auto loan, a credit card, and rent an apartment. She remains financially responsible for her daughter, who is now a college student.

153.   The Office of the New York Attorney General (OAG) conducted a thorough investigation into the misconduct of Career Education Corporation (CEC), SBI's parent company, at SBI schools. In 2013, the OAG announced a $10.25 million settlement with CEC over repeated violations of New York state consumer protection laws.

154.   Among other things, the OAG determined that SBI regularly presented false and misleading information to prospective and current students concerning programmatic accreditation, specifically with reference to the diagnostic medical ultrasound program. Consistent with Ms. Espada's experience, the OAG determined that SBI failed to disclose that its program was not accredited, and that graduates routinely faced "catch-22" situations just like the one Ms. Espada found herself trapped in, where they could neither find work nor obtain certification. The OAG concluded that graduates "were highly unlikely to obtain employment." The OAG also concluded that SBI falsely inflated its job placement rates, and lured prospective students in using incorrect data.

155.   In August 2018, Ms. Espada submitted a comprehensive DTR to ED. Her DTR explained in detail SBI's misrepresentations regarding job placement and accreditation, which led her to enroll and ultimately caused her to become unemployed with tens of thousands of dollars of debt. The details in her DTR established that SBI violated New York consumer protection laws with respect to her. Moreover, the OAG's investigation and findings demonstrate that Ms. Espada has a meritorious borrower defense claim.

156.   Ms. Espada has yet to receive a decision on her DTR. Given how few borrowers receive complete relief under the Partial Relief Rule, ED is unlikely to award Ms. Espada full relief when it applies the Rule to her.

### Heather Bianchi

~~157.~~141.   Plaintiff Heather Bianchi attended the for-profit school Art Institute of California – San Diego from 2007 to 2011, and Art Institute of California – Orange County from 2011 to 2014.

~~158.~~142.   Mrs. Bianchi grew up in Highland, New York. She was an artist from a young age and never had any doubt that she wanted to go into the arts for a living.

~~159.~~143.   When Mrs. Bianchi began looking into colleges, she considered Art Institute because of representations the school made about high job placement statistics. She believed that attending Art Institute would prepare her for a successful career upon graduation. When she spoke over the phone to Art Institute representatives, they boasted about job placement ratings, the ease of repaying loans, short degree programs, and student success stories. They also assured her that Art Institute career services would place her in her "dream job."

~~160.~~144.   Enrolling at Art Institute was a high-pressure process. Representatives told Mrs. Bianchi that she needed to urgently enroll to secure a spot, and she and her mother quickly

flew across the country to California to sign paperwork. During enrollment, she was told that Art Institute's "award-winning program" would "guarantee" a degree within three years.

161.145.     Mrs. Bianchi moved to California to enroll at Art Institute's campus in San Diego. At the direction of Art Institute representatives, she took out substantial federal and private loans to attend the school. Her parents also took out Parent PLUS loans. Art Institute representatives instructed her on which specific loans to take out and were constantly giving her paperwork to sign.

162.146.     After Mrs. Bianchi began classes, it quickly became apparent to her that many of Art Institute's representations were false. In order to graduate within three years, she realized that she would need to tackle a nearly-impossible course load, taking 6-8 courses per week, year-round. This left virtually no time for homework or project development.

163.147.     It also became apparent that Art Institute's high-pressure pitch to enroll immediately was a sham. Students were constantly coming and going with no urgency, and there would have been no problem if she had waited to enroll.

164.148.     As each semester of classes became overwhelming, Mrs. Bianchi occasionally had to drop courses in order to keep up. She was billed for classes that she dropped and then had to pay again to retake them. Additionally, Art Institute counselors routinely recommended or requested that she pay for extracurricular classes, which she later learned did not count towards graduation in her concentration of study.

165.149.     Art Institute lacked the tools and resources to train Mrs. Bianchi appropriately. In particular, classes lacked an emphasis on modern technology. When she eventually graduated with a degree in advertising, it became clear that she was not adequately prepared for the modern workplace.

166.150.      After nearly four years of studying at Art Institute's San Diego campus, Mrs. Bianchi decided to transfer to the Orange County campus. During the transfer process, Art Institute refused to transfer several of her completed credits from one campus to another. She had to pay to retake some of the same courses in order to complete her degree. Despite massive and growing debt, Mrs. Bianchi felt stuck, with no choice but to move forward with her degree.

167.151.      After graduating from the Orange County campus in 2014, Mrs. Bianchi began searching for a stable job in her field. It turned out that Art Institute was unable to place her at her "dream job." Despite promising to work with her indefinitely, career services only assisted her for six months, and the services provided mostly consisted of sending her publicly-available LinkedIn job postings. Eventually, Art Institute career counselors stopped working with her entirely and passed her on to a staffing agency that was not recruiting for work in her field.

168.152.      Mrs. Bianchi found that the Art Institute degree was a net negative on her resume. After many months of searching, and with no meaningful help from Art Institute career counselors, Mrs. Bianchi gave up on finding a job in the advertising field.

169.153.      Today, Mrs. Bianchi owes over $76,000 in federal student loans in connection with her attendance at Art Institute. All of her private loans but one have gone into default and been in collections. Additionally, her parents owe over $150,000 on their Parent PLUS loans.

170.154.      Mrs. Bianchi ultimately started a company with her husband doing video production work. Her income is not sufficient to allow her to make significant payments on her student loans.

171.155.      In 2015, the United States Department of Justice investigated Education Management Corp. (EDMC), Art Institute's parent company, for fraud and misrepresentation at

its schools. DOJ described EDMC schools as "recruitment mill[s]" and concluded that EDMC "[ran] a high pressure boiler room where admissions personnel were paid based purely on the number of students they enrolled," violating the prohibition on paying recruiters based on the number of students they enroll. DOJ's investigation followed a United States Senate investigation in 2012 that discovered that EDMC employed almost five times as many recruiters as student services staff. DOJ's investigation resulted in a $95.5 million settlement with EDMC to settle claims of consumer fraud, illegal recruiting, and other violations.

172.156.      Also in 2015, an investigation by 39 state attorneys general and the District of Columbia resulted in a separate $102.8 million settlement with EDMC after uncovering illegal recruitment practices, misrepresentations as to program accreditation, and falsified job placement rates.

173.157.      Over the past several years, dozens of Art Institute campuses have closed—including the Orange County campus that Mrs. Bianchi attended—and EDMC filed for bankruptcy.

174.158.      In 2018, Mrs. Bianchi submitted a comprehensive DTR to ED. Her DTR explained in detail Art Institute's high-pressure enrollment tactics and its misrepresentations regarding the cost of the program, the length of time required to reasonably complete the program, job placement, and transferability of credits. The details in her DTR established that Art Institute violated state consumer protection laws with respect to her. Moreover, the investigation and findings made by the DOJ and state attorneys general demonstrate that Mrs. Bianchi has a meritorious borrower defense claim.

175.159.      Mrs. Bianchi has yet to receive a decision on her DTR. Given how few

borrowers receive complete relief under the Partial Relief Rule, ED is unlikely to award Mrs.

Bianchi full relief when it applies the Rule to her.

## CLASS ACTION ALLEGATIONS

176.160.      Plaintiffs Sammia Pratt, Alicia Davis, and Brittany Saulsberry bring this

action on behalf of themselves and all other similarly situated borrowers.

177.161.      Pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2), Plaintiffs

seek to represent the following class:

> All people who have taken out a Direct Loan or FFEL loan to pay for a program of higher
> education, who have asserted a borrower defense claim within, who have received or will
> receive by the scopetime of entry of final judgment in this action a decision applying the
> Partial Relief RuleRule's methodology to their borrower defense claim, and who willhave
> not receive and will not be granted full relief onfrom their federal student loans under the
> Partial Relief Rule's methodology.

178.      This class consists of two subclasses. Ms. Pratt, Ms. Davis, and Ms. Saulsberry seek

to represent a subclass consisting of class members to whom ED has applied the Partial Relief

Rule and afforded less than full relief on their federal student loans (the "received decision

subclass").

179.      Ms. Castillo, Ms. Espada, and Mrs. Bianchi seek to represent a subclass consisting

of class members who are still awaiting a final determination on their borrower defense claims (the

"pending claim subclass").

180.162.      The Partial Relief Rule does not apply to individuals who are members of

the class certified in *Calvillo Manriquez v. DeVos*, No. 17-7210 (N.D. Cal.), and those individuals

are excluded fromunless those individuals would be awarded full relief under the Partial Relief

Rule's methodology. Borrowers who are awarded full relief under the Partial Relief Rule's

methodology are not included within the class. Accordingly, no members of the class certified in *Calvillo Manriquez* are within the class in this case.

~~181.~~163.        The proposed class satisfies the requirements of Federal Rule of Civil Procedure 23(a).

    a.  The proposed class is so numerous that joinder of all members is impracticable because the class consists of thousands of individuals.

    b.  There are questions of law and fact common to all members of the class including, without limitation, whether the Partial Relief Rule is arbitrary and capricious and whether ED violated the APA's and HEA's procedures in promulgating the Partial Relief Rule.

    c.  The claims of the named Plaintiffs are typical of the claims of the class. Ms. Pratt, Ms. Davis, and Ms. Saulsberry have all had the Partial Relief Rule applied to their borrower defense claims and all received less than full relief from their federal student loans. ~~Ms. Castillo, Ms. Espada, and Mrs. Bianchi all have pending borrower defense claims within the scope of the Partial Relief Rule and, under the Partial Relief Rule, are unlikely to receive full relief.~~

    d.  Plaintiffs are adequate representatives of the class because their interests do not conflict with the interests of the class they seek to represent, they intend to prosecute this action vigorously, and they have retained counsel who are competent, have knowledge of and familiarity with the relevant laws and regulations concerning student loans and borrower defense, and are experienced in APA and class action litigation.

~~182.~~164.      This case is maintainable as a class action under Federal Rule of Civil Procedure 23(b)(2) because the defendants' action in adopting the Partial Relief Rule applies generally to the class, such that final injunctive relief and corresponding declaratory relief is appropriate with respect to the class as a whole.

## FIRST CAUSE OF ACTION

### (5 U.S.C. § 706(2)(A))

~~183.~~165.      The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

~~184.~~166.      The Partial Relief Rule is a final agency action.

~~185.~~167.      The Partial Relief Rule ignores factors relevant to determining how much a borrower was harmed by a school's wrongful acts or omissions, rests on an earnings comparison that captures neither that harm nor the value of the education provided, applies an inappropriate statistical test, uses unrepresentative and flawed data, does not adequately justify the test and data it uses, fails to apply the tests for determining relief mandated by applicable regulations, and purports to establish a rebuttable presumption but does not provide a means of rebutting the presumption before a final determination and, even after that, requires borrowers to seek reconsideration under procedures that require new evidence.

~~186.~~168.      The Partial Relief Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, 5 U.S.C. § 706(2)(A).

## SECOND CAUSE OF ACTION

### (5 U.S.C. § 706(2)(D))

~~187.~~169.        The Partial Relief Rule is a regulation for which the agency was required to follow the public consultation and negotiated rulemaking process set forth in the Higher Education Act, 20 U.S.C. § 1098a.

~~188.~~170.        The Partial Relief Rule is a legislative rule for which the agency was required to undertake notice-and-comment rulemaking, 5 U.S.C. § 553.

~~189.~~171.        By failing to engage in public consultation, a negotiated rulemaking, and notice-and-comment rulemaking before adopting the Partial Relief Rule, ED failed to observe procedures required by law, 5 U.S.C. § 706(2)(D).

## THIRD CAUSE OF ACTION

### (5 U.S.C. § 706(2)(A))

~~(On behalf of the received decision subclass)~~

~~190.    Defendants have applied~~Decisions made under the Partial Relief Rule ~~to members of the received decision subclass and provided them with decisions on their borrower defense claims that afford them less than full relief on their federal student loans.~~

~~191.~~172.        ~~The decisions the received decision subclass received on their borrower defense claims~~ are final agency ~~action~~actions.

~~192.~~173.        Because ~~those~~ decisions ~~were~~made under the Partial Relief Rule are based solely on ~~the Partial Relief Rule, which~~a rule that is arbitrary, capricious, contrary to law, and promulgated without procedures required by law, those decisions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

(A)    Declare the Partial Relief Rule unlawful because it was promulgated without observance of procedure required by law;

(B)    Declare the Partial Relief Rule arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(C)    Declare that decisions on borrower defense claims that were based on the Partial Relief Rule and that afforded the borrowers less than full relief on their federal student loans are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(D)    Vacate the Partial Relief Rule;

(E)    Vacate all decisions on borrower defense claims that were based on the Partial Relief Rule and that afforded the borrowers less than full relief on their federal student loans;

(F)    Award Plaintiffs their costs and expenses, including reasonable attorney's fees; and

(G)    Grant such other relief as this Court deems just and proper.

Dated: ~~June 9~~August 17, 2020          Respectfully submitted,

                                         /s/ Adina H. Rosenbaum
                                         Adina H. Rosenbaum (D.C. Bar No. 490928)
                                         Adam R. Pulver (D.C. Bar No. 1020475)
                                         PUBLIC CITIZEN LITIGATION GROUP
                                         1600 20th St. NW
                                         Washington, DC 20009
                                         (202) 588-1000
                                         arosenbaum@citizen.org

                                         Michael N. Turi (New York Bar No. 5385745)
                                         ~~(application for admission forthcoming)~~
                                         *Pro hac vice*
                                         Eileen M. Connor (Mass. BBO No. 569184)
                                         (application for admission forthcoming)
                                         Toby R. Merrill (Mass. BBO No. 601071)
                                         PROJECT ON PREDATORY STUDENT LENDING,
                                         LEGAL SERVICES CENTER OF HARVARD LAW
                                         SCHOOL
                                         122 Boylston Street
                                         Jamaica Plain, MA 02130
                                         (617) 522-3003
                                         mturi@law.harvard.edu

                                         Counsel for Plaintiffs