## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAMMIA PRATT, ALICIA DAVIS, and BRITTANY SAULSBERRY, individually and on behalf of all others similarly situated, and MARISOL CASTILLO and HEATHER BIANCHI,<br><br>          Plaintiffs,<br><br>     v.<br><br>ELISABETH DeVOS, in her official capacity as Secretary of Education, and UNITED STATES DEPARTMENT OF EDUCATION,<br><br>          Defendants. | Civil Action No. 20-cv-1501-TNM |

## DECLARATION OF ADINA H. ROSENBAUM IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I, Adina H. Rosenbaum, declare and state as follows:

1.      I am a member of the bar of this Court and an attorney for Plaintiffs in the above-captioned matter.

2.      I am an attorney at Public Citizen Litigation Group (PCLG), where I have practiced since 2004.

3.      PCLG has represented plaintiffs in many cases arising under the Administrative Procedure Act (APA), including cases against the Department of Education, the Food and Drug Administration, the Department of Transportation, and the Department of Housing and Urban Development. These cases have included cases related to the borrower defense process. *See Bauer v. DeVos*, No. 17-cv-1330 (D.D.C); *New York Legal Assistance Group v. DeVos*, No. 20-cv-1414 (S.D.N.Y). PCLG lawyers have also conducted APA trainings for lawyers and advised policy staff at Public Citizen and other non-profit organizations about administrative law and procedure.  In

addition, PCLG lawyers have participated in class-action litigation, as counsel for plaintiffs, as counsel for absent class members objecting to proposed settlements as not fair, reasonable, and adequate, and as counsel for amicus curiae addressing substantive and procedural class-action issues.

4.      I have knowledge of, and familiarity with, the relevant laws and regulations concerning federal student loans and borrower defense.

5.      I am not aware of any potential conflicts of interest between PCLG and members of the proposed class.

6.      I am well-prepared and well-equipped to vigorously prosecute this case.

7.      I believe that my co-counsel and I will adequately represent the interests of the class.

8.      Attached as Exhibit 1 is a true and correct copy of a memorandum issued by the Department of Education on December 10, 2019, entitled "Tiered relief methodology to adjudicate certain borrower defense claims."

9.      Attached as Exhibit 2 is a true and correct copy of a memorandum issued by the Department of Education on December 10, 2019, entitled "Tiered relief methodology to adjudicate certain borrower defense claims," as revised by the Department of Education on August 4, 2020 "for accuracy and clarity, including for technical corrections."

10.      Attached as Exhibit 3 is a true and correct copy of a Department of Education press release dated December 10, 2019, entitled "Secretary DeVos Approves New Methodology for Providing Student Loan Relief to Borrower Defense Applicants."

11.      Attached as Exhibit 4 is a true and correct copy of a chart released by the Department of Education in December 2019 entitled "Borrower Defense Partial Relief Methodology, Corinthian Colleges, Inc. (CCI) Programs, December 2019."

12.      Attached as Exhibit 5 is a true and correct copy of a chart released by the Department of Education in December 2019 entitled "Borrower Defense Partial Relief Methodology, ITT Educational Services, Inc. Programs, December 2019."

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 15, 2020

/s/ Adina H. Rosenbaum
Adina H. Rosenbaum

# Exhibit 1

## POLICY STATEMENT

**RE**:        Tiered relief methodology to adjudicate certain borrower defense claims

**DATE:**      December 10, 2019

_____

This Policy Statement sets forth the Department's approach to determine the amount of relief to be provided to certain groups of borrowers who meet the legal standard for federal student loan discharges and other relief under the Department's borrower defense to repayment ("borrower defense" or "BD") authorities.  This approach involves a standard methodology that establishes a rebuttable presumption regarding relief, enabling the Department to process claims expeditiously while ensuring the flexibility and opportunity to make individualized determinations.

This Memorandum follows from the options memorandum (the "Options Memo") regarding potential approaches presented by the Office of the Under Secretary ("OUS") and Federal Student Aid (FSA) to implement a new, tiered relief methodology to adjudicate current and future borrower defense claims.  The Options Memo outlined different methodologies for the Secretary's consideration and was signed by the Secretary on November 12, 2019.

The tiered methodology adopted by this Policy Statement establishes a rebuttable presumption. That is, it provides the framework within which the Department will determine relief for meritorious cases. However, under the Department's regulations, borrowers have the right to seek reconsideration, submit new evidence regarding their borrower defense application, and rebut the relief presumption.

### I.    Governing law and regulations

Under § 455(h) of the Higher Education Act of 1965, as amended ("HEA"), 20 U.S.C. § 1087e(h), the Department is authorized to establish regulations under which borrowers may assert "acts or omissions of an institution of higher education . . .  as a defense to repayment" of a Direct Loan.  In 1994, the Department published regulations regarding borrower defense, 34 C.F.R. § 685.206(c). The Department recently amended those regulations both in 2016 and in 2019.

The 1994 regulation stated that if "the borrower's defense against repayment is successful," the borrower may be "relieved of the obligation to repay all or part of the loan and associated costs and fees." _Id_. at § 685.206(c)(2) (2016). After the 2016 amendments, the revised regulations similarly provide that a borrower may be relieved of his or her obligation to repay all or part of the loan and associated costs.  _See_ 34 C.F.R. § 685.222(i)(1) (2017).

### II.    Background

Prior to 2015, the Department had received only a small number of requests for federal student loan discharges under the Department's borrower defense to repayment authorities. However, in 2015, the number of borrower defense applications increased significantly following the collapse of Corinthian Colleges, Inc. ("CCI"). The Department also announced that borrowers would be able to apply for federal student loan discharges by asserting a borrower defense to the repayment of their related federal student loans. The Department created an application form specifically for CCI borrowers who had enrolled in certain programs during certain time periods to expedite the application process. This led to the filing of tens of thousands of borrower defense applications by borrowers who alleged that CCI misrepresented the rates at which its graduates were placed into jobs, *i.e.*, job placement rates ("CCI JPR claims"), which the Department decided to generally grant within certain parameters.

The Department also decided to generally approve other specific categories of applications within certain parameters. Some of these were CCI borrower defense applications, including those based on allegations of misrepresentations about the transferability of credits by the CCI-operated Heald College, Everest Institute, and WyoTech campuses ("CCI transfer of credits claims") and those based on allegations of misrepresentations by CCI-operated schools that employment after students' graduation was guaranteed ("CCI guaranteed employment claims"). Others were applications by borrowers from other schools, including those based on allegations of misrepresentations that employment after students' graduation was guaranteed by California campuses of ITT Technical Institute ("ITT (CA) guaranteed employment claims") and those from students who attended American Career Institute ("ACI claims").

From the time when the Department began processing CCI claims through January 2017, all of the borrower defense claims that were approved resulted in a 100% discharge and refunds where applicable; however, thousands of other claims determined to be ineligible for relief were simply moved to the side and the notice of ineligibility was not sent. In total, approximately 62 percent of claims adjudicated by January 2017 were approved. Another 100,000 claims held by the Department as of January 2017 had not yet been adjudicated at that time.

In December 2017, the Department announced that it would use a tiered methodology to adjudicate CCI JPR claims, CCI transfer of credits claims, and CCI guaranteed employment claims. That methodology ("the 2017 methodology") assessed the relief owed to borrowers with such claims based on the extent to which CCI borrower defense applicants in a given program generally had earnings similar to those of completers of similar programs that had a passing debt-to-earnings ratio under the Gainful Employment (GE) regulations (34 CFR part 668, subpart Q). The level of student loan relief calculated and provided under this methodology ranged from a discharge of 10% to 100% of the amount borrowed. Any borrower who was eligible for more than 50 percent relief was given full loan relief.

The December 20, 2017 press release announcing the 2017 methodology justified the methodology by citing "[t]he principle of relief based on value of education received…"[1]  The memorandum[2] explaining the mechanics of the 2017 methodology stated that the methodology "was developed to provide borrowers relief consistent with and appropriate to the harm they incurred from the misrepresentation by CCI, thereby making them whole" and that it was "rooted in a determination of the value of the claimant's CCI education, as calculated by comparing average earnings of CCI claimants who attended a given academic program to those who attended similar programs at schools the Department has determined adequately prepare students for gainful employment."  Similar language was used to justify the amount of relief provided to borrowers in the individual decision letters to CCI borrower defense applicants who received relief under the 2017 methodology.

Since May of 2018 the Department has been unable to use the 2017 methodology to determine relief for adjudicated BD claims. The Department cannot currently use the 2017 methodology because the Department no longer has access to the same data source moving forward and because the preliminary injunction is still in place. As of November 12, 2019, the Department had received over 290,000 borrower defense applications, and more than 225,000 of those applications remained pending.

### III.  Standard deviation methodology as a rebuttable presumption for borrower defense relief

The relief methodology, like the 2017 methodology, provides relief to successful borrower defense applicants based upon a comparison of the program-level earnings for graduates of the specific program at the borrower's school that is at issue in the borrower defense application, with the earnings of graduates at the same or similar program at other schools.  As with the 2017 methodology, this new methodology would provide for tiers of relief, but those tiers would be based on the quartiles, with 100 percent relief being awarded to successful borrower defense applicants whose program's median earnings were at or lower than two standard deviations from the median earnings of graduates of similar programs at other schools. Successful BD applicants whose median program earnings are higher than two standard deviations below the median, but lower than the median of the comparison group will generally be awarded 25 percent, 50 percent, or 75 percent relief.

### A.  Rationale for using earnings as a measure for relief and for establishing the standard deviation methodology as a rebuttable presumption

---

[1] Available at https://www.ed.gov/news/press-releases/improved-borrower-defense-discharge-process-will-aid-defrauded-borrowers-protect-taxpayers.
[2] Available at https://www2.ed.gov/documents/press-releases/borrower-defense-relief-methodology-cci.pdf.

In assessing the appropriate measure of relief, it is important to note that the majority of borrower defense applicants have not provided the Department with evidence of or supporting the scope of their harm to support their claims, likely because the Department did not require such evidence when they applied. Even though the Department has determined that certain CCI borrowers made a prima facie case for borrower defense relief, the borrowers have generally not provided evidence of the resulting harm or as to the scope of such harm. Accordingly, the Department has examined other evidence in its possession to assess the relief to be provided to borrowers.

The new methodology is based on a determination of the harm suffered by a successful BD applicant as a result of the misconduct, as determined by comparing earnings imputed to the BD applicant against earnings of a representative comparison group. The level of harm measured in this way can also be said to reflect the quantifiable lack of value conveyed by a borrower defense applicant's education. Using comparative earnings, generally available data can be used to focus on the harm that is actually attributable to the program the applicant was enrolled in by comparing earnings information for that program to a group of similar comparable programs offered by other institutions that the applicant might have otherwise attended.

Using program-level earnings, both as imputed to the borrower defense applicant and for the comparison group, is appropriate because this approach provides an objective look at the harm and lack of value to be derived from a specific program caused by a pattern of misconduct by a school, when compared to similar programs in the educational marketplace. An individual's earnings could be influenced by a multitude of factors other than the education they received at a college or university. However, taking the median of earnings among a cohort of program graduates provides a summary statistic based primarily on the common experience of program participants, gives more weight to factors shared among participants because of their shared participation in the program than to factors that vary across the different participants. Therefore, median earnings of program graduates are imputed to the successful BD applicant.

This approach differs from that taken before December 2017 for the CCI claims, including CCI transfer of credit claims, CCI guaranteed employment claims, and the ITT (CA) guaranteed employment claims.[3] As explained by the Department in December 2017, with the benefit of reviewing the GE earnings data published by the Department in late 2017, the Department was able to further analyze the value conferred by the educations received by students attending CCI schools. Through that analysis, the Department determined that tiered, or partial, relief for CCI JPR claims applicants and applicants with CCI-related claims categories applications was appropriate. The Department continues to believe that the 2017 methodology is

---

[3] ACI claims are not discussed here because all students from ACI were given 100% relief on a group basis, without requiring the submission of applications from the students given the nature of the misconduct at issue for that school, so there are no remaining ACI claims that could need to be adjudicated in the future.

a sound way to determine relief for all CCI-related borrower defense claims. However, a federal district court has preliminarily enjoined the Department from using the methodology in the lawsuit *Manriquez et al. v. DeVos*, Case No. 17-cv-07210-SK (N.D. Cal.).[4] Further, many borrower defense claims not covered by the class certified in that case (consisting of CCI claims borrower defense applicants) have been pending for years.

As a result, given the Department's interest in providing borrowers with timely borrower defense relief in addition to its interest in creating easily administered rules for relief, the Department has determined that it is appropriate to apply the new standard deviation methodology, which follows the same principle that the harm to a borrower (attributable to lower program value) can be assessed in terms of the difference between a program's earnings and the earnings of similar/same programs at other schools, to borrowers that were originally covered by the 2017 methodology who are <u>not</u> in the *Manriquez* class (*i.e.*, borrowers with CCI guaranteed employment claims and CCI transferability of credit claims). Further, it is appropriate to apply this methodology to ITT (CA) guaranteed employment claims and to similarly-established categories of claims established in the future, because this comparative analysis will reveal whether a borrower has been harmed as a result of the misconduct, in comparison to his or her peers at other schools.

We are establishing the amount of relief to be provided through the standard deviation methodology as a rebuttable presumption. This adjudicatory process to determine relief enables the Department to exercise its discretionary powers while preserving its flexibility and the opportunity to make individualized determinations. The Department will inform applicants that they may use the reconsideration process described in 34 C.F.R. § 685.222(e)(5)(i) to challenge the initial determination of relief in light of their individual circumstances.

### B.  The standard deviation methodology tiers

The standard deviation methodology will generally award full relief to an otherwise successful BD applicant if the borrower's imputed median earnings are less than or equal to wages that are two standard deviations below the median wages of the comparison group. As described above, earnings would be imputed to a borrower and to a comparison group based on the median earnings of graduates of the program in which the applicant was enrolled or median earnings of graduates of similar programs. The median wage for the comparison group would be the median of the medians of the program level earnings calculated for graduates based on a 4-digit classification of instruction program ("CIP") code and the credential level.

---

[4] The Department has appealed from the district court's order, but the appeal is still pending before the Ninth Circuit.

Standard deviations are used to identify statistically significant earnings differences since even among programs of equal quality, median earnings could differ based on the part of the country in which graduates are employed, the socioeconomic level of students prior to enrollment, the age and gender of the students (which could influence the likelihood that graduates would choose part-time work over full-time work) or the selectivity of the institution, among other things.

In a normal distribution, approximately 68% of the data points in the sample will fall within one standard deviation above and one standard deviation below the median. Approximately 95% of all data points in the sample will fall within two standard deviations from the median. Therefore, median earnings at or below the earnings that are two standard deviations from the median should result in full relief to successful BD applicants since it is at this point where differences between data points is considered to be statistically significant. This does not mean that programs with earnings lower than two standard deviations from the median are necessarily bad programs, but in attempting to develop a methodology to determine the harm suffered by a borrower as a result of misrepresentation, the Department will rely on scientific convention and establish that only earnings differences that are statistically significant (more than two standard deviations below the median) should qualify a successful BD applicant for full relief.

Successful BD applicants whose earnings are higher than the threshold that is two standard deviations below the median, but lower than the median would generally receive partial relief. To determine the level of partial relief such a borrower would receive, the Department could simply divide the difference between median wages and wages two standard deviations below the median by three to establish three tiers of relief between 0% and 100%. In other words, successful BD applicants whose program earnings were less than the median could be awarded 25, 50, 75 or 100 percent relief, depending upon where their program median earnings fall in the range.



## C. Data

Using 4-digit CIP codes and credential levels, the Department will impute earnings to the borrower by determining the median earnings of the graduates of the BD applicant's program. The Department has determined that 4-digit CIP codes provide the greatest coverage of programs and allow the Department to adjudicate a larger number of claims using the borrower's program and credential level. The program-level earnings data that will be used to calculate relief under the standard deviation as a rebuttable presumption will differ depending on several different factors as described below.

- <u>Programs that are both (a) non-operational, and (b) for which there is 2014 GE earnings data:</u> For programs that are both (a) closed and non-operational as of the date of this Memorandum, and (b) for which there are 2014 earnings data as a result of the GE regulations (the "GE earnings data"),[5] the Department will use these data to establish the borrower defense applicant's program earnings, and the earnings for the comparison group.

- <u>For programs for which there is no 2014 GE earnings data, but there is other publicly-available data at the 4-digit CIP code level</u>: For programs for which there are not 2014 GE earnings data, earnings data from other publicly available sources should be used, such as data currently being disclosed on the Department's website as part of the College Scorecard.

- <u>For programs for which there is no earnings data for the credential or at the 4-digit CIP level</u>: The Department may not have earnings data for the program at issue as either a part of the GE earnings data or in future publicly available data. In such a case, the Department will use earnings from graduates of similar programs based on the 4-digit CIP code, but at the next highest credential level, to impute borrower and comparison group earnings. If sufficient data are not available to make that determination, then the Department will review program level outcomes for other programs offered by the institution (and the relevant comparison group) using the 2-digit CIP code and credential level (or the next higher credential level if available, and if not, the next lower credential level) and award to borrowers the highest level of relief that would be awarded to borrowers in any of those programs. In the event that there are no other programs with the same 2-digit CIP code, the Department will

---

[5] The GE disclosure earnings data is data obtained from SSA as to the mean and median annual earnings of a cohort of students who completed a GE program during a specified cohort period. At least 10 completers from a program must be matched for SSA to return mean and median earnings information for disclosure purposes, while there must be at least 30 students in the cohort sent to SSA for the Department. This data is publicly available on the Department's website and the use of this public data is not enjoined by any court action. The Department has this data for calendar year 2014 and will not be able to obtain it for any other years.

award to those successful BD applicants the highest level of relief awarded to any successful BD applicant who received relief calculated under the 2017 methodology or the standard deviation methodology.

The above describes the standard deviation methodology as a rebuttable presumption. The following explains how this approach relates to the date of the misconduct.  For programs that are no longer in operation but were included in the 2015 GE earnings data published on the Department's website, the use of GE earnings data for determining harm is appropriate.  These earnings data were provided to the Department by the Social Security Administration (SSA), under a now-expired Memorandum of Understanding (MOU), and are already published in the public domain.  However, the Gainful Employment rule has been rescinded and the SSA has not signed a new MOU with the Department, so for the foreseeable future, new SSA earnings data will not be made available to the Department.  The Department would be significantly delayed if it were to request from the Internal Revenue Service more recent earnings data on these cohorts of students; such a data query may not be permitted under the Department's current MOU with the Department of the Treasury.

However, for programs that are still operational, the College Scorecard will serve as the data source for program-level median earnings for both the borrower's program and the similar comparison group program. College Scorecard earnings data are provided by the Internal Revenue Service, with whom the Department has an MOU for data sharing.  Because College Scorecard data will be updated annually, the Department will have access to an on-going source of earnings data for adjudicating future BD claims.

The Department will use the most recent College Scorecard data to determine harm for successful borrower defense applicants, except in instances in which a program was discontinued earlier and is not included in the most recent College Scorecard data.  In such a case, the Department will go back to the most recent College Scorecard data which included earnings data for that program, and calculate harm using program data and comparison group data from that year's College Scorecard data.  The Department seeks to use the most recent data available to impute earnings to the borrower and to determine the comparison group earnings levels.  Currently the College Scorecard includes only first year earnings data, since program level data were not reported to the Department prior to 2014-2015.  Over time, the College Scorecard will capture earnings at different intervals following completion, such as one, three, five and/or ten years after completion.  When sufficient data are available, the Department will use multiple-year earnings data (e.g., three- or five-year data) to calculate relief.

### D.  Scope of application

The standard deviation methodology will be applied to:

1)  CCI guaranteed employment claims;
2)  CCI transfer of credit claims;
3)  ITT (CA) guaranteed employment claims; and
4)  All other non-CCI JPR claims.

### IV.   Legal authority to determine the amount of the relief for borrower defense claims

The statute and the Department's regulations allow the Secretary to exercise reasonable discretion to determine the amount of relief to borrowers.  A borrower defense applicant with a meritorious claim should receive federal student loan relief proportionate to the difference between the earnings being made by graduates of the applicant's program, as compared to the earnings of his or her peers at other schools.  This approach to relief properly reflects the Department's interest in protecting the federal taxpayer while also treating borrower defense applicants consistently and equitably.  Further, the standard deviation methodology as a rebuttable presumption is an appropriate way to calculate that difference and establish tiers of relief.

### A.  Legal authority to establish a methodology to adjudicate borrower defense claims

The language of the borrower defense regulation clearly establishes that the Secretary has the discretion to determine the amount of relief to provide to a successful borrower defense applicant. At other times the Department has taken the position internally that the amount of relief is subject to the Secretary's discretion, relying upon this regulatory language. At other times in the past, however, the Department has taken the position internally that the amount of relief due to BD applicants is dictated by state law. This position was based on an extension of the application of state law in the adjudication of BD claims under the 1995 regulation to the determination of relief and reliance on the example of the approach taken by courts in consumer protection cases, but it did not clearly address or distinguish the regulatory language supporting the Secretary's discretion. The Department's current position is that the amount of relief is a matter of the Secretary's discretion, given the clear language in the regulation.

The borrower defense statute does not require the Department to award relief to successful applicants in any particular fashion.  The only statutory limit on the Secretary's ability to grant relief is that no student may recover in excess of the amount the borrower has repaid on the loan.  *See* 20 U.S.C § 1087e(h). While the original version of the Department's regulation, 34 C.F.R. § 685.206(c)(1995), required a claimant to allege an act or omission that would "give rise

to a cause of action" under "applicable state law" in order to be eligible for BD relief, the rule did not direct the Department to award relief to a claimant based on state law principles of restitution or damages. Instead, that regulation clearly provided that the Secretary has discretion to fashion relief as suited to the facts of a particular case:

> If the borrower's defense against repayment is successful, the Secretary notifies the borrower that the borrower is relieved of the obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay. The Secretary affords the borrower such further relief *as the Secretary determines is appropriate under the circumstances* [including reimbursement to the borrower of amounts paid towards the loan].

*Id.* at § 685.206(c)(2) (emphasis added).  The current borrower defense regulations similarly give the Secretary the discretion to determine the appropriate amount relief:

> (1)  The Department official or the hearing official deciding the claim determines the *appropriate amount of relief* to award the borrower, which *may* be a discharge of all amounts owed to the Secretary on the loan at issue and *may* include the recovery of amounts previously collected by the Secretary on the loan, or some lesser  amount.
>
> ….
>
> (7) The Department official or the hearing official deciding the case, or the Secretary as applicable, affords the borrower such further relief *as appropriate under the circumstances*….

34 C.F.R. § 685.222(i)(2017).

Thus, relief is a matter of the Secretary's discretion, and for the reasons described herein, the use of the standard deviation methodology as a rebuttable presumption is an appropriate exercise of the Secretary's discretion to resolve the borrower defense claims of borrowers with CCI transfer of credit claims, CCI guaranteed employment claims, ITT (CA) guaranteed employment claims, and other non-CCI JPR claims categories to be identified into the future.

### B.  Departure from previous approaches to relief for the CCI transfer of credit, CCI guaranteed employment, and ITT (CA) guaranteed employment claims

Prior to December 2017, the Department—lacking a methodology to evaluate harm and provide proportionate relief—provided full relief to borrowers who submitted successful CCI guaranteed employment, CCI transfer of credits, and ITT (CA) guaranteed employment claims. Prior to December 2017, the Department did not issue decisions for claims that preliminarily

determined ineligible for relief. After December 2017, the Department provided tiered relief to borrowers with successful CCI guaranteed employment and CCI transfer of credit claims. Borrowers with successful ITT (CA) guaranteed employment claims did not receive relief under the 2017 methodology.

The Department's decisions to provide 100% relief prior to December 2017 to certain successful borrower defense claimants were based on assumptions about the value of the education received by those claimants. The Department cited misconduct by the schools attended by the claimants, such as the misleading statements by CCI employees regarding job placement rates and other fraudulent actions related to job placement, and reasoned that this misconduct severely limited the value of the degree received by the claimants. However, it does not follow from the mere fact of misconduct that the education provided to students had no value. The Department also cited to a series of statements by claimants about how the degree that they received did not have any value. However, anecdotal statements by some number of individual students, even if accurate, do not demonstrate that all claimants from these schools should receive 100% relief. The Department further relied upon the various investigations into the schools' misconduct and the publicity associated with those investigations in concluding that the claimants should receive 100% relief. However, none of the allegations raised against the institutions by several attorneys general has resulted in a final judgment on the merits.  And even if negative public announcements regarding investigations into a school significantly tarnished that school's brand independent of the underlying truth or falsity of the allegations against the school, a decrease in the brand value associated with a degree from that school does not remove the value in knowledge and skills acquired by students during the program itself.

In addition, the Department relied upon its practice of providing 100% relief to many other claimants and reasoned that it would not be fair to change that practice for the next group of claimants in the queue. However, the persuasiveness of any prior provision of 100% relief depends on both the correctness of the original decision to provide 100% relief to another claimant and on the relevant similarities and differences between the two claimants. The Department also cited to applicants' difficulty in transferring their credits to another institution, concluding that such difficult greatly diminished the value of those credits. A decrease in value does not equate to a complete loss of value, however, and the value of credits for transfer purposes is not the only value received by a student. Furthermore, the Department also has determined that transfer of credit limitations are widespread, and often times transfer credits are denied as a result of academic elitism or perceived differences in accreditation standards which have not been substantiated.

The Department's conclusions were ultimately based on the assumption that claimants with successful CCI transfer of credit claims, CCI guaranteed employment claims, and ITT (CA) guaranteed employment claims received "worthless" educations and therefore full discharge was appropriate for all such claimants with valid claims.  However, when the Department reviewed

publicly available earnings data, made available as a result of the GE regulations, it concluded that the evidence did not support the idea that the degrees were worthless. Through its analysis of the data, the Department identified instances in which borrowers who graduated from a CCI school earned more than graduates of other institutions. The Department has determined that it would be unreasonable to write off 100% of the loans of a high earning borrower based on a conclusion of "worthlessness" just because that borrower attended a CCI school that engaged in misconduct while expecting a lower-earning borrower not affected by such institutional misconduct to repay their loans.  Moreover, the fact that participants in a given program are able to earn high wages constitutes evidence that contradicts the notion that the program had low or no value.  Therefore, after a deeper analysis of available data and a comprehensive review of challenges that students in all sectors of higher education face, the Department realized that its earlier broad assumptions about "worthless" education were unfounded and that further analysis was needed to determine the harm a borrower actually suffers when he or she attends a school that engages in wrongdoing sufficient to establish a borrower defense.

As stated by the Department in December 2017, the Department re-evaluated its earlier assumptions, with regard to CCI and ITT borrowers, and determined that many had received an education of equal or better value as compared to their peers and developed the 2017 methodology as a way to align the amount of relief awarded with the degree to which a borrower may have been harmed as a result of the misconduct.  As described above, some CCI borrowers received value from their degree as evidenced by the earnings comparison between those who attended CCI programs and those who attended other similar programs. The same principles and rationale apply to the standard deviation methodology for CCI students, as well as for ITT (CA) guaranteed employment claim categories borrowers.  Where a comparison of a borrower's program's earnings show that a borrower defense applicant has been harmed by a school's misconduct, the standard deviation methodology will provide relief to the borrower commensurate with the level of harm they suffered, likely as a result of the misconduct which may have robbed the borrower an opportunity to attend a higher-value institution.  For those who have been harmed, the amount of debt relief awarded is commensurate with the gap between the median earnings of graduates of the borrower's program and those of the comparison group.

The value of the standard deviation methodology will grow over time as the comparison peer group grows larger and a greater diversity of institutions contribute to the peer group data set.  The standard deviation model enables the Department to differentiate between earnings differences that may be the result of low-value education and those that may be the result of the natural variation in earnings among individuals at a single institution or among individuals at different institutions.  The standard deviation methodology may provide different amount of relief for a borrower with a CCI transfer of credits or CCI guaranteed employment claim than would have been provided under the 2017 methodology.  However, given the Department's inability to continue using the 2017 methodology due to data and litigation reasons, in

combination with the Department's interest in providing timely relief to borrower defense applicants, a new methodology paired with the ability for the Department to make individualized determinations was needed.  Further, the standard deviation methodology results in levels of relief that are more reflective of the financial harm to borrowers, making use of the information regarding variability in average earnings numbers as measured by the standard deviation.

Like the 2017 methodology, the standard deviation methodology will provide a minimum floor of 10% relief to CCI borrowers in recognition that, although the data may reveal that the value of the education of a program at issue is comparatively high, borrowers suffer some basic harm by virtue of the Department's statements related to the school's misconduct.  Also, the Department recommended that CCI students file BD claims and even provided a specialized form for borrowers to use in seeking relief, making the CCI circumstances unique. As a result, the 10% floor at this point in time will be provided only to CCI applicants that have filed their application as of the date of the Options Memo.

The amount of relief provided by the standard deviation methodology is established as a rebuttable presumption.  As stated, this allows the Department to exercise its discretionary powers while preserving our flexibility and opportunity to make individualized determinations.

Exhibit 2

**Explanatory note regarding August 4, 2020 revisions**

The policy statement below has been revised from the December 10, 2019 version of the document, for accuracy and clarity, including edits for technical corrections. Edits have been made on the following pages:

- Page 2, edits made for accuracy
- Page 3, edits made to provide clarity regarding the preliminary injunction referenced at the bottom of the page, and to correct technical errors
- Page 4, edits made for accuracy
- Page 5, edits made for accuracy
- Pages 5-6, edits made to include the U.S. Department of Education's (Department's) rationale as to the application of the standard deviation methodology to borrower defense claims at issue in the *Manriquez v. DeVos* litigation that would receive 100% relief under the standard deviation methodology
- Page 6, edits made for accuracy
- Page 7, edits made to chart to allow reader to read missing text and other edits for clarity
- Page 8, edits made to clarify that the 2014 GE earnings data will be used both for schools that are: (i) non-operational for which there is such data available, and (ii) for schools that are operational for which there is only 2014 GE earnings data available
- Page 8, edits made to clarify what data will be used for programs for which there is both 2014 GE earnings data and other publicly-available data at the 4-digit CIP code level
- Page 9, edits made for accuracy and to correct technical errors
- Page 10, edits made to include borrower defense claims at issue in the *Manriquez v. DeVos* litigation that would receive 100% relief under the standard deviation methodology within the scope of the standard deviation methodology
- Page 12, edits for accuracy
- Page 14, edits to correct technical errors

<u>POLICY STATEMENT</u>

**RE**:        Tiered relief methodology to adjudicate certain borrower defense claims

**DATE:**     December 10, 2019, as revised on August 4, 2020[1]

---

This Policy Statement sets forth the Department's approach to determine the amount of relief to be provided to certain groups of borrowers who meet the legal standard for federal student loan discharges and other relief under the Department's borrower defense to repayment ("borrower defense" or "BD") authorities. This approach involves a standard methodology that establishes a rebuttable presumption regarding relief, enabling the Department to process claims expeditiously while ensuring the flexibility and opportunity to make individualized determinations.

This Memorandum follows from the options memorandum (the "Options Memo") regarding potential approaches presented by the Office of the Under Secretary ("OUS") and Federal Student Aid ("FSA") to implement a new, tiered relief methodology to adjudicate current and future borrower defense claims. The Options Memo outlined different methodologies for the Secretary's consideration and was signed by the Secretary on November 12, 2019.

The tiered methodology adopted by this Policy Statement establishes a rebuttable presumption. That is, it provides the framework within which the Department will determine relief for meritorious cases. However, under the Department's regulations, borrowers have the right to seek reconsideration, submit new evidence regarding their borrower defense application, and rebut the relief presumption.

I.        **Governing law and regulations**

Under § 455(h) of the Higher Education Act of 1965, as amended ("HEA"), 20 U.S.C. § 1087e(h), the Department is authorized to establish regulations under which borrowers may assert "acts or omissions of an institution of higher education . . . as a defense to repayment" of a Direct Loan. In 1994, the Department published regulations regarding borrower defense, 34 C.F.R. § 685.206(c). The Department recently amended those regulations both in 2016 and in 2019.

The 1994 regulation stated that if "the borrower's defense against repayment is successful," the borrower may be "relieved of the obligation to repay all or part of the loan and associated costs and fees." *Id*. at § 685.206(c)(2) (2016). After the 2016 amendments, the revised regulations similarly provide that a borrower may be relieved of

---

[1] Revisions include edits for accuracy and clarity, including for technical corrections.

his or her obligation to repay all or part of the loan and associated costs. *See* 34 C.F.R. § 685.222(i)(1) (2017).

## II.    Background

Prior to 2015, the Department had received only a small number of requests for federal student loan discharges under the Department's borrower defense to repayment authorities. However, in 2015, the number of borrower defense applications increased significantly following the collapse of Corinthian Colleges, Inc. ("CCI"). The Department also announced that borrowers would be able to apply for federal student loan discharges by asserting a borrower defense to the repayment of their related federal student loans. The Department created an application form specifically for CCI borrowers who had enrolled in certain programs during certain time periods to expedite the application process. This led to the filing of tens of thousands of borrower defense applications by borrowers who alleged that CCI misrepresented the rates at which its graduates were placed into jobs, *i.e.*, job placement rates ("CCI JPR claims,"), which the Department decided to generally grant within certain parameters.

The Department also decided to generally approve other specific categories of applications within certain parameters. Some of these were CCI borrower defense applications, including those based on allegations of misrepresentations about the transferability of credits by the CCI-operated Heald College, Everest Institute, and WyoTech campuses ("CCI transfer of credits claims") and those based on allegations of misrepresentations by CCI-operated schools that employment after students' graduation was guaranteed ("CCI guaranteed employment claims"). Others were applications by borrowers from other schools, including those based on allegations of misrepresentations that employment after students' graduation was guaranteed by California campuses of ITT Technical Institute ("ITT (CA) guaranteed employment claims") and those from students who attended American Career Institute ("ACI claims.").

From the time when the Department began processing CCI claims through January 2017, all of the borrower defense claims that were approved resulted in a 100% discharge and refunds where applicable; however, thousands of other claims determined to be ineligible for relief were simply moved to the side and the notice of ineligibility was not sent. In total, approximately 62 percent of job placement rate claims adjudicated by January 2017 were approved. Another 100,000 claims held by the Department as of January 2017 had not yet been adjudicated at that time.

In December 2017, the Department announced that it would use a tiered methodology to decide the amount of relief for CCI JPR claims, CCI transfer of credits claims, and CCI guaranteed employment claims. That methodology ("the 2017 methodology") assessed the relief owed to borrowers with such claims based on the

extent to which CCI borrower defense applicants in a given program generally had earnings similar to those of completers of similar programs that had a passing debt-to-earnings ratio under the Gainful Employment (GE) regulations (34 C.F.R. part 668, subpart Q).  The level of student loan relief calculated and provided under this methodology ranged from a discharge of 10% to 100% of the amount borrowed.  Any borrower who was eligible for more than 50 percent relief was given full loan relief.

The December 20, 2017 press release announcing the 2017 methodology justified the methodology by citing "[t]he principle of relief based on value of education received…"[2]  The memorandum[3] explaining the mechanics of the 2017 methodology stated that the methodology "was developed to provide borrowers relief consistent with and appropriate to the harm they incurred from the misrepresentation by CCI, thereby making them whole" and that it was "rooted in a determination of the value of the claimant's CCI education, as calculated by comparing average earnings of CCI claimants who attended a given academic program to those who attended similar programs at schools the Department has determined adequately prepare students for gainful employment."  Similar language was used to justify the amount of relief provided to borrowers in the individual decision letters to CCI borrower defense applicants who received relief under the 2017 methodology.

Since May of 2018 the Department has been unable to use the 2017 methodology to determine relief for adjudicated BD claims. The Department cannot currently use the 2017 methodology because the Department no longer has access to the same data source moving forward and because a preliminary injunction[4] prevents the Department from applying the 2017 methodology to award relief other than a 100 percent discharge .  As of November 12, 2019, the Department had received over 290,000 borrower defense applications, and more than 225,000 of those applications remained pending.

### III.    Standard deviation methodology as a rebuttable presumption for borrower defense relief

---

[2] Available at https://www.ed.gov/news/press-releases/improved-borrower-defense-discharge-process-will-aid-defrauded-borrowers-protect-taxpayers.

[3] Available at https://www2.ed.gov/documents/press-releases/borrower-defense-relief-methodology-cci.pdf.

[4] The U.S. District Court for the Northern District of California issued a preliminary injunction order on May 25, 2018. *See* Order Granting in Part and Denying in Part Plaintiff's Motion for Preliminary Injunction (ECF No.60) ("PI Order"), *Manriquez et al. v. DeVos*, Case No. 17-cv-07210-SK (N.D. Cal.). The PI Order was amended on June 19, 2018, *see* Amended Order Regarding Plaintiff's Motion for Preliminary Injunction, (ECF No. 70), *Manriquez*, Case No. 17-cv-07210-SK (N.D. Cal.), and clarified on August 30, 2018, *see* Order Regarding Motion for Clarification (ECF No. 89), *Manriquez*, Case No. 17-cv-07210-SK (N.D. Cal.).

The relief methodology, like the 2017 methodology, provides relief to successful borrower defense applicants based upon a comparison of the program-level earnings for graduates of the same or similar program at the borrower's school that is at issue in the borrower defense application, with the earnings of graduates at the same or similar program at other schools. As with the 2017 methodology, this new methodology would provide for tiers of relief, but those tiers would be based on the quartiles, with 100 percent relief being awarded to successful borrower defense applicants whose imputed program median earnings were at or lower than two standard deviations from the median earnings of graduates of similar programs at other schools. Successful BD applicants whose imputed program median earnings are higher than two standard deviations below the median, but lower than the median of the comparison group, will generally be awarded 25 percent, 50 percent, or 75 percent relief.

### A.  Rationale for using earnings as a measure for relief and for establishing the standard deviation methodology as a rebuttable presumption

In assessing the appropriate measure of relief, it is important to note that the majority of borrower defense applicants have not provided the Department with evidence of or supporting the scope of their harm to support their claims, likely because the Department did not require such evidence when they applied. Even though the Department has determined that certain CCI borrowers made a prima facie case for borrower defense relief, the borrowers have generally not provided evidence of the resulting harm or as to the scope of such harm. Accordingly, the Department has examined other evidence in its possession to assess the relief to be provided to borrowers.

The new methodology is based on a determination of the harm suffered by a successful BD applicant as a result of the misconduct, as determined by comparing earnings imputed to the BD applicant against earnings of a representative comparison group. The level of harm measured in this way can also be said to reflect the quantifiable lack of value conveyed by a borrower defense applicant's education. Using comparative earnings,, generally available data can be used to focus on the harm that is actually attributable to the program the applicant was enrolled in by comparing earnings information for that program to a group of similar comparable programs offered by other institutions that the applicant might have otherwise attended.

Using program-level earnings, both as imputed to the borrower defense applicant and for the comparison group, is appropriate because this approach provides an objective look at the harm and lack of value to be derived from a program or similar programs caused by a pattern of misconduct by a school, when compared to similar programs in the educational marketplace. An individual's earnings could be influenced by a multitude of

factors other than the education they received at a college or university.  However, taking the median of earnings among a cohort of program graduates provides a summary statistic based primarily on the common experience of program participants, and gives more weight to factors shared among participants because of their participation in the program than to factors that vary across the different participants.  Therefore, median earnings of program graduates are imputed to the successful BD applicant.

This approach differs from that taken before December 2017 for the CCI claims, including CCI JPR claims, CCI transfer of credit claims, CCI guaranteed employment claims, and the ITT (CA) guaranteed employment claims.[5]  As explained by the Department in December 2017, with the benefit of reviewing the GE earnings data published by the Department in late 2017, the Department was able to further analyze the value conferred by the educations received by students attending CCI schools.  Through that analysis, the Department determined that tiered, or partial, relief for CCI JPR claims applicants and applicants with CCI-related applications was appropriate.  The Department continues to believe that the 2017 methodology is a sound way to determine relief for all CCI-related borrower defense claims.  pre

As a result, given the Department's interest in providing borrowers with timely borrower defense relief in addition to its interest in creating easily administered rules for relief, the Department has determined that it is appropriate to apply the new standard deviation methodology, which follows the same principle that the harm to a borrower (attributable to lower program value) can be assessed in terms of the difference between the earnings of a program's completers and the earnings of completers of similar/same programs at other schools, to borrowers that were originally covered by the 2017 methodology who are <u>not</u> in the *Manriquez* class (*i.e.*, borrowers with CCI guaranteed employment claims and CCI transferability of credit claims).  Further, it is appropriate to apply this methodology to ITT (CA) guaranteed employment claims and to similarly established categories of claims established in the future, because this comparative analysis will reveal whether a borrower has been harmed as a result of the misconduct, in comparison to his or her peers at other schools.  Additionally, it is appropriate to apply this methodology to CCI JPR claims that will receive 100% relief under the standard deviation methodology.  While the preliminary injunction entered in the *Manriquez* litigation prevents the Department from using the 2017 methodology, the court's order specifically provides that it does not "prohibit[] the Secretary from fully discharging the loans" of any successful CCI JPR claim applicant.[6]  As with the other claims listed, many

---

[5] ACI claims are not discussed here because all students from ACI were given 100 percent relief on a group basis, without requiring the submission of applications from the students given the nature of the misconduct at issue for that school, so there are no remaining ACI claims that could need to be adjudicated in the future.

[6] *See* Amended Order Regarding Plaintiffs' Motion for Preliminary Injunction, ECF No. 70 (June 19, 2018), *Manriquez*, Case No. 17-cv-07210-SK (N.D. Cal.).

CCI JPR claims have also been pending for years.  To the extent that the standard deviation methodology would provide 100 percent relief for CCI JPR claims, we believe it is appropriate to apply the standard deviation methodology to provide 100 percent relief for the reasons described herein.

We are establishing the amount of relief to be provided through the standard deviation methodology as a rebuttable presumption.  This adjudicatory process to determine relief enables the Department to exercise its discretionary powers while preserving its flexibility and the opportunity to make individualized determinations.  The Department will inform applicants that they may use the reconsideration process described in 34 C.F.R. § 685.222(e)(5)(i) to challenge the initial determination of relief in light of their individual circumstances.

### B.  The standard deviation methodology tiers

The standard deviation methodology will generally award full relief to an otherwise successful BD applicant if the borrower's imputed median earnings are less than or equal to wages that are two standard deviations below the median wages of the comparison group.  As described above, earnings would be imputed to a borrower and to a comparison group based on the median earnings of graduates of the program or similar programs in which the applicant was enrolled.  The median wage for the comparison group would be the median of the medians of the program-level earnings calculated for graduates based on a 4-digit classification of instruction program ("CIP") code and the credential level.

Standard deviations are used to identify statistically significant earnings differences since even among programs of equal quality, median earnings could differ based on the part of the country in which graduates are employed, the socioeconomic level of students prior to enrollment, the age and gender of the students (which could influence the likelihood that graduates would choose part-time work over full-time work), or the selectivity of the institution, among other things.

In a normal distribution, approximately 68% of the data points in the sample will fall within one standard deviation above and one standard deviation below the median.  Approximately 95% of all data points in the sample will fall within two standard deviations from the median.  Therefore, median earnings at or below the earnings that are two standard deviations from the median should result in full relief to successful BD applicants since it is at this point where differences between data points is considered to be statistically significant.  This does not mean that programs with earnings lower than two standard deviations from the median are necessarily bad programs, but in attempting to develop a methodology to determine the harm suffered by a borrower as a result of

misrepresentation, the Department will rely on scientific convention and establish that only earnings differences that are statistically significant (more than two standard deviations below the median) should qualify a successful BD applicant for full relief.

Successful BD applicants whose earnings are higher than the threshold that is two standard deviations below the median, but lower than the median, would generally receive partial relief. To determine the level of partial relief such a borrower would receive, the Department could simply divide the difference between median wages and wages two standard deviations below the median by three to establish three tiers of relief between 0% and 100%. In other words, successful BD applicants whose program earnings were less than the median could be awarded 25, 50, 75 or 100 percent relief, depending upon where their program median earnings fall in the range.



**C. Data**

Using 4-digit CIP codes and credential levels, the Department will impute earnings to the borrower by determining the median earnings of the graduates of the BD applicant's program or similar programs covered by the same 4-digit CIP code. The Department has determined that 4-digit CIP codes provide the greatest coverage of programs and allow the Department to adjudicate a larger number of claims using the borrower's program and credential level. The program-level earnings data that will be used to calculate relief under the standard deviation as a rebuttable presumption will differ depending on several different factors as described below.

- For programs that are both (a) non-operational, and (b) for which there is 2014 GE earnings data: For programs that are both (a) closed and non-operational as of the date of this Memorandum, and (b) for which there are 2014 earnings

7

data as a result of the GE regulations (the "GE earnings data"),[7] the Department will use these data to establish the borrower defense applicant's program earnings, and the earnings for the comparison group. Because these programs are non-operational, there will only be 2014 GE earnings data. The 2014 GE earnings data will be used regardless of whether the borrower was enrolled relative to the year the 2014 GE earnings data is sourced from.

- <u>For programs that are (a) operational and (b) for which only 2014 GE earnings data is available</u>: For other programs for which there is only 2014 GE earnings data and there is no other publicly available data, the 2014 GE earnings data will be used regardless of whether the borrower was enrolled relative to the year the 2014 GE earnings data is sourced from.

- <u>For programs for which there is no 2014 GE earnings data, but there is other publicly available data at the 4-digit CIP code level</u>: For programs for which there are not 2014 GE earnings data, earnings data from other publicly available sources will be used, such as data currently being disclosed on the Department's website as part of the College Scorecard.

- <u>For programs for which there is both 2014 GE earnings data and other publicly-available data at the 4-digit CIP code level</u>: For programs for which both GE and program-level College Scorecard data are available, the data source that will be used will depend on when the borrower was enrolled. If the borrower was enrolled in any time period on or after the date that the program-level College Scorecard was implemented, the program-level College Scorecard data will be used. Otherwise, the 2014 GE earnings data will be used.

- <u>For programs for which there are no earnings data for the credential or at the 4-digit CIP level</u>: The Department may not have earnings data for the program at issue as either a part of the GE earnings data or in other publicly available data. In such a case, the Department will use earnings from graduates of similar programs based on the 4-digit CIP code, but at the next

---

[7] The GE disclosure earnings data is data obtained from Social Security Administration (SSA) as to the mean and median annual earnings of a cohort of students who completed a GE program during a specified cohort period. At least 10 completers from a program must be matched for SSA to return mean and median earnings information for disclosure purposes, while there must be at least 30 students in the cohort sent to SSA for the Department. This data is publicly available on the Department's website and the use of this public data is not enjoined by any court action. The Department has this data for calendar year 2014 and will not be able to obtain it for any other years.

highest credential level, to impute borrower and comparison group earnings. If sufficient data are not available to make that determination, then the Department will review program level outcomes for other programs offered by the institution (and the relevant comparison group) using the 2-digit CIP code and credential level (or the next higher credential level if available, and, if not, the next lower credential level) and award to borrowers the highest level of relief that would be awarded to borrowers in any of those programs. In the event that there are no other programs with the same 2-digit CIP code, the Department will award to those successful BD applicants the highest level of relief awarded to any successful BD applicant who received relief calculated under the 2017 methodology or the standard deviation methodology, which is 100 percent relief.

The above describes the standard deviation methodology as a rebuttable presumption. The following explains how this approach relates to the date of the misconduct. For programs that are no longer in operation but were included in the 2014 GE earnings data published on the Department's website, the use of GE earnings data for determining harm is appropriate. These earnings data were provided to the Department by the SSA, under a now-expired Memorandum of Understanding (MOU), and are already published in the public domain. However, the GE rule has been rescinded and the SSA has not signed a new MOU with the Department, so for the foreseeable future, new SSA earnings data will not be made available to the Department. The Department would be significantly delayed if it were to request from the Internal Revenue Service more recent earnings data on these cohorts of students; such a data query may not be permitted under the Department's current MOU with the Department of the Treasury.

However, for programs that are still operational, the College Scorecard will serve as the data source for program-level median earnings for both the borrower's program and the similar comparison group program. College Scorecard earnings data are provided by the Internal Revenue Service, with whom the Department has an MOU for data sharing. Because College Scorecard data will be updated annually, the Department will have access to an on-going source of earnings data for adjudicating future BD claims.

The Department will use the most recent College Scorecard data to determine harm for successful borrower defense applicants, except in instances in which a program was discontinued earlier and is not included in the most recent College Scorecard data. In such a case, the Department will go back to the most recent College Scorecard data which included earnings data for that program, and calculate harm using program data and comparison group data from that year's College Scorecard data. The Department

seeks to use the most recent data available to impute earnings to the borrower and to determine the comparison group earnings levels.  Currently the College Scorecard includes only first-year earnings data, since program-level data were not reported to the Department prior to 2014-2015.  Over time, the College Scorecard will capture earnings at different intervals following completion, such as one, three, five and/or ten years after completion.  When sufficient data are available, the Department will use multiple-year earnings data (e.g., three- or five-year data) to calculate relief.

### D.  Scope of application

The standard deviation methodology will be applied to:

1)  CCI JPR claims that receive 100 percent under the methodology;
2)  CCI guaranteed employment claims;
3)  CCI transfer of credit claims;
4)  ITT (CA) guaranteed employment claims; and
5)  All other claims that are not CCI JPR claims (*i.e.*, claims from all other schools and categories not named above in items (1) to (4)).

## IV.   Legal authority to determine the amount of the relief for borrower defense claims

The statute and the Department's regulations allow the Secretary to exercise reasonable discretion to determine the amount of relief to borrowers.  A borrower defense applicant with a meritorious claim should receive federal student loan relief proportionate to the difference between the earnings being made by graduates of the applicant's program, as compared to the earnings of his or her peers at other schools.  This approach to relief properly reflects the Department's interest in protecting the federal taxpayer while also treating borrower defense applicants consistently and equitably.  Further, the standard deviation methodology as a rebuttable presumption is an appropriate way to calculate that difference and establish tiers of relief.

### A.  Legal authority to establish a methodology to adjudicate borrower defense claims

The language of the borrower defense regulation clearly establishes that the Secretary has the discretion to determine the amount of relief to provide to a successful borrower defense applicant.  At other times the Department has taken the position internally that the amount of relief is subject to the Secretary's discretion, relying upon this regulatory language.  At other times in the past, however, the Department has taken the position internally that the amount of relief due to BD applicants is dictated by state law.  This position was based on an extension of the application of state law in the

10

adjudication of BD claims under the 1995 regulation to the determination of relief and reliance on the example of the approach taken by courts in consumer protection cases, but it did not clearly address or distinguish the regulatory language supporting the Secretary's discretion.  The Department's current position is that the amount of relief is a matter of the Secretary's discretion, given the clear language in the regulation.

The borrower defense statute does not require the Department to award relief to successful applicants in any particular fashion.  The only statutory limit on the Secretary's ability to grant relief is that no student may recover in excess of the amount the borrower has repaid on the loan.  *See* 20 U.S.C § 1087e(h).  While the original version of the Department's regulation, 34 C.F.R. § 685.206(c)(1995), required a claimant to allege an act or omission that would "give rise to a cause of action" under "applicable state law" in order to be eligible for BD relief, the rule did not direct the Department to award relief to a claimant based on state law principles of restitution or damages.  Instead, that regulation clearly provided that the Secretary has discretion to fashion relief as suited to the facts of a particular case:

> If the borrower's defense against repayment is successful, the Secretary notifies the borrower that the borrower is relieved of the obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay.  The Secretary affords the borrower such further relief *as the Secretary determines is appropriate under the circumstances* [including reimbursement to the borrower of amounts paid towards the loan].

*Id.* at § 685.206(c)(2) (emphasis added).  The current borrower defense regulations similarly give the Secretary the discretion to determine the appropriate amount of relief:

> (1)  The Department official or the hearing official deciding the claim determines the *appropriate amount of relief* to award the borrower, which *may* be a discharge of all amounts owed to the Secretary on the loan at issue and *may* include the recovery of amounts previously collected by the Secretary on the loan, or some lesser  amount.
>
> ….
>
> (7) The Department official or the hearing official deciding the case, or the Secretary as applicable, affords the borrower such further relief *as appropriate under the circumstances*….

34 C.F.R. § 685.222(i)(2017) (emphasis added).

Thus, relief is a matter of the Secretary's discretion, and for the reasons described herein, the use of the standard deviation methodology as a rebuttable presumption is an appropriate exercise of the Secretary's discretion to resolve the borrower defense claims of borrowers with CCI transfer of credit claims, CCI guaranteed employment claims, ITT (CA) guaranteed employment claims, and other non-CCI JPR claims categories to be identified into the future.

**B.  Departure from previous approaches to relief for the CCI transfer of credit, CCI guaranteed employment, and ITT (CA) guaranteed employment claims**

Prior to December 2017, the Department—lacking a methodology to evaluate harm and provide proportionate relief—provided full relief to borrowers who submitted successful CCI guaranteed employment, CCI transfer of credits, and ITT (CA) guaranteed employment claims.  Prior to December 2017, the Department did not issue decisions for claims that were preliminarily determined ineligible for relief.  After December 2017, the Department provided tiered relief to borrowers with successful CCI guaranteed employment and CCI transfer of credit claims.  Borrowers with successful ITT (CA) guaranteed employment claims did not receive relief under the 2017 methodology.

The Department's decisions to provide 100% relief prior to December 2017 to certain successful borrower defense claimants were based on assumptions about the value of the education received by those claimants.  The Department cited misconduct by the schools attended by the claimants, such as the misleading statements by CCI employees regarding job placement rates and other fraudulent actions related to job placement, and reasoned that this misconduct severely limited the value of the degree received by the claimants.  However, it does not follow from the mere fact of misconduct that the education provided to students had no value.  The Department also cited to a series of statements by claimants about how the degree that they received did not have any value.  However, anecdotal statements by some number of individual students, even if accurate, do not demonstrate that all claimants from these schools should receive 100% relief.  The Department further relied upon the various investigations into the schools' misconduct and the publicity associated with those investigations in concluding that the claimants should receive 100% relief.  However, none of the allegations raised against the institutions by several attorneys general has resulted in a final judgment on the merits.  And even if negative public announcements regarding investigations into a school significantly tarnished that school's brand independent of the underlying truth or falsity of the allegations against the school, a decrease in the brand value associated with a

degree from that school does not remove the value in knowledge and skills acquired by students during the program itself.

In addition, the Department relied upon its practice of providing 100% relief to many other claimants and reasoned that it would not be fair to change that practice for the next group of claimants in the queue.  However, the persuasiveness of any prior provision of 100% relief depends on both the correctness of the original decision to provide 100% relief to another claimant and on the relevant similarities and differences between the two claimants.  The Department also cited to applicants' difficulty in transferring their credits to another institution, concluding that such difficult greatly diminished the value of those credits.  A decrease in value does not equate to a complete loss of value, however, and the value of credits for transfer purposes is not the only value received by a student.  Furthermore, the Department also has determined that transfer of credit limitations are widespread, and often times transfer credits are denied as a result of academic elitism or perceived differences in accreditation standards which have not been substantiated.

The Department's conclusions were ultimately based on the assumption that claimants with successful CCI transfer of credit claims, CCI guaranteed employment claims, and ITT (CA) guaranteed employment claims received "worthless" educations and therefore full discharge was appropriate for all such claimants with valid claims.  However, when the Department reviewed publicly available earnings data, made available as a result of the GE regulations, it concluded that the evidence did not support the idea that the degrees were worthless.  Through its analysis of the data, the Department identified instances in which borrowers who graduated from a CCI school earned more than graduates of other institutions.  The Department has determined that it would be unreasonable to write off 100% of the loans of a high earning borrower based on a conclusion of "worthlessness" just because that borrower attended a CCI school that engaged in misconduct while expecting a lower-earning borrower not affected by such institutional misconduct to repay their loans.  Moreover, the fact that participants in a given program are able to earn high wages constitutes evidence that contradicts the notion that the program had low or no value.  Therefore, after a deeper analysis of available data and a comprehensive review of challenges that students in all sectors of higher education face, the Department realized that its earlier broad assumptions about "worthless" education were unfounded and that further analysis was needed to determine the harm a borrower actually suffers when he or she attends a school that engages in wrongdoing sufficient to establish a borrower defense.

As stated by the Department in December 2017, the Department re-evaluated its earlier assumptions, with regard to CCI and ITT borrowers, and determined that many had received an education of equal or better value as compared to their peers and

13

developed the 2017 methodology as a way to align the amount of relief awarded with the degree to which a borrower may have been harmed as a result of the misconduct.  As described above, some CCI borrowers received value from their degree as evidenced by the earnings comparison between those who attended CCI programs and those who attended other similar programs.  The same principles and rationale apply to the standard deviation methodology for CCI students, as well as for ITT (CA) guaranteed employment claim categories borrowers.  Where a comparison of a borrower's program's earnings show that a borrower defense applicant has been harmed by a school's misconduct, the standard deviation methodology will provide relief to the borrower commensurate with the level of harm they suffered, likely as a result of the misconduct which may have robbed the borrower an opportunity to attend a higher-value institution.  For those who have been harmed, the amount of debt relief awarded is commensurate with the gap between the median earnings of graduates of the borrower's program and those of the comparison group.

The value of the standard deviation methodology will grow over time as the comparison peer group grows larger and a greater diversity of institutions contribute to the peer group data set.  The standard deviation model enables the Department to differentiate between earnings differences that may be the result of low-value education and those that may be the result of the natural variation in earnings among individuals at a single program or among individuals at different programs.  The standard deviation methodology may provide a different amount of relief for a borrower with a CCI transfer of credits or CCI guaranteed employment claim than would have been provided under the 2017 methodology.  However, given the Department's inability to continue using the 2017 methodology due to data and litigation reasons, in combination with the Department's interest in providing timely relief to borrower defense applicants, a new methodology paired with the ability for the Department to make individualized determinations was needed.  Further, the standard deviation methodology results in levels of relief that are more reflective of the financial harm to borrowers, making use of the information regarding variability in average earnings numbers as measured by the standard deviation.

Like the 2017 methodology, the standard deviation methodology will provide a minimum floor of 10% relief to CCI borrowers in recognition that, although the data may reveal that the value of the education of a program at issue is comparatively high, borrowers suffer some basic harm by virtue of the Department's statements related to the school's misconduct.  Also, the Department recommended that CCI students file BD claims and even provided a specialized form for borrowers to use in seeking relief, making the CCI circumstances unique.  As a result, the 10% floor at this point in time

14

will be provided only to CCI applicants that have filed their application as of the date of the Options Memo.

       The amount of relief provided by the standard deviation methodology is established as a rebuttable presumption.  As stated, this allows the Department to exercise its discretionary powers while preserving our flexibility and opportunity to make individualized determinations.

Exhibit 3

Skip to main content │ About Us (https://www2.ed.gov/about/landing.jhtml) │ Contact Us (https://www2.ed.gov/about/contacts/gen) │
FAQs (https://www.ed.gov/answers/) │ [2A] Language Assistance ▾



(/)

# U.S. Department of Education (/)

Search...

**ARCHIVED INFORMATION**

# Secretary DeVos Approves New Methodology for Providing Student Loan Relief to Borrower Defense Applicants

**While courts continue to deliberate, DeVos moves forward with ensuring harmed students receive relief**

DECEMBER 10, 2019

**Contact:**  Press Office, (202) 401-1576, press@ed.gov (mailto: press@ed.gov)

WASHINGTON –Today, U.S. Secretary of Education Betsy DeVos announced the Department has implemented a new methodology for assessing borrower defense to repayment (BDR) claims, many of which were left behind by the previous administration. The new methodology relies on publicly available earnings data and a scientifically robust statistical methodology to determine harm.

"Despite the mess we inherited from the previous administration, we committed from day one to getting this right for students and taxpayers," said Secretary DeVos. "We cannot tolerate fraud in higher education, nor can we tolerate furiously giving away taxpayer money to those who have submitted a false claim or aren't eligible for relief. This new methodology treats students fairly and ensures that taxpayers who did not go to college or who faithfully paid off their student loans do not shoulder student loan costs for those who didn't suffer harm."

**More Resources**

📄 New Borrower Defense Relief Methodology Policy Statement (https://www.ed.gov/sites /default/files/documents /borrower-defense- relief.pdf)

As illustrated in the chart below, the new borrower defense relief methodology relies on publicly available data to compare median earnings of graduates who have made BDR claims to the median earnings of graduates from comparable programs. If the earnings from the school in question under the BDR application are lower than the median for that program at all comparable schools, then they will be determined to have suffered harm and will receive student loan relief, either in full or in part:

- Earnings lower than two standard deviations from the median will result in full relief.
- Successful BDR applicants whose program earnings are lower than the median but higher than two standard deviations from the median will receive tiered relief of either 25%, 50%, or 75%, based on their program's earnings deviation from the median.



To calculate harm and determine the relief amount, the Department is relying on publicly available 2017 Gainful Employment earnings data, Social Security Administration earnings, College Scorecard data and IRS information.

Because of promises made by the prior administration, and damages likely caused to those borrowers by the Department's continuous efforts to use Corinthian Colleges, Inc. (CCI) institutions as an example, the Department will award no less than 10% relief to all eligible CCI Borrower Defense applicants, regardless of program earnings.

Hundreds of claims adjudicated utilizing the new methodology, mostly consisting of Corinthian and ITT borrowers, will be released this week. FSA will also resume notifying borrowers that their loans are ineligible for relief under the 2016 BDR regulation based on the following factors:

- Borrowers did not have Direct Loans related to the claim.
- Borrowers were not part of the pre-identified class of Corinthian Colleges for whom approval was provided in advance.
- Borrowers did not make an allegation or provide sufficient evidence that the institution violated an applicable state law.
  - For example, borrowers who submitted a claim stating that their teacher was unfair or that they have not found a job they like are not eligible for relief under the applicable BDR provision.

The decisions issued this week include thousands of claims that were effectively denied by the prior administration but were left behind for this administration to notify borrowers. For context, the prior administration's final BDR report had indicated approximately 40% of pending claims at that point in time were deemed ineligible. Students deemed ineligible for relief, who have loans held by the Department, will have any interest accrued on their loan waived from the date their claim was submitted.

This is the second robust adjudication process put in place by this administration to address pending claims. As many will recall, the Department first began adjudicating BDR claims in 2017 but was stopped by a California court based on technical, legal questions arising from a data-sharing agreement within the federal government. The Department appealed the court's decision, but when it became obvious that the court was not going to move quickly, the Department began to develop the new methodology released today for adjudicating claims.

**Tags:**   Press Releases (/news/press-releases)

# How Do I Find...?

- Student loans, forgiveness (https://www2.ed.gov/fund/grants-college.html?src=rn)
- College accreditation (https://www.ed.gov/accreditation?src=rn)
- Every Student Succeeds Act (ESSA) (https://www.ed.gov/essa?src=rn)
- FERPA (https://studentprivacy.ed.gov?src=rn)
- FAFSA (https://fafsa.ed.gov/?src=edgov-rn)
- 1098, tax forms (https://www.ed.gov/1098-e?src=rn)
- More... (https://www2.ed.gov/about/top-tasks.html?src=rn)

# Information About...

- Transforming Teaching (https://www.ed.gov/teaching?src=rn)
- Family and Community Engagement (https://www.ed.gov/family-and-community-engagement?src=rn)
- Early Learning (https://www2.ed.gov/about/inits/ed/earlylearning/index.html?src=rn)

# Search press releases

Search...

# Find By Month

- September 2020 (/news/press-releases/monthly/202009)
- August 2020 (/news/press-releases/monthly/202008)
- July 2020 (/news/press-releases/monthly/202007)
- June 2020 (/news/press-releases/monthly/202006)
- May 2020 (/news/press-releases/monthly/202005)
- April 2020 (/news/press-releases/monthly/202004)
- March 2020 (/news/press-releases/monthly/202003)
- February 2020 (/news/press-releases/monthly/202002)
- January 2020 (/news/press-releases/monthly/202001)
- December 2019 (/news/press-releases/monthly/201912)
- November 2019 (/news/press-releases/monthly/201911)
- October 2019 (/news/press-releases/monthly/201910)
- All Press Releases (/news/press-releases)

---

Student Loans (https://www2.ed.gov/fund/grants-college.html?src=ft)

Repaying Loans (https://studentaid.gov/manage-loans/repayment?src=ft)

Defaulted Loans (https://studentaid.gov/manage-loans/default?src=ft)

Loan Forgiveness (https://studentaid.gov/manage-loans/forgiveness-cancellation?src=ft)

Loan Servicers (https://studentaid.gov/manage-loans/repayment/servicers?src=ft)

Laws & Guidance (https://www2.ed.gov/policy/landing.jhtml?src=ft)

Every Student Succeeds Act (ESSA) (https://www.ed.gov/essa?src=ft)

FERPA (https://studentprivacy.ed.gov/?src=ft)

Civil Rights (https://www2.ed.gov/about/offices/list/ocr/know.html?src=ft)

IDEA Website (https://sites.ed.gov/idea/?src=ft)

Data & Research (https://www2.ed.gov/rschstat

About Us (https://www2.ed.gov/about/landing.jhtml?src=ft)

Contact Us (https://www2.ed.gov/about/contacts/gen/index.html?src=ft)

ED Offices (https://www2.ed.gov/about/offices/list/index.html?src=ft)

Jobs (https://www.ed.gov/jobs?src=ft)

Press Releases (https://www.ed.gov/news/?src=ft)

FAQs (https://www.ed.gov/answers?src=ft)

Recursos en español (https://www2.ed.gov/espanol/bienvenidos

Grants & Programs
(https://www2.ed.gov
/fund/grants-
apply.html?src=ft)

Apply for Pell Grants
(https://www.fafsa.ed.gov
/?src=ft)

Grants Forecast
(https://www2.ed.gov
/fund/grant/find/edlite-
forecast.html?src=ft)

Apply for a Grant
(https://www2.ed.gov
/fund/grant/apply/grantapps
/index.html?src=ft)

Eligibility for Grants
(https://www2.ed.gov
/programs/find/elig
/index.html?src=ft)

/landing.jhtml?src=ft)

Education Statistics
(https://nces.ed.gov/?src=ft)

Postsecondary Education
Data (https://nces.ed.gov
/ipeds/?src=ft)

ED Data Express
(https://eddataexpress.ed.gov
/?src=ft)

Nation's Report Card
(https://nces.ed.gov
/nationsreportcard/?src=ft)

What Works Clearinghouse
(https://ies.ed.gov/ncee/wwc
/?src=ft)

/es/index.html?src=ft)

Budget, Performance
(https://www2.ed.gov/about
/overview/focus
/performance.html?src=ft)

Privacy Program
(https://www2.ed.gov
/privacy?src=ft)

Subscribe to E-Mail Updates
(https://www.ed.gov
/subscriptions)



(http://www.facebook.com

/ed.gov) 

(http://www.twitter.com

/usedgov) 

(https://www.ed.gov

/subscriptions) 

(https://www.ed.gov/feed)

Notices (https://www2.ed.gov/notices/index.html?src=ft)   FOIA (https://www2.ed.gov/policy/gen/leg/foia/foiatoc.html?src=ft)
Privacy Policy (https://www2.ed.gov/notices/privacy/index.html?src=ft)
Accessibility (https://www2.ed.gov/notices/accessibility/index.html?src=ft)
Security (https://www2.ed.gov/notices/security/index.html?src=ft)
Information Quality (https://www2.ed.gov/policy/gen/guid/infoqualguide.html?src=ft)
Inspector General (https://www2.ed.gov/about/offices/list/oig/index.html?src=ft)   Whitehouse.gov (https://www.whitehouse.gov/)
USA.gov (https://www.usa.gov/)   Benefits.gov (https://www.benefits.gov/)   Regulations.gov (https://www.regulations.gov/)

Exhibit 4

**Borrower Defense Partial Relief Methodology**
**Corinthian Colleges, Inc. (CCI) Programs**
**December 2019**

To calculate the amount of your borrower defense discharge relief, the U.S. Department of Education (ED) compared the earnings of those who completed the same or a similar program at your school ("median program earnings") to the earnings of those who completed the same or a similar program at other schools ("median comparison earnings"). Specifically, ED used a statistical tool called "standard deviation" to identify the range of program earnings that would qualify for loan relief, and then divided that range into quartiles to determine the amount of relief you would be provided. If your program earnings exceeded the comparison earnings, then even if you have filed an approved claim, you will not receive a discharge, unless your approved application is associated with CCI. If your approved application is associated with CCI, you will receive at least a 10% discharge. The larger the negative gap between your program earnings and comparison earnings, the greater the amount of loan discharge you received.

If the relief score is a negative number, the relief is 10%, if it is greater than zero but less than 0.67, then the relief is 25%, if it is greater than or equal to 0.67 but less than 1.33, then the relief is 50%, if it is greater than or equal to 1.33 but less than 2, then the relief is 75%, if it is greater than or equal to 2, then the relief is 100%. The relief score is calculated by subtracting median program earnings from median comparison earnings and then dividing the result by 1 standard deviation.

| Program Name | Credential | Median Program Earnings (CCI) | Median Comparison Earnings (Non-CCI Programs) | 1 Standard Deviation | 2 Standard Deviations | Relief Score | % Relief |
|---|---|---|---|---|---|---|---|
| Accounting and Business/Management. | Associate | $26,347.00 | $23,464.50 | $6,473.78 | $12,947.56 | -0.45 | 10% |
| Accounting and Business/Management. | Bachelor | $22,726.50 | $22,014.00 | $7,131.13 | $14,262.27 | -0.10 | 10% |
| Accounting and Business/Management. | Diploma | $11,371.50 | $19,966.00 | $8,783.48 | $17,566.96 | 0.98 | 50% |
| Accounting and Business/Management. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Accounting Technology/Technician and Bookkeeping. | Associate | $26,347.00 | $23,464.50 | $6,473.78 | $12,947.56 | -0.45 | 10% |
| Accounting Technology/Technician and Bookkeeping. | Diploma | $11,371.50 | $19,966.00 | $8,783.48 | $17,566.96 | 0.98 | 50% |
| Accounting. | Associate | $26,347.00 | $23,464.50 | $6,473.78 | $12,947.56 | -0.45 | 10% |
| Accounting. | Bachelor | $22,726.50 | $22,014.00 | $7,131.13 | $14,262.27 | -0.10 | 10% |
| Accounting. | Diploma | $11,371.50 | $19,966.00 | $8,783.48 | $17,566.96 | 0.98 | 50% |
| Accounting. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Administrative Assistant and Secretarial Science, General. | Associate | $22,726.50 | $22,014.00 | $7,131.13 | $14,262.27 | -0.10 | 10% |
| Administrative Assistant and Secretarial Science, General. | Bachelor | $22,726.50 | $22,014.00 | $7,131.13 | $14,262.27 | -0.10 | 10% |
| Administrative Assistant and Secretarial Science, General. | Diploma | $22,764.00 | $15,403.50 | $6,201.20 | $12,402.39 | -1.19 | 10% |
| Administrative Assistant and Secretarial Science, General. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Applied Psychology. | Bachelor | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |

| Program Name | Credential | Median Program Earnings (CCI) | Median Comparison Earnings (Non-CCI Programs) | 1 Standard Deviation | 2 Standard Deviations | Relief Score | % Relief |
|---|---|---|---|---|---|---|---|
| Athletic Training/Trainer. | Diploma | $24,166.00 | $33,997.00 | $16,806.12 | $33,612.24 | 0.58 | 25% |
| Autobody/Collision and Repair Technology/Technician. | Associate | $26,642.00 | $26,265.00 | $10,832.29 | $21,664.57 | -0.03 | 10% |
| Autobody/Collision and Repair Technology/Technician. | Bachelor | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Autobody/Collision and Repair Technology/Technician. | Diploma | $26,642.00 | $26,294.00 | $10,158.54 | $20,317.09 | -0.03 | 10% |
| Autobody/Collision and Repair Technology/Technician. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Automobile/Automotive Mechanics Technology/Technician. | Associate | $26,642.00 | $26,265.00 | $10,832.29 | $21,664.57 | -0.03 | 10% |
| Automobile/Automotive Mechanics Technology/Technician. | Bachelor | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Automobile/Automotive Mechanics Technology/Technician. | Diploma | $26,642.00 | $26,294.00 | $10,158.54 | $20,317.09 | -0.03 | 10% |
| Automobile/Automotive Mechanics Technology/Technician. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Automotive Engineering Technology/Technician. | Diploma | $21,323.00 | $30,698.00 | $15,927.94 | $31,855.89 | 0.59 | 25% |
| Biological and Physical Sciences. | Associate | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Biomedical Technology/Technician. | Diploma | $21,323.00 | $30,698.00 | $15,927.94 | $31,855.89 | 0.59 | 25% |
| Business Administration and Management, General. | Associate | $22,726.50 | $22,014.00 | $7,131.13 | $14,262.27 | -0.10 | 10% |
| Business Administration and Management, General. | Bachelor | $22,726.50 | $22,014.00 | $7,131.13 | $14,262.27 | -0.10 | 10% |
| Business Administration and Management, General. | Diploma | $11,669.00 | $18,104.00 | $10,327.32 | $20,654.64 | 0.62 | 25% |
| Business Administration and Management, General. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Business Administration, Management and Operations, Other. | Associate | $22,726.50 | $22,014.00 | $7,131.13 | $14,262.27 | -0.10 | 10% |
| Business Administration, Management and Operations, Other. | Bachelor | $22,726.50 | $22,014.00 | $7,131.13 | $14,262.27 | -0.10 | 10% |
| Business Administration, Management and Operations, Other. | Diploma | $11,669.00 | $18,104.00 | $10,327.32 | $20,654.64 | 0.62 | 25% |
| Business Administration, Management and Operations, Other. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |

| Program Name | Credential | Median Program Earnings (CCI) | Median Comparison Earnings (Non-CCI Programs) | 1 Standard Deviation | 2 Standard Deviations | Relief Score | % Relief |
|---|---|---|---|---|---|---|---|
| Business Operations Support and Secretarial Services, Other. | Associate | $22,726.50 | $22,014.00 | $7,131.13 | $14,262.27 | -0.10 | 10% |
| Business Operations Support and Secretarial Services, Other. | Bachelor | $22,726.50 | $22,014.00 | $7,131.13 | $14,262.27 | -0.10 | 10% |
| Business Operations Support and Secretarial Services, Other. | Diploma | $22,764.00 | $15,403.50 | $6,201.20 | $12,402.39 | -1.19 | 10% |
| Business Operations Support and Secretarial Services, Other. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Business, Management, Marketing, and Related Support Services, Other. | Associate | $19,106.00 | $19,768.50 | $5,889.54 | $11,779.09 | 0.11 | 25% |
| Business, Management, Marketing, and Related Support Services, Other. | Bachelor | $22,726.50 | $22,014.00 | $7,131.13 | $14,262.27 | -0.10 | 10% |
| Business, Management, Marketing, and Related Support Services, Other. | Diploma | $19,106.00 | $19,768.50 | $5,889.54 | $11,779.09 | 0.11 | 25% |
| Business, Management, Marketing, and Related Support Services, Other. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Business/Commerce, General. | Bachelor | $22,726.50 | $22,014.00 | $7,131.13 | $14,262.27 | -0.10 | 10% |
| Business/Office Automation/Technology/Data Entry. | Associate | $22,726.50 | $22,014.00 | $7,131.13 | $14,262.27 | -0.10 | 10% |
| Business/Office Automation/Technology/Data Entry. | Bachelor | $22,726.50 | $22,014.00 | $7,131.13 | $14,262.27 | -0.10 | 10% |
| Business/Office Automation/Technology/Data Entry. | Diploma | $22,764.00 | $15,403.50 | $6,201.20 | $12,402.39 | -1.19 | 10% |
| Business/Office Automation/Technology/Data Entry. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Cardiopulmonary Technology/Technologist. | Diploma | $24,166.00 | $33,997.00 | $16,806.12 | $33,612.24 | 0.58 | 25% |
| Carpentry/Carpenter. | Associate | $18,672.00 | $26,173.00 | $14,547.14 | $29,094.28 | 0.52 | 25% |
| Carpentry/Carpenter. | Bachelor | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Carpentry/Carpenter. | Diploma | $11,519.00 | $23,757.00 | $9,358.19 | $18,716.37 | 1.31 | 50% |
| Carpentry/Carpenter. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Cinematography and Film/Video Production. | Associate | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Cinematography and Film/Video Production. | Bachelor | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Cinematography and Film/Video Production. | Diploma | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |

| Program Name | Credential | Median Program Earnings (CCI) | Median Comparison Earnings (Non-CCI Programs) | 1 Standard Deviation | 2 Standard Deviations | Relief Score | % Relief |
|---|---|---|---|---|---|---|---|
| Cinematography and Film/Video Production. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Clinical Laboratory Science/Medical Technology/Technologist. | Diploma | $16,474.50 | $22,243.00 | $12,484.57 | $24,969.14 | 0.46 | 25% |
| Computer and Information Sciences, General. | Associate | $15,965.00 | $23,496.00 | $13,343.25 | $26,686.50 | 0.56 | 25% |
| Computer and Information Sciences, General. | Bachelor | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Computer and Information Sciences, General. | Diploma | $15,965.00 | $23,216.00 | $11,661.51 | $23,323.03 | 0.62 | 25% |
| Computer and Information Sciences, General. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Computer Programming, Specific Applications. | Bachelor | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Computer Support Specialist. | Associate | $15,965.00 | $23,496.00 | $13,343.25 | $26,686.50 | 0.56 | 25% |
| Computer Support Specialist. | Bachelor | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Computer Support Specialist. | Diploma | $15,965.00 | $23,496.00 | $13,343.25 | $26,686.50 | 0.56 | 25% |
| Computer Support Specialist. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Computer Systems Analysis/Analyst. | Bachelor | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Construction Management. | Associate | $22,726.50 | $22,014.00 | $7,131.13 | $14,262.27 | -0.10 | 10% |
| Construction Management. | Bachelor | $22,726.50 | $22,014.00 | $7,131.13 | $14,262.27 | -0.10 | 10% |
| Construction Management. | Diploma | $11,669.00 | $18,104.00 | $10,327.32 | $20,654.64 | 0.62 | 25% |
| Construction Management. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Court Reporting/Court Reporter. | Diploma | $17,778.00 | $28,212.00 | $10,292.16 | $20,584.32 | 1.01 | 50% |
| Criminal Justice/Law Enforcement Administration. | Associate | $28,654.00 | $21,707.00 | $4,625.64 | $9,251.29 | -1.50 | 10% |
| Criminal Justice/Law Enforcement Administration. | Bachelor | $28,654.00 | $21,868.50 | $6,304.76 | $12,609.51 | -1.08 | 10% |
| Criminal Justice/Law Enforcement Administration. | Diploma | $28,417.00 | $32,463.00 | $12,192.83 | $24,385.66 | 0.33 | 25% |
| Criminal Justice/Law Enforcement Administration. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Criminal Justice/Police Science. | Associate | $28,654.00 | $21,707.00 | $4,625.64 | $9,251.29 | -1.50 | 10% |
| Criminal Justice/Police Science. | Bachelor | $28,654.00 | $21,868.50 | $6,304.76 | $12,609.51 | -1.08 | 10% |

| Program Name | Credential | Median Program Earnings (CCI) | Median Comparison Earnings (Non-CCI Programs) | 1 Standard Deviation | 2 Standard Deviations | Relief Score | % Relief |
|---|---|---|---|---|---|---|---|
| Criminal Justice/Police Science. | Diploma | $28,417.00 | $32,463.00 | $12,192.83 | $24,385.66 | 0.33 | 25% |
| Criminal Justice/Police Science. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Dental Assisting/Assistant. | Associate | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Dental Assisting/Assistant. | Bachelor | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Dental Assisting/Assistant. | Diploma | $16,459.00 | $21,145.00 | $7,162.97 | $14,325.94 | 0.65 | 25% |
| Dental Assisting/Assistant. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Diagnostic Medical Sonography/Sonographer and Ultrasound Technician. | Diploma | $24,166.00 | $33,997.00 | $16,806.12 | $33,612.24 | 0.58 | 25% |
| Diesel Mechanics Technology/Technician. | Associate | $26,642.00 | $26,265.00 | $10,832.29 | $21,664.57 | -0.03 | 10% |
| Diesel Mechanics Technology/Technician. | Bachelor | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Diesel Mechanics Technology/Technician. | Diploma | $26,642.00 | $26,294.00 | $10,158.54 | $20,317.09 | -0.03 | 10% |
| Diesel Mechanics Technology/Technician. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Drywall Installation/Drywaller. | Diploma | $18,672.00 | $26,173.00 | $14,547.14 | $29,094.28 | 0.52 | 25% |
| Electrical, Electronic and Communications Engineering Technology/Technician. | Associate | $21,323.00 | $30,698.00 | $15,927.94 | $31,855.89 | 0.59 | 25% |
| Electrical, Electronic and Communications Engineering Technology/Technician. | Bachelor | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Electrical, Electronic and Communications Engineering Technology/Technician. | Diploma | $21,323.00 | $30,698.00 | $15,927.94 | $31,855.89 | 0.59 | 25% |
| Electrical, Electronic and Communications Engineering Technology/Technician. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Electrical/Electronics Equipment Installation and Repair, General. | Associate | $26,642.00 | $26,265.00 | $10,832.29 | $21,664.57 | -0.03 | 10% |
| Electrical/Electronics Equipment Installation and Repair, General. | Bachelor | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Electrical/Electronics Equipment Installation and Repair, General. | Diploma | $26,642.00 | $26,265.00 | $10,832.29 | $21,664.57 | -0.03 | 10% |
| Electrical/Electronics Equipment Installation and Repair, General. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Electrician. | Associate | $18,672.00 | $26,173.00 | $14,547.14 | $29,094.28 | 0.52 | 25% |
| Electrician. | Bachelor | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Electrician. | Diploma | $23,697.00 | $29,079.00 | $14,651.19 | $29,302.38 | 0.37 | 25% |

| Program Name | Credential | Median Program Earnings (CCI) | Median Comparison Earnings (Non-CCI Programs) | 1 Standard Deviation | 2 Standard Deviations | Relief Score | % Relief |
|---|---|---|---|---|---|---|---|
| Electrician. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Engineering, General. | Bachelor | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| English Language and Literature/Letters, Other. | Associate | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Entrepreneurship/Entrepreneurial Studies. | Associate | $22,726.50 | $22,014.00 | $7,131.13 | $14,262.27 | -0.10 | 10% |
| Entrepreneurship/Entrepreneurial Studies. | Bachelor | $22,726.50 | $22,014.00 | $7,131.13 | $14,262.27 | -0.10 | 10% |
| Entrepreneurship/Entrepreneurial Studies. | Diploma | $11,669.00 | $18,104.00 | $10,327.32 | $20,654.64 | 0.62 | 25% |
| Entrepreneurship/Entrepreneurial Studies. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| General Office Occupations and Clerical Services. | Associate | $22,726.50 | $22,014.00 | $7,131.13 | $14,262.27 | -0.10 | 10% |
| General Office Occupations and Clerical Services. | Bachelor | $22,726.50 | $22,014.00 | $7,131.13 | $14,262.27 | -0.10 | 10% |
| General Office Occupations and Clerical Services. | Diploma | $22,764.00 | $15,403.50 | $6,201.20 | $12,402.39 | -1.19 | 10% |
| General Office Occupations and Clerical Services. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| General Studies. | Associate | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| General Studies. | Bachelor | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| General Studies. | Diploma | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Health and Wellness, General. | Associate | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Health and Wellness, General. | Bachelor | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Health and Wellness, General. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Health Information/Medical Records Administration/Administrator. | Associate | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Health Information/Medical Records Administration/Administrator. | Diploma | $15,823.50 | $19,552.00 | $6,599.15 | $13,198.30 | 0.56 | 25% |
| Health Information/Medical Records Technology/Technician. | Associate | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Health Information/Medical Records Technology/Technician. | Bachelor | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |

| Program Name | Credential | Median Program Earnings (CCI) | Median Comparison Earnings (Non-CCI Programs) | 1 Standard Deviation | 2 Standard Deviations | Relief Score | % Relief |
|---|---|---|---|---|---|---|---|
| Health Information/Medical Records Technology/Technician. | Diploma | $15,823.50 | $19,552.00 | $6,599.15 | $13,198.30 | 0.56 | 25% |
| Health Information/Medical Records Technology/Technician. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Health/Health Care Administration/Management. | Associate | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Health/Health Care Administration/Management. | Bachelor | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Health/Health Care Administration/Management. | Diploma | $15,823.50 | $19,552.00 | $6,599.15 | $13,198.30 | 0.56 | 25% |
| Health/Health Care Administration/Management. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Heating, Air Conditioning, Ventilation and Refrigeration Maintenance Technology/Technician. | Associate | $26,642.00 | $26,265.00 | $10,832.29 | $21,664.57 | -0.03 | 10% |
| Heating, Air Conditioning, Ventilation and Refrigeration Maintenance Technology/Technician. | Bachelor | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Heating, Air Conditioning, Ventilation and Refrigeration Maintenance Technology/Technician. | Diploma | $26,642.00 | $26,265.00 | $10,832.29 | $21,664.57 | -0.03 | 10% |
| Heating, Air Conditioning, Ventilation and Refrigeration Maintenance Technology/Technician. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Heating, Ventilation, Air Conditioning and Refrigeration Engineering Technology/Technician. | Associate | $21,323.00 | $30,698.00 | $15,927.94 | $31,855.89 | 0.59 | 25% |
| Heating, Ventilation, Air Conditioning and Refrigeration Engineering Technology/Technician. | Bachelor | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Heating, Ventilation, Air Conditioning and Refrigeration Engineering Technology/Technician. | Diploma | $22,574.50 | $27,836.50 | $13,637.48 | $27,274.97 | 0.39 | 25% |
| Heating, Ventilation, Air Conditioning and Refrigeration Engineering Technology/Technician. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Homeland Security. | Associate | $28,654.00 | $21,868.50 | $6,304.76 | $12,609.51 | -1.08 | 10% |
| Homeland Security. | Bachelor | $28,654.00 | $21,868.50 | $6,304.76 | $12,609.51 | -1.08 | 10% |

| Program Name | Credential | Median Program Earnings (CCI) | Median Comparison Earnings (Non-CCI Programs) | 1 Standard Deviation | 2 Standard Deviations | Relief Score | % Relief |
|---|---|---|---|---|---|---|---|
| Homeland Security. | Diploma | $28,417.00 | $33,473.50 | $12,403.38 | $24,806.75 | 0.41 | 25% |
| Homeland Security. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Hospitality Administration/Management, General. | Associate | $22,726.50 | $22,014.00 | $7,131.13 | $14,262.27 | -0.10 | 10% |
| Hospitality Administration/Management, General. | Bachelor | $22,726.50 | $22,014.00 | $7,131.13 | $14,262.27 | -0.10 | 10% |
| Hospitality Administration/Management, General. | Diploma | $11,669.00 | $18,104.00 | $10,327.32 | $20,654.64 | 0.62 | 25% |
| Hospitality Administration/Management, General. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Industrial Production Technologies/Technicians, Other. | Associate | $21,323.00 | $30,698.00 | $15,927.94 | $31,855.89 | 0.59 | 25% |
| International Business/Trade/Commerce. | Bachelor | $22,726.50 | $22,014.00 | $7,131.13 | $14,262.27 | -0.10 | 10% |
| Legal Assistant/Paralegal. | Associate | $13,331.00 | $22,043.50 | $6,259.34 | $12,518.68 | 1.39 | 75% |
| Legal Assistant/Paralegal. | Bachelor | $13,331.00 | $22,043.50 | $6,259.34 | $12,518.68 | 1.39 | 75% |
| Legal Assistant/Paralegal. | Diploma | $17,778.00 | $28,212.00 | $10,292.16 | $20,584.32 | 1.01 | 50% |
| Legal Assistant/Paralegal. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Liberal Arts and Sciences/Liberal Studies. | Associate | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Liberal Arts and Sciences/Liberal Studies. | Diploma | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Licensed Practical/Vocational Nurse Training. | Associate | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Licensed Practical/Vocational Nurse Training. | Bachelor | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Licensed Practical/Vocational Nurse Training. | Diploma | $14,174.00 | $34,251.50 | $9,464.26 | $18,928.51 | 2.12 | 100% |
| Licensed Practical/Vocational Nurse Training. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Marine Maintenance/Fitter and Ship Repair Technology/Technician. | Associate | $26,642.00 | $26,265.00 | $10,832.29 | $21,664.57 | -0.03 | 10% |
| Marine Maintenance/Fitter and Ship Repair Technology/Technician. | Bachelor | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Marine Maintenance/Fitter and Ship Repair Technology/Technician. | Diploma | $26,642.00 | $26,294.00 | $10,158.54 | $20,317.09 | -0.03 | 10% |

| Program Name | Credential | Median Program Earnings (CCI) | Median Comparison Earnings (Non-CCI Programs) | 1 Standard Deviation | 2 Standard Deviations | Relief Score | % Relief |
|---|---|---|---|---|---|---|---|
| Marine Maintenance/Fitter and Ship Repair Technology/Technician. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Marketing/Marketing Management, General. | Bachelor | $22,726.50 | $22,014.00 | $7,131.13 | $14,262.27 | -0.10 | 10% |
| Massage Therapy/Therapeutic Massage. | Associate | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Massage Therapy/Therapeutic Massage. | Bachelor | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Massage Therapy/Therapeutic Massage. | Diploma | $13,260.00 | $14,678.50 | $4,485.60 | $8,971.20 | 0.32 | 25% |
| Massage Therapy/Therapeutic Massage. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Mechanical Engineering. | Bachelor | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Medical Administrative/Executive Assistant and Medical Secretary. | Associate | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Medical Administrative/Executive Assistant and Medical Secretary. | Bachelor | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Medical Administrative/Executive Assistant and Medical Secretary. | Diploma | $15,823.50 | $19,552.00 | $6,599.15 | $13,198.30 | 0.56 | 25% |
| Medical Administrative/Executive Assistant and Medical Secretary. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Medical Insurance Coding Specialist/Coder. | Diploma | $15,823.50 | $19,552.00 | $6,599.15 | $13,198.30 | 0.56 | 25% |
| Medical Insurance Specialist/Medical Biller. | Associate | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Medical Insurance Specialist/Medical Biller. | Bachelor | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Medical Insurance Specialist/Medical Biller. | Diploma | $15,823.50 | $19,552.00 | $6,599.15 | $13,198.30 | 0.56 | 25% |
| Medical Insurance Specialist/Medical Biller. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Medical Office Management/Administration. | Associate | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Medical Office Management/Administration. | Bachelor | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Medical Office Management/Administration. | Diploma | $15,823.50 | $19,552.00 | $6,599.15 | $13,198.30 | 0.56 | 25% |
| Medical Office Management/Administration. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Medical Radiologic Technology/Science-Radiation Therapist. | Associate | $29,558.00 | $33,215.00 | $14,508.86 | $29,017.73 | 0.25 | 25% |
| Medical/Clinical Assistant. | Associate | $20,011.00 | $21,351.00 | $9,161.00 | $18,322.00 | 0.15 | 25% |
| Medical/Clinical Assistant. | Bachelor | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Medical/Clinical Assistant. | Diploma | $17,579.00 | $19,283.00 | $5,036.03 | $10,072.06 | 0.34 | 25% |
| Medical/Clinical Assistant. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Medical/Health Management and Clinical Assistant/Specialist. | Associate | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |

| Program Name | Credential | Median Program Earnings (CCI) | Median Comparison Earnings (Non-CCI Programs) | 1 Standard Deviation | 2 Standard Deviations | Relief Score | % Relief |
|---|---|---|---|---|---|---|---|
| Motorcycle Maintenance and Repair Technology/Technician. | Associate | $26,642.00 | $26,265.00 | $10,832.29 | $21,664.57 | -0.03 | 10% |
| Motorcycle Maintenance and Repair Technology/Technician. | Bachelor | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Motorcycle Maintenance and Repair Technology/Technician. | Diploma | $26,642.00 | $26,294.00 | $10,158.54 | $20,317.09 | -0.03 | 10% |
| Motorcycle Maintenance and Repair Technology/Technician. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Music Technology. | Associate | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Nail Technician/Specialist and Manicurist. | Diploma | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Network and System Administration/Administrator. | Associate | $15,965.00 | $23,496.00 | $13,343.25 | $26,686.50 | 0.56 | 25% |
| Network and System Administration/Administrator. | Bachelor | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Network and System Administration/Administrator. | Diploma | $15,965.00 | $23,496.00 | $13,343.25 | $26,686.50 | 0.56 | 25% |
| Network and System Administration/Administrator. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Nurse/Nursing Assistant/Aide and Patient Care Assistant. | Diploma | $16,474.50 | $22,243.00 | $12,484.57 | $24,969.14 | 0.46 | 25% |
| Nursing Assistant/Aide and Patient Care Assistant/Aide. | Associate | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Nursing Assistant/Aide and Patient Care Assistant/Aide. | Bachelor | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Nursing Assistant/Aide and Patient Care Assistant/Aide. | Diploma | $14,174.00 | $34,251.50 | $9,464.26 | $18,928.51 | 2.12 | 100% |
| Nursing Assistant/Aide and Patient Care Assistant/Aide. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Pharmacy Technician/Assistant. | Associate | $20,011.00 | $21,351.00 | $9,161.00 | $18,322.00 | 0.15 | 25% |
| Pharmacy Technician/Assistant. | Bachelor | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Pharmacy Technician/Assistant. | Diploma | $17,579.00 | $19,283.00 | $5,036.03 | $10,072.06 | 0.34 | 25% |
| Pharmacy Technician/Assistant. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Plumbing Technology/Plumber. | Associate | $18,672.00 | $26,173.00 | $14,547.14 | $29,094.28 | 0.52 | 25% |
| Plumbing Technology/Plumber. | Bachelor | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |

| Program Name | Credential | Median Program Earnings (CCI) | Median Comparison Earnings (Non-CCI Programs) | 1 Standard Deviation | 2 Standard Deviations | Relief Score | % Relief |
|---|---|---|---|---|---|---|---|
| Plumbing Technology/Plumber. | Diploma | $14,176.00 | $19,912.00 | $17,313.64 | $34,627.27 | 0.33 | 25% |
| Plumbing Technology/Plumber. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Practical Nursing, Vocational Nursing and Nursing Assistants, Other. | Diploma | $14,174.00 | $34,251.50 | $9,464.26 | $18,928.51 | 2.12 | 100% |
| Pre-Engineering. | Associate | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Psychology, General. | Associate | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Radiologic Technology/Science-Radiographer. | Diploma | $24,166.00 | $33,997.00 | $16,806.12 | $33,612.24 | 0.58 | 25% |
| Registered Nursing/Registered Nurse. | Associate | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Registered Nursing/Registered Nurse. | Bachelor | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Registered Nursing/Registered Nurse. | Diploma | $16,474.50 | $22,243.00 | $12,484.57 | $24,969.14 | 0.46 | 25% |
| Registered Nursing/Registered Nurse. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Renal/Dialysis Technologist/Technician. | Associate | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Renal/Dialysis Technologist/Technician. | Bachelor | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Renal/Dialysis Technologist/Technician. | Diploma | $16,474.50 | $22,243.00 | $12,484.57 | $24,969.14 | 0.46 | 25% |
| Renal/Dialysis Technologist/Technician. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Respiratory Care Therapy/Therapist. | Associate | $29,558.00 | $33,215.00 | $14,508.86 | $29,017.73 | 0.25 | 25% |
| Respiratory Care Therapy/Therapist. | Bachelor | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Respiratory Care Therapy/Therapist. | Diploma | $24,166.00 | $33,997.00 | $16,806.12 | $33,612.24 | 0.58 | 25% |
| Respiratory Care Therapy/Therapist. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Restaurant, Culinary, and Catering Management/Manager. | Diploma | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Sales, Distribution, and Marketing Operations, General. | Associate | $22,726.50 | $22,014.00 | $7,131.13 | $14,262.27 | -0.10 | 10% |
| Sales, Distribution, and Marketing Operations, General. | Bachelor | $22,726.50 | $22,014.00 | $7,131.13 | $14,262.27 | -0.10 | 10% |
| Sales, Distribution, and Marketing Operations, General. | Diploma | $11,669.00 | $18,104.00 | $10,327.32 | $20,654.64 | 0.62 | 25% |
| Sales, Distribution, and Marketing Operations, General. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Social Sciences, General. | Associate | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |

| Program Name | Credential | Median Program Earnings (CCI) | Median Comparison Earnings (Non-CCI Programs) | 1 Standard Deviation | 2 Standard Deviations | Relief Score | % Relief |
|---|---|---|---|---|---|---|---|
| Sociology. | Associate | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Sociology. | Bachelor | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Speech Communication and Rhetoric. | Associate | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Surgical Technology/Technologist. | Associate | $29,558.00 | $33,215.00 | $14,508.86 | $29,017.73 | 0.25 | 25% |
| Surgical Technology/Technologist. | Bachelor | $24,784.50 | $22,447.50 | $13,957.89 | $27,915.77 | -0.17 | 10% |
| Surgical Technology/Technologist. | Diploma | $24,166.00 | $33,997.00 | $16,806.12 | $33,612.24 | 0.58 | 25% |
| Surgical Technology/Technologist. | Master | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Sustainability Studies. | Bachelor | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |
| Youth Services/Administration. | Bachelor | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available | No Data Available |

Exhibit 5

**Borrower Defense Partial Relief Methodology**
**ITT Educational Services, Inc. Programs**
**December 2019**

To calculate the amount of your borrower defense discharge relief, the U.S. Department of Education (ED) compared the earnings of those who completed the same or a similar program at your school ("median program earnings") to the earnings of those who completed the same or a similar program at other schools ("median comparison earnings"). Specifically, ED used a statistical tool called "standard deviation" to identify the range of program earnings that would qualify for loan relief, and then divided that range into quartiles to determine the amount of relief you would be provided. If your program earnings exceeded the comparison earnings, then even if you have filed an approved claim, you will not receive a discharge. The larger the negative gap between your program earnings and comparison earnings, the greater the amount of loan discharge you received.

| Program Name | Credential | Median Program Earnings | Median Comparison Earnings | 2 Standard Deviations | % Relief Standard Deviation |
|---|---|---|---|---|---|
| Accounting Technology/Technician and Bookkeeping. | Associate | $26,257.00 | $23,464.50 | $12,948.49 | 0% |
| Accounting Technology/Technician and Bookkeeping. | Bachelor | $34,013.00 | $39,134.00 | $16,477.37 | 25% |
| Animation, Interactive Technology, Video Graphics and Special Effects. | Bachelor | $23,114.00 | $26,035.50 | $19,569.43 | 25% |
| Business Administration and Management, General. | Associate | $25,072.00 | $20,861.00 | $15,855.27 | 0% |
| Business Administration and Management, General. | Bachelor | $35,693.00 | $36,945.50 | $24,177.02 | 25% |
| Business Administration and Management, General. | Master | $43,093.00 | $50,607.00 | $18,927.79 | 50% |
| CAD/CADD Drafting and/or Design Technology/Technician. | Associate | $35,947.00 | $31,649.00 | $14,547.47 | 0% |
| Computer and Information Systems Security/Information Assurance. | Bachelor | $46,083.00 | $49,694.50 | $34,107.25 | 25% |
| Computer Programming/Programmer, General. | Associate | $31,679.00 | $24,176.50 | $15,048.34 | 0% |
| Computer Programming/Programmer, General. | Bachelor | $50,558.00 | $52,988.00 | $32,028.10 | 25% |
| Computer Software and Media Applications, Other. | Associate | $30,127.50 | $23,012.50 | $23,751.61 | 0% |
| Computer Software and Media Applications, Other. | Bachelor | $54,098.00 | $44,052.00 | $22,727.71 | 0% |
| Computer Systems Networking and Telecommunications. | Associate | $32,687.50 | $26,037.00 | $15,240.03 | 0% |

| Program Name | Credential | Median Program Earnings | Median Comparison Earnings | 2 Standard Deviations | % Relief Standard Deviation |
|---|---|---|---|---|---|
| Construction Management. | Bachelor | $43,589.00 | No Data Available | No Data Available | No Data Available |
| Construction Trades, General. | Associate | $51,180.00 | No Data Available | No Data Available | No Data Available |
| Criminal Justice/Law Enforcement Administration. | Associate | $21,948.00 | $21,815.00 | $9,387.91 | 0% |
| Criminal Justice/Law Enforcement Administration. | Bachelor | $26,053.50 | $29,678.50 | $18,572.86 | 25% |
| Design and Visual Communications, General. | Associate | $19,838.50 | $21,371.00 | $12,005.15 | 25% |
| E-Commerce/Electronic Commerce. | Bachelor | $35,693.00 | $36,945.50 | $24,177.02 | 25% |
| Electrical, Electronic and Communications Engineering Technology/Technician. | Associate | $36,773.50 | $30,465.50 | $16,306.59 | 0% |
| Electrical, Electronic and Communications Engineering Technology/Technician. | Bachelor | $53,355.00 | $47,972.00 | $16,832.58 | 0% |
| Health Information/Medical Records Technology/Technician. | Associate | $24,425.00 | $19,808.00 | $9,669.74 | 0% |
| Information Technology. | Associate | $39,443.00 | $22,996.00 | $14,513.53 | 0% |
| Legal Assistant/Paralegal. | Associate | $25,382.50 | $21,898.00 | $12,624.22 | 0% |
| Manufacturing Engineering Technology/Technician. | Bachelor | $55,204.00 | No Data Available | No Data Available | No Data Available |
| Network and System Administration/Administrator. | Associate | $33,904.00 | $28,396.00 | $15,905.39 | 0% |
| Network and System Administration/Administrator. | Bachelor | $46,083.00 | $49,694.50 | $34,107.25 | 25% |
| Registered Nursing/Registered Nurse. | Associate | $50,267.00 | $52,443.00 | $31,306.56 | 25% |
| Web Page, Digital/Multimedia and Information Resources Design. | Associate | $30,127.50 | $23,012.50 | $23,751.61 | 0% |