## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SAMMIA PRATT, ALICIA DAVIS, and BRITTANY SAULSBERRY, individually and on behalf of all others similarly situated, and MARISOL CASTILLO and HEATHER BIANCHI,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>ELISABETH DeVOS, in her official capacity as Secretary of Education, and UNITED STATES DEPARTMENT OF EDUCATION,<br><br>　　　　　　Defendants. | Civil Action No. 20-cv-1501-TNM |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, plaintiffs hereby move for summary judgment on their individual and class claims on the ground that there is no genuine issue of disputed material fact and that plaintiffs and the members of the class are entitled to judgment as a matter of law. In support of this motion, plaintiffs submit the accompanying (1) memorandum of points and authorities; (2) declaration of Jordan Matsudaira; and (3) proposed order.

Dated:  November 2, 2020

Respectfully submitted,

/s/ Adina H. Rosenbaum
Adina H. Rosenbaum (D.C. Bar No. 490928)
Adam R. Pulver (D.C. Bar No. 1020475)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th St. NW
Washington, DC 20009
(202) 588-1000
arosenbaum@citizen.org

Michael N. Turi (New York Bar No. 5385745)
*Pro hac vice*
Eileen M. Connor (Mass. BBO No. 569184)
(application for admission forthcoming)
Toby R. Merrill (Mass. BBO No. 601071)
PROJECT ON PREDATORY STUDENT
LENDING,
LEGAL SERVICES CENTER OF HARVARD
LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
(617) 522-3003
mturi@law.harvard.edu

*Counsel for Plaintiffs and the Class*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SAMMIA PRATT, ALICIA DAVIS, and
BRITTANY SAULSBERRY, individually
and on behalf of all others similarly situated,
and MARISOL CASTILLO and HEATHER
BIANCHI,

               Plaintiffs,

        v.

ELISABETH DeVOS, in her official capacity
as Secretary of Education, and UNITED
STATES DEPARTMENT OF EDUCATION,

               Defendants.

Civil Action No. 20-cv-1501-TNM

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 2

      A.     Statutory and Regulatory Framework ..................................................... 2

      B.     The Partial Relief Rule............................................................................. 7

      C.     The Plaintiffs......................................................................................... 13

LEGAL STANDARD............................................................................................ 15

ARGUMENT ....................................................................................................... 16

I.      The Partial Relief Rule is Reviewable Final Agency Action. ........................... 16

II.     The Partial Relief Rule is Arbitrary, Capricious, and Contrary to Law. ........................... 17

      A.  The Partial Relief Rule does not logically measure the harm a borrower suffered as a result of wrongful acts by the school the borrower attended. ................................. 18

            1.   The Rule fails to take into account reasons why the imputed earnings do not measure the value of the education provided to the borrower.................. 18

            2.   The Rule fails to take into account reasons why comparing the median earnings of program graduates does not measure the programs' comparative value............................................................................................. 21

            3.   The Rule fails to take into account reasons why looking only at comparative earnings data does not measure the harm a student borrower suffered as a result of a school's wrongful conduct. ............................................ 23

      B.  The Partial Relief Rule's standard deviation methodology is unsupported and statistically invalid. ................................................................................. 26

            1.   ED's assertion that two standard deviations below the median of the comparison programs' median earnings is the point at which imputed earnings differ from that median in a statistically significant manner is unsupported and incorrect. ............................................................. 26

            2.   The earnings data do not follow a normal distribution. .................................. 31

        3.   Standard deviations measure distribution of data from the mean, not the median..............................................................................................................33

   C.  The Partial Relief Rule conflicts with governing regulations.....................................34

III.   The Partial Relief Rule Was Adopted Without Observance of Procedure Required by Law ..................................................................................................................................35

   A.  The Partial Relief Rule is not a "general statement of policy." .................................36

   B.  The Partial Relief Rule is not an "interpretative rule." .................................................38

   C.  The Partial Relief Rule is not a "procedural rule." .....................................................39

IV.   The Court Should Vacate Relief Determinations Based on the Partial Relief Rule. .........40

CONCLUSION..............................................................................................................................41

## TABLE OF AUTHORITIES

**CASES**                                                      **PAGE(S)**

*American Ass'n of Cosmetology Schools v. DeVos*,
258 F. Supp. 3d 50 (D.D.C. 2017) ...............................................................19, 28

*Animal Legal Defense Fund, Inc. v. Perdue*,
872 F.3d 602 (D.C. Cir. 2017)................................................................................29

*Ass'n of Private Colleges & Universities v. Duncan*,
870 F. Supp. 2d 133 (D.D.C. 2012).......................................................................31

*\*Batterton v. Marshall*,
648 F.2d 694 (D.C. Cir. 1980) ...........................................................36, 38, 39, 40

*Bennet v. Spear*,
520 U.S. 154 (1997) ........................................................................................15, 16

*Calvillo Manriquez v. DeVos*,
345 F. Supp. 3d 1077 (N.D. Cal. 2018),
*appeal pending*, *Calvillo Manriquez v. DeVos*, No. 18-16375 (9th Cir.) ..........7, 16

*Calvillo Manriquez v. DeVos*,
No. 17-CV-07210-SK, 2018 WL 5316175 (N.D. Cal. Oct. 15, 2018) .....................7

*Chiayu Chang v. United States Citizenship & Immigration Services*,
289 F. Supp. 3d 177 (D.D.C. 2018) .......................................................................17

*Clarian Health West, LLC v. Hargan*,
878 F.3d 346 (D.C. Cir. 2017) ..............................................................................36

*County of Los Angeles v. Shalala*,
192 F.3d 1005 (D.C. Cir. 1999) ............................................................................22

*D.A.M. v. Barr*,
No. 20-CV-1321 (CRC), 2020 WL 5525056 (D.D.C. Sept. 15, 2020) ..................40

*Electronic Privacy Information Center v. United States Department of Homeland Security*,
653 F.3d 1 (D.C. Cir. 2011) ............................................................................37, 39

*Esch v. Yeutter*,
876 F.2d 976 (D.C. Cir. 1989)...............................................................................29

*General Electric Co. v. Environmental Protection Agency*,
290 F.3d 377 (D.C. Cir. 2002) ..............................................................................37

*Guardian Federal Savings & Loan Association v. Federal Savings & Loan Insurance Corp.*,
  589 F.2d 658 (D.C. Cir. 1978) ..................................................................38

*Ipsen Biopharmaceuticals, Inc. v. Azar*,
  943 F.3d 953 (D.C. Cir. 2019) ..................................................................17

*Landmark Hospital of Salt Lake City v. Azar*,
  442 F. Supp. 3d 327 (D.D.C. 2020) ..........................................................15

*L.M.-M. v. Cuccinelli*,
  442 F. Supp. 3d 1 (D.D.C. 2020) ...............................................................41

*Mendoza v. Perez*,
  754 F.3d 1002 (D.C. Cir. 2014) ...................................................38, 39, 40

*Motor Vehicle Manufacturers Ass'n of United States. v. State Farm Mutual Automobile
  Insurance Co.*, 463 U.S. 29 (1983) ..............................................17, 18, 28, 33

*Oceana v. Ross*,
  No. CV 08-1881 (PLF), 2020 WL 5834838 (D.D.C. Oct. 1, 2020) .......................18

*Owner-Operator Independent Drivers Association, Inc. v. Federal Motor Carrier Safety
  Administration*, 494 F.3d 188 (D.C. Cir. 2007) ...................................... 28, 32-33

*Panhandle Producers & Royalty Owners Association v. Economic Regulatory Administration*,
  822 F.2d 1105 (D.C. Cir. 1987) ..................................................................37

*Perez v. Mortgage Bankers Ass'n*,
  575 U.S. 92 (2015)....................................................................................35

*POET Biorefining, LLC v. Environmental Protection Agency*,
  970 F.3d 392 (D.C. Cir. 2020) ..................................................................16

*Safari Club International v. Jewell*,
  842 F.3d 1280 (D.C. Cir. 2016) ..................................................................17

**STATUTES**

5 U.S.C. § 553(b) .................................................................36, 38, 39, 40

5 U.S.C. § 553(b)(3)(B) ...............................................................................3

5 U.S.C. § 553(b)–(c)........................................................................8, 35, 40

5 U.S.C. § 704 ...........................................................................................15

iv

5 U.S.C. § 706(2)(A) ..................................................................................................15

5 U.S.C. § 706(2)(D) ............................................................................................15, 40

20 U.S.C. § 1002(b)(1)(A)(i) ...................................................................................7, 22

20 U.S.C. § 1070, et seq. ...............................................................................................2

20 U.S.C. § 1078 ..........................................................................................................3

20 U.S.C. § 1087a .........................................................................................................3

20 U.S.C. § 1087e(h) ....................................................................................................3

20 U.S.C. § 1098a(a)(1) ...............................................................................3, 8, 35, 40

20 U.S.C. § 1098a(b) ...................................................................................3, 8, 35, 40

## REGULATIONS AND RULES

34 C.F.R. § 668.403 (2017) .........................................................................................7

34 C.F.R. § 682.209(g) .................................................................................................3

34 C.F.R. § 685.206(c)(1) .............................................................................................5

34 C.F.R. § 685.206(c)(2) .............................................................................................4

34 C.F.R. § 685.212(k)(2) .............................................................................................5

34 C.F.R. § 685.222 ......................................................................................................5

34 C.F.R. § 685.222(a)(2) .............................................................................................4

34 C.F.R. §§ 685.222(b)-(d) ..........................................................................................4

34 C.F.R. §§ 685.222(e)–(k) ..........................................................................................5

34 C.F.R. § 685.222(e)(2) ...........................................................................................12

34 C.F.R. § 685.222(e)(5) .............................................................................11, 12, 16, 37

34 C.F.R. § 685.222(e)(5)(i) ..........................................................................12, 13, 38

34 C.F.R. § 685.222(i)(1) ................................................................................5, 33

34 C.F.R. § 685.222(i)(2) ....................................................................5, 34, 35, 39

34 C.F.R. § 685.222(i)(2)(i) ............................................................................6, 34

34 C.F.R. § 685.222(i)(2)(ii) ...............................................................................34

34 C.F.R. § 685.222(i)(2)(ii)(A) ...........................................................................6

34 C.F.R. § 685.222(i)(2)(ii)(B) ...........................................................................6

34 C.F.R. § 685.222(i)(2)(iii) .........................................................................6, 34

ED, Final Regulations, Program Integrity: Gainful Employment, 84 Fed. Reg. 31392
   (July 1, 2019) ................................................................................................ 22

ED, Final Rule, Student Assistance General Provisions, Federal Family Education Loan
   Program, and William D. Ford Federal Direct Loan Program, 84 Fed. Reg. 49788
   (Sept. 23, 2019) ............................................................................................. 5

ED, Final Regulations, Student Assistance General Provisions, Federal Perkins Loan
   Program, Federal Family Education Loan Program, William D. Ford Federal Direct
   Loan Program, and Teacher Education Assistance for College and Higher Education
   Grant Program, 81 Fed. Reg. 75926 (Nov. 1, 2016) ..................................... 4, 6, 20

ED, Final Regulations, William D. Ford Direct Loan Program, 59 Fed. Reg. 61664
   (Dec. 1, 1994) ................................................................................................ 4

Federal Rule of Civil Procedure 56(c) ...............................................................15

**MISCELLANEOUS**

ED, College Scorecard, https://collegescorecard.ed.gov ..............................................11

## INTRODUCTION

Over the past decade, investigations have revealed that some colleges and universities, particularly in the for-profit sector, have misled and deceived vulnerable students, inducing them to amass significant federal student loan debt in exchange for low-quality and often useless educations. Schools have been documented providing false information about program costs and financial aid, touting inflated graduation or employment statistics, falsely representing that credits would transfer to other educational institutions, and misleading students about their programs' accreditation.

The Higher Education Act (HEA) and its implementing regulations provide students who have been harmed by such predatory colleges and universities with a defense against repayment of their federal student loan debt, known as a "borrower defense" to repayment. This defense against repayment is vital to ensuring that student borrowers are not left saddled with insurmountable debt in exchange for worthless educations.

Recently, however, the Department of Education (ED) adopted a rule for deciding how much relief to award borrowers who have successfully established a borrower defense to repayment, under which the vast majority of such borrowers receive only partial or no relief from repayment of their federal student loans, despite having shown that the school they attended misled, deceived, or otherwise preyed upon them. The new rule requires ED officials deciding borrower defense claims to determine the amount of relief to award borrowers solely by comparing earnings that ED "imputes" to the borrowers to the median of the median earnings of graduates of other programs, and to award borrowers full relief only if the imputed earnings are two standard deviations below that median. ED asserts that this methodology measures "the harm suffered by a successful [borrower defense] applicant as a result of the [school's] misconduct." AR-A-0005.

The new rule, referred to herein as the Partial Relief Rule, is arbitrary, capricious, and contrary to law. The Rule fails to consider relevant factors and does not provide a rational connection between its methodology and the harm inflicted on borrowers by their schools' wrongful acts and omissions. ED's justification for using standard deviations to determine the amount of relief—that two standard deviations below the median of the comparison programs' median earnings is the point at which the imputed earnings differ from the earnings of other schools in a statistically significant manner—is unsupported by the record, unexplained, and based on misunderstandings of basic statistical concepts. And the Rule conflicts with applicable regulations that specify factors ED must take into account in determining the amount of relief to award certain borrowers and that make clear that the nature of the borrower defense is relevant to determining relief.

In addition, ED adopted the Partial Relief Rule without observing procedures required by law. Specifically, although the Partial Relief Rule is a legislative rule, ED did not engage in notice-and-comment rulemaking and did not undertake the public consultation and negotiated rulemaking procedures required by the HEA.

Because the Partial Relief Rule is arbitrary, capricious, and contrary to law, and was adopted without procedures required by law, it violates the Administrative Procedure Act (APA) and should be set aside. Moreover, because the named plaintiffs' and the class members' relief determinations are based on an unlawful rule, they should be set aside as well.

## STATEMENT OF FACTS

### A. Statutory and Regulatory Framework

Title IV of the HEA, 20 U.S.C. § 1070 et seq., establishes the rules governing the majority of postsecondary student aid, including loans distributed under the Federal Family Education Loan

(FFEL) and William D. Ford Federal Direct Loan (Direct Loan) programs. Under the FFEL program (which ceased issuing loans July 1, 2010), private lenders issued student loans, which were then insured by guaranty agencies and reinsured by ED. 20 U.S.C. § 1078. Under the Direct Loan Program, the federal government lends money to eligible student borrowers for use at "participating institutions of higher education" selected by ED. *Id.* § 1087a.

In granting ED authority to implement Title IV, Congress mandated an unusual amount of public involvement. First, the HEA requires ED to "obtain public involvement in the development of proposed regulations" under Title IV, including by obtaining the "advice of and recommendations from" individuals and groups "involved in student financial assistance programs" under Title IV. *Id.* § 1098a(a)(1). The HEA then requires ED to submit any new regulations to a negotiated rulemaking process, "unless the Secretary determines that applying such a requirement with respect to given regulations is impracticable, unnecessary, or contrary to the public interest" within the meaning of the APA, 5 U.S.C. § 553(b)(3)(B), "and publishes the basis for such determination in the Federal Register at the same time as the proposed regulations in question are first published." 20 U.S.C. § 1098a(b).

The HEA and its implementing regulations provide borrowers under the FFEL and Direct Loan programs with a safety valve to keep them from being encumbered by federal student loans as a result of misconduct by schools they attended. By regulation, a holder of a FFEL loan is "subject to all claims and defenses that the borrower could assert against the school with respect to that loan" if a sufficiently close relationship existed between the school and the lender. 34 C.F.R. § 682.209(g). In 1993, Congress required the Secretary of Education to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment" of Direct Loans. 20 U.S.C. § 1087e(h). Accordingly, in 1994, ED issued regulations

that permitted a Direct Loan borrower to assert as a defense against repayment "any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law." ED, Final Regulations, William D. Ford Direct Loan Program, 59 Fed. Reg. 61664, 61696 (Dec. 1, 1994) (1994 Rule). The 1994 Rule provided that, if a borrower asserted a "successful" defense against repayment, the Secretary would "notif[y]the borrower that the borrower is relieved of the obligation to repay all or part of the loan," and "afford[] the borrower such further relief as the Secretary determines is appropriate under the circumstances." *Id*.

In 2016, ED promulgated new Direct Loan borrower defense regulations "to establish a more accessible and consistent borrower defense standard and clarify and streamline the borrower defense process to protect borrowers and improve the Department's ability to hold schools accountable for actions and omissions that result in loan discharges." ED, Final Regulations, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 81 Fed. Reg. 75926, 75926 (Nov. 1, 2016) (2016 Rule). Under the 2016 Rule, a borrower has a defense to repayment of his or her Direct Loans if (1) the borrower "has obtained against the school a nondefault, favorable contested judgment based on State or Federal law in a court or administrative tribunal of competent jurisdiction"; (2) the borrower's school "failed to perform its obligations under the terms of a contract with the student"; or (3) the borrower's school or its representatives "made a substantial misrepresentation … that the borrower reasonably relied on to the borrower's detriment when the borrower decided to attend, or to continue attending, the school or decided to take out a Direct Loan." 34 C.F.R. §§ 685.222(b)–(d). The 2016 standards apply to Direct Loans first disbursed on or after July 1, 2017, and before July 1, 2020. *See id*. § 685.222(a)(2). The standard set by the 1994 Rule—which looks to whether

4

the school's actions or omissions "would give rise to a cause of action against the school under applicable State law"—continues to apply to Direct Loans first disbursed before July 1, 2017. *See id*. § 685.206(c)(1).[1]

In addition to establishing new standards for determining whether a borrower has a defense to repayment of Direct Loans, the 2016 Rule established procedures for adjudication of borrower defense claims. *See* 34 C.F.R. §§ 685.222(e)–(k). These procedures apply both to borrowers who have asserted borrower defenses under the standards in the 2016 Rule and borrowers who have asserted borrower defenses under the standards in the 1994 Rule—that is, it applies to all borrower defense claims based on loans that were first disbursed before July 1, 2020. *See id*. §§ 685.222, 685.206(c)(2).[2] Under these procedures, "the Department official or the hearing official deciding the claim determines the appropriate amount of relief to award the borrower, which may be a discharge of all amounts owed to the Secretary on the loan at issue and may include the recovery of amounts previously collected by the Secretary on the loan, or some lesser amount." *Id*. § 685.222(i)(1). The regulations then specify factors that ED must consider to determine the appropriate amount of relief to award to borrowers asserting certain borrower defenses. *Id*. § 685.222(i)(2). For a borrower defense based on a substantial misrepresentation, the ED official deciding the claim must "factor the borrower's cost of attendance to attend the school, as well as the value of the education the borrower received, the value of the education that a reasonable

---

[1]On September 23, 2019, ED promulgated a new rule regarding borrower defenses that applies to the repayment of loans first disbursed on or after July 1, 2020. *See* ED, Final Rule, Student Assistance General Provisions, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 84 Fed. Reg. 49788 (Sept. 23, 2019). That rule is not at issue in this case.

[2]The borrower defense process applies specifically to Direct Loans. For the purpose of borrower defense discharges, however, ED considers consolidated Direct Loans to be Direct Loans. Thus, FFEL borrowers can receive a discharge under the borrower defense process if they consolidate their FFEL loans into the Direct Loan Program. *See* AR-B-0975; 34 C.F.R. § 685.212(k)(2).

borrower in the borrower's circumstances would have received, and/or the value of the education the borrower should have expected given the information provided by the institution, into the determination of appropriate relief." *Id*. § 685.222(i)(2)(i). The official may also consider "any other relevant factors." *Id*. For a borrower defense based on a judgment against the school, where "the judgment awards specific financial relief, relief will be the amount of the judgment that remains unsatisfied," subject to certain limits imposed by the regulations and "any other reasonable consideration." *Id*. § 685.222(i)(2)(ii)(A). "Where the judgment does not award specific financial relief, the Department will rely on the holding of the case and applicable law to monetize the judgment." *Id*. § 685.222(i)(2)(ii)(B). Finally, for a borrower defense based on a "breach of contract, relief will be determined according to the common law of contracts," subject to certain limits imposed by the regulations and "any other reasonable considerations." *Id*. § 685.222(i)(2)(iii).

Before 2015, the borrower defense process was rarely used. *See* 2016 Rule, 81 Fed. Reg. at 75926; AR-A-0003. In 2015, however, Corinthian Colleges (Corinthian), a large for-profit college chain, closed after years of misconduct, leading to a flood of borrower defense claims. *See* 2016 Rule, 81 Fed. Reg. at 75926, 76047; AR-A-0003. Until January 2017, ED granted a full discharge of loans whenever it approved a borrower defense related to Corinthian's misconduct. *See* AR-A-0003. In December 2017, however, ED announced a tiered methodology for determining relief for certain categories of Corinthian students. *See* AR-C-0001. Under that methodology, instead of fully discharging the loans of all students who had established a borrower defense, ED would provide a percentage of relief based on a comparison of the average earnings of borrower defense applicants from the borrower's program to the average earnings of students

at similar programs with passing scores under ED's "gainful employment" regulations. *See id.*[3] A borrower would receive a complete discharge only if the borrower had attended a program whose graduates earned less than half of the amount earned by students at similar programs with passing gainful employment scores; otherwise, ED would discharge just 10% to 50% of the loans. *See id.*

Impacted borrowers brought a class-action challenge to the adoption of the 2017 methodology and sought a class-wide preliminary injunction. On May 25, 2018, the U.S. District Court for the Northern District of California granted the motion for a preliminary injunction to prevent ED from using the methodology, concluding that the borrowers had demonstrated a likelihood of success on the merits of their argument that ED's implementation of the rule violated the Privacy Act and that implementation of the rule was causing irreparable harm. *Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077, 1109 (N.D. Cal. 2018), *appeal pending*, *Calvillo Manriquez v. DeVos*, No. 18-16375 (9th Cir.). The court also certified the case as a class action. *See Calvillo Manriquez v. DeVos*, No. 17-cv-07210, 2018 WL 5316175 (N.D. Cal. Oct. 15, 2018).

### B.  The Partial Relief Rule

On December 10, 2019, ED issued a memorandum announcing its adoption of a new methodology to determine the amount of relief to award borrowers who have successfully established a borrower defense to repayment of their federal student loans due to the wrongful acts or omissions of the school they attended—the Partial Relief Rule. *See* AR-A-0017–29. Secretary Elisabeth DeVos approved the use of this methodology by signing a decision memo dated November 12, 2019. AR-A-0213–22. ED issued a revised version of the December 10, 2019

---

[3] Under ED's gainful employment regulations, ED calculated debt-to-earning ratios for programs, as part of determining whether the programs "prepare[d] students for gainful employment in a recognized occupation" for the purpose of eligibility for Title IV funds, 20 U.S.C. § 1002(b)(1)(A)(i). *See* 34 C.F.R. § 668.403 (2017) (gainful employment program framework). Programs had passing scores if their debt-to-earnings ratios were above certain thresholds. *See id.*

memorandum on August 4, 2020, with edits "for accuracy and clarity, including for technical corrections." AR-A-0001.

ED established the Partial Relief Rule as the method for determining the amount of relief to afford to a borrower whom it determines has established a borrower defense, except for members of the *Calvillo Manriquez* class. *See* AR-A-0006; AR-A-0011; AR-A-0222.[4] ED did not follow either the APA's notice-and-comment rulemaking procedures, *see* 5 U.S.C. § 553(b)–(c), or the HEA's public consultation and negotiated rulemaking process, *see* 20 U.S.C. § 1098a(a)(1), (b), in adopting the Rule.

Like the methodology for determining relief that had been enjoined in *Calvillo Manriquez*, the Partial Relief Rule uses a tiered methodology that deprives the vast majority of successful borrower defense claimants of full relief on their claims. Under the Rule, ED "impute[s]" to a borrower the median earnings of recent graduates of the program that the borrower attended—regardless of whether the borrower graduated or when the borrower attended the program—or of other "similar" programs. AR-A-0007. ED then determines the amount of relief it will award solely by comparing the earnings it imputed to the borrower to the median of the median earnings of graduates of programs with the same 4-digit classification of instruction program (CIP) code and credential level at other schools ("comparison programs"). *Id.* ED does not consider any other factors besides the earnings comparison—not the cost of the program, the reasonable expectation of earnings a borrower would have based on the school's representations, the number of students who drop out of the school, the range of incomes of the schools' graduates, geographical

---

[4] The Partial Relief Rule applies to members of the *Calvillo Manriquez* class only if they would receive full relief under the Rule's methodology. *See* AR-A-0006.

differences between schools, or whether the comparison programs themselves engaged in predatory behavior.

Under the Rule, ED does not afford any relief to borrowers with successful borrower defense claims who attended non-Corinthian schools if the earnings it imputed to them—that is, the median earnings of graduates of the programs they attended or other "similar" programs—are equal to or more than the median of the median earnings of graduates of comparison programs. *See* AR-A-0005; AR-A-0008. ED affords borrowers who attended Corinthian schools and filed their borrower defense applications by November 12, 2019, just 10% relief on their successful borrower defense claims if the earnings it imputed to them are equal to or more than the median of the comparison programs' median earnings. *See* AR-A-0002; AR-A-0015–16. ED affords such borrowers no relief if they did not file their claims by November 12, 2019. *See* AR-A-0016.

ED grants borrowers who attended any school either 25%, 50%, or 75% relief if the earnings ED imputed to them are less than the median of the comparison programs' median earnings but greater than two standard deviations below the median of the comparison programs' median earnings. *See* AR-A-0008. Whether ED grants 25%, 50%, or 75% relief depends on how far the earnings it imputes to the borrower fall below the median of the comparison programs' median earnings. *See id*. If the median earnings of graduates of the borrower's program are less than .67 standard deviations below that of comparison programs, the borrower receives 25% relief; if they are between .67 and 1.33 standard deviations below, the borrower receives 50% relief; and if they are between 1.33 and 2 standard deviations below, the borrower receives 75% relief. *See* AR-A-0198.

ED grants full relief on a successful borrower defense claim only if the earnings ED imputes to the borrower are two standard deviations below the median of the comparison

programs' median earnings. *See* AR-A-0007. Very few programs fall into this category. In December 2019, ED provided charts applying the Partial Relief Rule to programs at Corinthian and ITT Tech, another failed for-profit college company. *See* AR-A-0198–0209; AR-A-1210–11. Only borrowers who attended three of the 150 Corinthian programs for which ED provided calculations in December 2019 qualified for full relief; no borrowers who attended ITT programs for which ED provided calculations met this criterion.

For many programs, two standard deviations below the median of the median earnings of the comparison programs—that is, the point at which borrowers would receive full relief—is less than the annual earnings of a full-time minimum-wage worker. *See*, *e.g.*, AR-A-0198. Thus, borrowers who attended those programs would not receive full relief unless the median earnings of graduates of the program they attended were below the minimum wage. For some programs, including almost 40% of the Corinthian programs for which ED provided data in December 2019, two standard deviations below the median of the comparison programs' median earnings is a negative number. *See* AR-A-0198–0209. Thus, ED will not award full relief to borrowers who attended those programs, no matter how little value students received from the program, how severe the school's misbehavior, or how little the program's graduates earn.

In conducting the earnings comparison, ED does not consider a student borrower's actual earnings. Instead, ED "imputes" to borrowers the median earnings of recent graduates of the program they attended, regardless of when the borrower attended the program or whether the borrower graduated. In particular, for programs that are non-operational and for which there are 2014 earnings data as a result of ED's gainful employment regulations, the Partial Relief Rule looks to that data to determine both the borrower defense applicant's program earnings and the earnings for the comparison programs. AR-A-0008–09. Likewise, for programs that are

operational, for which there are 2014 gainful employment earnings data, and for which there are no other publicly available data, ED will use the 2014 gainful employment earnings data. AR-A-0009. For programs for which there are no 2014 gainful employment earnings data, ED will use "earnings data from other publicly available sources," such as "data currently being disclosed on the Department's website as part of the College Scorecard." *Id*.[5] For programs for which both gainful employment and College Scorecard data are available at the 4-digit CIP code level, ED will use the College Scorecard data if the borrower was enrolled in the program on or after the date the College Scorecard was implemented. Otherwise, ED will use the 2014 gainful employment data. AR-A-0009. Finally, for programs for which there are no earnings data for the credential or at the 4-digit CIP level, ED "will use earnings from graduates of similar programs based on the 4-digit CIP code, but at the next highest credential level to impute borrower and comparison group earnings." AR-A-0009–10. "If sufficient data are not available to make that determination, then the Department will review program level outcomes for other programs offered by the institution (and the relevant comparison group) using the 2-digit CIP code and credential level (or the next higher credential level if available, and, if not, the next lower credential level)." AR-A-0010.

ED describes the Partial Relief Rule as setting forth a "rebuttable presumption" that preserves "flexibility and the opportunity [for ED] to make individualized determinations." AR-A-0016. However, the Rule does not provide borrowers with the opportunity to rebut the determination made solely on the earnings comparison before ED makes a determination that, under governing regulations, is "final as to … any relief that may be granted on the claim," 34 C.F.R. § 685.222(e)(5). The only method the Rule provides for challenging the amount of relief

---

[5] The College Scorecard is an online tool that provides data about colleges. *See* ED, College Scorecard, https://collegescorecard.ed.gov.

awarded is through the optional reconsideration process described in 34 C.F.R. § 685.222(e)(5)(i), *see* AR-A-0007, which follows a final determination, *see* 34 C.F.R. § 685.222(e)(5). Reconsideration is available only if the borrower can identify "new evidence in support of the borrower's claim," defined as "relevant evidence that the borrower did not previously provide and that was not identified in the final decision as evidence that was relied upon for the final decision." *Id*. § 685.222(e)(5)(i). Because the agency tells borrowers to include information about the harm they experienced in their borrower defense application, however, many borrowers will not have new evidence to submit, even though the harm they experienced was not taken into account in affording them relief. *See, e.g.*, AR-B-0008 (ED borrower defense application form, asking applicant to "describe any financial harm to you as a result of the school's conduct").

When ED receives a borrower defense application, it grants forbearance on the loan for which the borrower defense has been asserted if the borrower is not in default and stops collection activity on the loan if the borrower is in default. 34 C.F.R. § 685.222(e)(2). When ED makes a determination that is final under 34 C.F.R. § 685.222(e)(5), ED can resume collection activity on any portion of the loan that is not discharged. *See, e.g.*, AR-B-0978. Thus, when ED awards a borrower less than full relief under the methodology in the Partial Relief Rule, the borrower's loan is taken out of forbearance or stopped collection, and ED can resume collecting the debt before the borrower has the opportunity to "rebut" the determination. Under 34 C.F.R. § 685.222(e)(5)(i), if ED "accept[s] for reconsideration" a request for ED to reconsider a borrower defense decision, ED places loans that are not in default into forbearance and suspends collection activity on loans that are in default. However, ED informs borrowers who receive determinations based on the Partial Relief Rule that it "will not place your federal student loans into forbearance or stopped collection activity when you file a request for reconsideration." *See, e.g.*, AR-B-0977. Thus, once

a borrower is given a determination based on the methodology in the Partial Relief Rule, the borrower's loan remains subject to collection based on that determination, even if the borrower requests reconsideration, unless ED accepts that request for reconsideration under 34 C.F.R. § 685.222(e)(5)(i).

### C.  The Plaintiffs

Plaintiffs Sammia Pratt, Alicia Davis, and Brittany Saulsberry each took out significant federal loans to attend institutions of higher education that made significant misrepresentations to induce them to enroll. *See* Pratt Decl., ECF No. 18-1, ¶¶ 6–8 (describing misrepresentations, including that credits would easily transfer to schools where Ms. Pratt hoped to complete her degree, and that school would provide her with job placement services with corporate partners if she finished her degree); Davis Decl., ECF No. 18-2, ¶ 6 (describing misrepresentations, including that the cost of the school would be covered by grants and scholarships, that Ms. Davis would easily get a job as a crime scene investigator after graduating, that she would make $35,000 a year after graduating, and that credits would transfer to other colleges and universities); Saulsberry Decl., ECF No. 18-3, ¶¶ 7–9 (describing misrepresentations, including promises of extensive career counseling and job placement and misrepresentations about transferability of credits). None of the borrowers would have attended those schools had they known those representations to be false. *See* Pratt Decl. ¶ 6; Davis Decl. ¶ 6; Saulsberry Decl. ¶ 7.

Ms. Pratt finished her bachelor's degree at the school that made misrepresentations to her— after learning that her credits would not transfer to the school where she had hoped to complete her degree—but found after graduation that the school's promises of job placement services were untrue and that employers did not want to hire her because they did not think a degree from her school had value. Pratt Decl. ¶¶ 7–8. Ms. Davis withdrew from the school that made

misrepresentations to her after two years—when she was told she would need to take out additional loans despite having been told during enrollment that her tuition would be covered by scholarships and grants—and started over, going first to community college and then to state schools. Davis Decl. ¶ 6–8. Although Ms. Davis's original school had told her that her credits would transfer to other colleges and universities, none of them transferred. *Id*. ¶¶ 6, 8. Ms. Saulsberry, who is an active duty service member of the United States Navy, graduated from an on-line program in the same school chain that made misrepresentations to her, after learning that her credits would not transfer to other online programs. Saulsberry Decl. ¶ 9. After graduation, the school provided her with none of the job placement assistance or corporate connections that she had been promised, and she was unable to find a job in her field. *Id*. ¶ 11.

Ms. Pratt, Ms. Davis, and Ms. Saulsberry each submitted a borrower defense application to ED, and ED determined that each of these borrowers successfully established a borrower defense to repayment of their federal student loans based on the misrepresentations made by their schools. *See* AR-B-0974 (approving Ms. Pratt's borrower defense claim); AR-B-0935 (approving Ms. Davis's borrower defense claim); AR-B-0982 (approving Ms. Saulsberry's borrower defense claim). Nonetheless, applying the Partial Relief Rule, ED awarded each of them only minimal relief from their federal student loans. *See* AR-B-0975 (awarding Ms. Pratt only 10% relief); AR-B-0936 (awarding Ms. Davis only 10% relief); AR-B-0983 (awarding Ms. Saulsberry only 25% relief). Ms. Pratt, Ms. Davis, and Ms. Saulsberry filed this case on their own behalf and on behalf of a class of student loan borrowers who likewise have or will have the Partial Relief Rule applied to their successful borrower defense claims and have or will receive less than full relief from their federal student loans under the Rule's methodology. *See* ECF No. 18 (motion for class

certification). The Court certified a class for purposes of this litigation on September 23, 2020. *See* ECF No. 19.

Plaintiffs Marisol Castillo and Heather Bianchi also each took out significant federal loans to attend institutions of higher education that made substantial misrepresentations to them during the enrollment process. *See* AR-B-0132–33 (describing misrepresentations made to Ms. Castillo, including that school would place her in externship in her field and that she would make more money after graduating than she currently earned); AR-B-0008–11 (describing misrepresentations made to Mrs. Bianchi, including about the length of time required to reasonably complete the program, job placement, and transferability of credits.). Both Ms. Castillo and Mrs. Bianchi have pending meritorious borrower defense applications within the scope of the Partial Relief Rule. *See* AR-B-0127–57; AR-B-0006–14.

## LEGAL STANDARD

Under the APA, this Court "shall hold unlawful and set aside" final agency action that is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When a plaintiff challenges final agency action under the APA, "summary judgment serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Landmark Hosp. of Salt Lake City v. Azar*, 442 F. Supp. 3d 327, 331 (D.D.C. 2020) (internal quotation marks and citation omitted).

**ARGUMENT**

**I.     The Partial Relief Rule is Reviewable Final Agency Action.**

The APA provides for judicial review of "final agency actions," 5 U.S.C. § 704, which are actions that mark "the consummation of the agency's decisionmaking process" and are ones "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennet v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks and citations omitted). The Partial Relief Rule easily meets both factors of this test. *Cf. Calvillo Manriquez*, 345 F. Supp. 3d at 1095 (recognizing that the adoption of the methodology at issue in *Calvillo Manriquez* was final agency action). First, the Partial Relief Rule "is properly attributable to the agency itself and represents the culmination of th[e] agency's consideration" of which methodology to use in determining the amount of relief to award successful borrower defense applicants. *POET Biorefining, LLC v. Envtl. Prot. Agency*, 970 F.3d 392, 404 (D.C. Cir. 2020) (citation omitted). Secretary DeVos officially approved the Partial Relief Rule by signing a November 12, 2019 decision memo, *see* AR-A-0222, and ED has implemented the Rule, *see* AR-A-0030–31. Second, the Partial Relief Rule has "direct and appreciable legal consequences," *Bennet*, 520 U.S. at 178, because it determines the amount of relief ED will award borrowers with successful borrower defense applications. *See* AR-A-0222. ED applies the Rule to determine the amount of relief to award borrowers when it approves their borrower defense applications, *see*, *e.g.*, AR-B-0975—a determination that is "final as to … any relief that may be awarded," 34 C.F.R. § 685.222(e)(5). Based on that determination, ED "proceed[s] with the applicable discharge" in the amount that it determines should be awarded to the borrower, AR-B-0975, and allows collection activity to resume on the undischarged loan amount, AR-B-0978. Although ED characterizes the Partial Relief Rule as establishing a rebuttable presumption, *see* AR-A-0007, borrowers have no

opportunity to "rebut" the application of the Partial Relief Rule's methodology before receiving

the "final" relief determination, 34 C.F.R. § 685.222(e)(5), with its resulting consequences for the

borrowers' loans, *see* AR-A-0007. Because the Partial Relief Rule "represent[s] the agency's final

decision" with respect to the methodology to use in determining the amount of relief to award

successful borrower defense applicants, *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir.

2016), and because it has "concrete consequences," *Ipsen Biopharms., Inc. v. Azar*, 943 F.3d 953,

956 (D.C. Cir. 2019) (citation omitted), the Partial Relief Rule is final agency action subject to

judicial review under 5 U.S.C. § 704.

## II.   The Partial Relief Rule is Arbitrary, Capricious, and Contrary to Law.

Agency action is arbitrary and capricious when it is not based on "reasoned

decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

29, 52 (1983). To satisfy this standard, an "agency must examine the relevant data and articulate a

satisfactory explanation for its action including a rational connection between the facts found and

the choice made." *Id*. at 43 (internal quotation marks and citation omitted). In reviewing an agency

action challenged as arbitrary and capricious, "courts must consider whether the agency acted

within the scope of its legal authority, whether the agency has explained its decision, whether the

facts on which the agency purports to have relied have some basis in the record, and whether the

agency considered the relevant factors." *Chiayu Chang v. United States Citizenship & Immigration

Servs.*, 289 F. Supp. 3d 177, 182 (D.D.C. 2018) (internal quotation marks and citation omitted).

The Partial Relief Rule falls short of this standard in three ways: It fails to consider all

relevant factors or to draw a rational connection between its methodology and the harm that

methodology purports to assess; it applies a standard deviation test that is unsupported and

statistically invalid; and it adopts a methodology that is inconsistent with applicable regulations specifying the factors to be considered in awarding relief for certain borrower defenses.

### A. The Partial Relief Rule does not logically measure the harm a borrower suffered as a result of wrongful acts by the school the borrower attended.

The Partial Relief Rule bases the amount of relief to afford a borrower who has successfully established a borrower defense entirely on a comparison between the median earnings of graduates of the borrower's program and the median of the median earnings of comparison programs' graduates. ED states that this earnings comparison measures "the harm suffered by a successful [borrower defense] applicant as a result of the [school's] misconduct." AR-A-0005. However, the Rule fails to account for many factors that are relevant to determining how much a borrower was harmed by a school's wrongful conduct and does not logically measure either that harm or the lack of value of the borrower's education. Because it fails to consider "relevant factors," and does not draw a "rational connection" between its methodology and the harm ED claims that methodology measures, the Partial Relief Rule is arbitrary and capricious. *State Farm*, 463 U.S. at 43 (citation omitted).

### 1. The Rule fails to take into account reasons why the imputed earnings do not measure the value of the education provided to the borrower.

Instead of comparing the borrower's actual earnings to earnings of graduates of other schools, the Partial Relief Rule "impute[s]" to borrowers the median earnings of graduates of the program they attended or other "similar" programs. AR-A-0007. ED states that "[u]sing program-level earnings … provides an objective look at the harm and lack of value to be derived from a program or similar programs caused by a pattern of misconduct by a school." *Id*. An agency, however, must "establish *how* the [data] it seeks to rely on is an adequate proxy for" what it is trying to measure, *Oceana v. Ross*, No. CV 08-1881 (PLF), 2020 WL 5834838, at *8 (D.D.C. Oct.

1, 2020), and the Rule does not account for the many reasons why the imputed earnings are not a reasonable proxy for the value of the education the school provided the borrower or explain why basing a borrower's relief on imputed earnings is nonetheless appropriate. *See Am. Ass'n of Cosmetology Sch. v. DeVos*, 258 F. Supp. 3d 50, 74 (D.D.C. 2017) (holding that ED's rigid use of data on reported income to calculate program earnings was arbitrary and capricious in light of problems with underreporting income).

To begin with, by imputing a program's graduates' median earnings to all borrowers who attended that program, the Rule does not account for the fact that not all students are harmed equally by a predatory school. For example, if a school worked hard to ensure that 51% of its programs' graduates' obtained high-paying jobs, but provided no assistance and no education of any value to the other 49%, its median earnings (the middle number on the list) would be high. Under the Rule, those high earnings would be imputed to all of its students, including the 49% who had received no value from their educations. Although an article in the record explains that "median wages tell only part of the story of how much workers" within a group actually earn, AR-A-0295, the Rule does not consider the spread of earnings at a school or otherwise account for differential levels of harm experienced by students within the same program.

Moreover, the Rule only looks at earnings data from specific years—either 2014 earnings data (when gainful employment data is used) or the most recent College Scorecard data, *see* AR-A-0010—and then imputes that data to borrowers regardless of when they attended the program at issue, even if they attended more than a decade earlier. *See, e.g.*, AR-B-0959 (noting that Ms. Pratt attended school between 2000 and 2003). The median earnings of graduates of a program in a year when a borrower did *not* attend a program do not reasonably measure the value of the education she received during the years she *did* attend the program.

Furthermore, the Rule bases the imputed earnings on the earnings of program *graduates*, rather than all people who attended the program. This aspect of the Rule introduces a selection bias into the data because many people who are affected by a school's predatory behavior drop out of the program when they realize its lack of value. *See* 2016 Rule, 81 Fed. Reg. at 39336 (noting that "high dropout rates may signal that an institution is employing high-pressure sales tactics or is not providing adequate educational services"). A memo in the administrative record describes a potential alternative methodology for calculating relief for borrowers who attended Corinthian programs, under which borrowers who did not complete their programs would receive full relief on the assumption that such borrowers "recognized that they would receive no value from the [Corinthian] programs and withdrew to reduce their injury." AR-A-0328. The Partial Relief Rule, however, does not take dropout rates into account, and ED has not explained why the earnings of people who were not driven to drop out because of a school's predatory behavior reasonably measure the educational value provided to those who were.

Finally, the median earnings that ED imputes to a borrower may not even be earnings from the borrower's own program. ED recognizes that it may not have earnings data for the program at issue through either the gainful employment regulations or College Scorecard. *See* AR-A-0009; *see*, *e.g.*, AR-A-0198–0209 (indicating that ED lacks data for 90 Corinthian programs). Under the Partial Relief Rule, when ED lacks earnings data for a program, it will use earnings data concerning "graduates of similar programs" with the same 4-digit CIP code but at the next highest credential level, and if it lacks that data, it will use data from graduates of other programs at the institution with the same 2-digit CIP code and credential level. AR-A-0008–09. ED has not explained why the median earnings of graduates of programs the borrower did not attend reasonably measure the value of the education provided by the program the borrower attended.

## 2.  The Rule fails to take into account reasons why comparing the median incomes of programs does not measure the programs' comparative value.

ED asserts that comparing the difference between the earnings of a program's graduates and the graduates of other programs assesses the harm to the borrower that is "attributable to lower program value." AR-A-0006. However, ED ignores multiple factors that can cause graduates of a program to have higher incomes than graduates of comparison programs that are not a sign of the program's value, and does not explain why the Partial Relief Rule's methodology is appropriate in light of those factors.

For example, ED recognizes that "median earnings could differ based on the part of the country in which graduates are employed, the socioeconomic level of students prior to enrollment, the age and gender of the students," and other factors. AR-A-0007. ED relies on this fact to deprive borrowers of full relief on their federal student loans even if their imputed earnings are below the median of comparison programs—unless they are two standard deviations below—reasoning that these factors might cause one program's graduates' median earnings to be below those of another program even if the programs are of "equal quality." *Id.* But ED ignores that these factors do not influence earnings in only one direction; they might also cause the median earnings associated with one program to be *above* those of other programs, even if the educational value of the program is lower than those of other programs. In that circumstance, borrowers who attended the program would be denied any relief from their federal student loans on the ground that they had attended a program of comparatively high value, even though they had not.

In addition, the Partial Relief Rule fails to take into account reasons why earnings of graduates of a program might not be two standard deviations below the median earnings of comparison programs even if the program provided no educational value at all. In particular, if a graduate of a program is able to obtain any full-time job at all, the graduate will earn at least the

minimum wage. Yet, for many programs, two standard deviations below the median of comparison programs' earnings is below the federal minimum wage. *See*, *e.g.*, AR-A-0198–0209. Thus, as long as just over half of graduates of those programs are able to obtain a full-time job of some type, borrowers who attended those programs will not be entitled to full relief, regardless of whether the jobs obtained by the program's graduates relate to the program or require higher education and regardless of the educational value provided by the school they attended.

ED itself has recently disavowed the ability of earnings data to accurately assess program quality. In a final rule it issued in July 2019, ED rescinded the gainful employment regulations, which compared the median annual loan payment of a program's graduates to their mean or median earnings to determine whether a school "prepare[d] students for gainful employment in a recognized occupation" for purposes of Title IV eligibility, 20 U.S.C. § 1002(b)(1)(A)(i). ED, Final Regulations, Program Integrity: Gainful Employment, 84 Fed. Reg. 31392 (July 1, 2019). In the July 2019 rule, ED criticized the gainful employment regulations' methodology for "fail[ing] to properly account for factors other than institutional or program quality that directly influence student earnings and other outcomes." *Id.* at 31392; *see also id.* at 31412 (criticizing the methodology for, among other things, not accounting for the fact that "salaries can vary from one geographic region of the country to another"); AR-A-0216. According to ED, it "does not currently have tools that can differentiate between outcomes that are the result of program quality and outcomes that are the result of institutional selectivity or student demographics," and it could not "identify a [debt-to-earnings] metric that was sufficiently valid and accurate to serve as a high-stakes quality test." 84 Fed. Reg. at 31408. ED's conclusion in July 2019 that earnings do not accurately assess program quality is inconsistent with its decision only a few months later to base the high-stakes determination of the amount of relief to award borrowers who have successfully

established a borrower defense entirely on a comparison of earnings data, on the theory that that

data reflected the "lack of value" of the borrowers' educations. AR-A-0005. ED has not explained

the contradiction between its reasoning in issuing the July 2019 rule and its reasoning in issuing

the December 2019 Partial Relief Rule. *See Cty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1022

(D.C. Cir. 1999) (holding agency action arbitrary where agency did not adequately explain why

certain data "were suitable for one significant calculation but unreliable for another").

> ### 3. The Rule fails to take into account reasons why looking only at comparative earnings data does not measure the harm a student borrower suffered as a result of a school's wrongful conduct.

The Partial Relief Rule is based on the premise that the harm suffered by a borrower as a

result of a school's predatory behavior can be determined solely by comparing earnings of people

who attended the same program as the borrower to earnings of people who attended other

programs. That premise is flawed, because it does not take into account the cost of the program,

and because it assumes that students would have attended a similar program, even absent the

predatory behavior to which they were subjected.

The Partial Relief Rule does not take into account the cost of the program the borrower

attended, either on its own or in relation to the cost of the comparison programs. But the amount a

borrower spends on a program of little or no educational value unquestionably affects both the

degree to which the borrower is harmed by having been misled into enrolling, and the comparative

value of different programs. A borrower who pays $100,000 to attend a program of no value is

harmed more than a borrower who pays $5,000 for an identical program. The Partial Relief Rule

is arbitrary and capricious in purporting to assess the harm caused by the school without taking the

school's cost into account.

The Partial Relief Rule's methodology also does not reasonably assess harm because it does not take into account whether the comparison programs are, themselves, engaged in predatory behavior. A comparison between programs that all mislead students in enrolling, and that all provide little or no educational value to the students once they have enrolled, does not measure the harm suffered by borrowers who were misled into attending one of the programs. The Partial Relief Rule does not consider whether the comparison programs it is using as a benchmark also engaged in wrongful acts or omission that would give rise to a borrower defense or whether programs with certain CIP codes are concentrated in schools or sectors known to engage in misleading, deceptive, or otherwise predatory behavior.

In addition, the Partial Relief Rule's methodology relies on the unsupported and unanalyzed presumption that, even if they had not been subject to any false or misleading information, borrowers would have chosen to enroll in the same type of program as the predatory program in which they enrolled. But it is illogical to assume, for example, that a borrower who enrolled in a program after being given false information about the salary she could expect to earn after graduation would have enrolled in a program in that exact same field had she been truthfully told that the salary would be far lower. The borrower may have decided to pursue an entirely different course of education, or may have opted not to pursue higher education, and not to take out any loans, at all.

Because it is based on the unreasonable assumption that borrowers would have attended a program in the same field of study regardless of the predatory behavior to which they were subjected, the Partial Relief Rule ignores other factors that are important to measuring the harm borrowers suffered because of the misconduct that gave rise to their successful defenses to repayment. It does not analyze whether the educational value of the program justified the amount

of loans the borrower had to take out to attend. It does not take into account the value of the education the borrower received as compared to the value of the education a reasonable borrower would have expected to receive given the representations made by the school. And it does not consider the amount the borrower would have earned without enrolling in the program or whether the program increased the borrower's potential earnings.[6]

*****

The borrowers to whom the Partial Relief Rule is applied have successfully shown that they were deceived or otherwise preyed upon by institutions of higher education, and have established their entitlement to a defense against repayment of the federal student loans they took out to attend those schools. The Partial Rule Relief's earnings comparison—which results in most borrowers receiving no or only minimal relief from their federal student loans—is far removed from the harm borrowers suffered as a result of the deceitful and otherwise predatory actions of the schools they attended, and does not rationally measure that harm. Because ED failed to consider relevant factors and draw a rational connection between the Partial Relief Rule's methodology and the harm inflicted on students, the Partial Relief Rule is arbitrary and capricious and should be set aside.

---

[6] A memorandum in the record discusses a potential methodology under which borrowers who attended Corinthian programs would receive full relief if the average earnings of graduates of the program were below the median earnings of employed full-time workers between the ages of 25 and 34 who have only a high school diploma. *See* AR-A-0327. The memo explains that this methodology was "premised on the concept that students seeking career education do so in anticipation of earning more than they would have had they not sought a postsecondary education" and that, "[c]onsequently, a 100% loan discharge would provide a measure of relief needed to put the [Corinthian] borrower in the position he or she would have occupied absent [Cornthian's] misconduct." *Id*. ED has not explained why it rejected this methodology.

### B. The Partial Relief Rule's standard deviation methodology is unsupported and statistically invalid.

Under the Partial Relief Rule, ED determines the amount of relief to award borrowers based on how many standard deviations the earnings imputed to them fall below the median of the comparison programs' median earnings. ED justifies its use of standard deviations in this manner by asserting that "two standard deviations from the median" is the "point where differences between data points is considered to be statistically significant." AR-A-0007. ED's assertion that two standard deviations below the median of median program earnings is where the difference between a particular program's median earnings and that median becomes statistically significant is both unsupported and incorrect. And ED's discussion of the number of datapoints that fall within one and two standard deviations in a normal distribution ignores that the earnings data do not follow such a distribution. Moreover, standard deviations measure distribution relative to the *mean*, but ED applies its standard deviation test to the *median* of the earnings data, without analyzing the effect of this switch on its test's validity. Because it bases relief determinations on a statistically incorrect test applied in an incorrect manner to data that does not comply with the test's assumptions, the Partial Relief Rule is arbitrary and capricious.

### 1. ED's assertion that two standard deviations below the median of the comparison programs' median earnings is the point at which imputed earnings differ from that median in a statistically significant manner is unsupported and incorrect.

The Partial Relief Rule's methodology is based on ED's assertion that two standard deviations below the median of the comparison programs' median earnings is where the difference between a program's earnings and that median becomes statistically significant. *See* AR-A-0007 ("[M]edian earnings at or below the earnings that are two standard deviations from the median should result in full relief to successful [borrower defense] applicants since it is at this point where

differences between data points is considered to be statistically significant."). However, although standard deviations are used in measuring statistical significance, ED is applying its methodology to the wrong distribution of datapoints to measure statistical significance.

As an initial matter, the administrative record does not support ED's assertion that the Partial Relief Rule's standard deviation methodology measures whether the difference between a program's earnings and the comparison programs' earnings are statistically significant. Except for documents authored by ED, the administrative record contains only one document that explains how standard deviations are used: a four-page document titled "Standard Deviation Definition" downloaded from a website called Investopedia.com. *See* AR-A-0239–41; Administrative Record Index, ECF No. 17-2, at ii. That document describes the standard deviation as a "statistic that measures the dispersion of a dataset relative to its mean" that, "when applied to the annual rate of return of an investment, sheds light on the historical volatility of that investment." AR-A-0239. The document does not discuss statistical significance or whether or when standard deviations are relevant to determining statistical significance. Indeed, the only time the document mentions significance is in a section titled "Related Terms," where, in defining a *different* term, "T-test Definition," it states that a "t-test is a type of inferential statistic used to determine if there is a significant difference between the means of two groups, which may be related in certain features." AR-A-0242.

The documents in the record that were authored by ED likewise do not support or explain ED's assertion that its methodology measures whether a program's median earnings are statistically different from the comparison programs' median earnings. In its memorandum announcing the Partial Relief Rule, ED asserts that it is "rely[ing] on scientific convention" in viewing two standard deviations below the median as the point where differences become

statistically significant, but provides no support for its assertion of "scientific convention," and no explanation or analysis of why the distribution of median program earnings is the correct distribution to which to apply the standard deviation test to determine statistical significance. ED's November 12, 2019 decision memo states that standard deviations "can be used to quantify the amount of variation within a set of data," that the size of the standard deviation indicates how big of a deviation from the median "trigger[s] an outlier," and that ED should "make the determination that financial harm has occurred" "only when the earnings imputed to the borrower are significantly different from the median." AR-A-0217. But the memo does not explain its conclusion that two standard deviations below the median is where a datapoint becomes "significantly different from the median." *Id*. Further, both the memorandum announcing the adoption of the Partial Relief Rule and the decision memo state that, in a normal distribution, around 95 percent of the datapoints in the sample will fall within two standard deviations of the median, AR-A-0007; AR-A-0217, but neither provides support or reasoning for the notion that a datapoint differs from the median of a set of datapoints in a statistically meaningful manner only if it falls within the bottom 2.5%. Because ED has failed to support the assertion that two standard deviations below the median of the comparison programs' median earnings is where the difference between a program's earnings and the comparison programs' earnings becomes statistically significant, ED has not demonstrated that its adoption of the standard deviation methodology "was the product of reasoned decisionmaking." *State Farm*, 463 U.S. at 52. The Court "cannot uphold a rule based on [the agency's use of a statistical model] when an important aspect of its methodology was wholly unexplained." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 205 (D.C. Cir. 2007); see *Am. Ass'n of Cosmetology Schs.*, 258 F. Supp. 3d at 75 (holding that ED failed to "meet its burden of engaging in reasoned

decisionmaking" where it failed "to justify the assumptions underlying" a process it adopted, including the assumption that certain data response rates "had some statistical significance").

In fact, the Partial Relief Rule's standard deviation methodology is *not* a statistically valid means of determining whether the median earnings of a program's graduates differ in a statistically significant manner from those of comparison programs, because it looks at the standard deviation of the wrong distribution. The concept of statistical significance measures whether a particular observed result, such as an observed difference in average program earnings, would be unlikely to have been observed in a sample due to chance—that is, to randomness in the particular sample being observed. *See* Matsudaira Decl. ¶ 18.[7] For example, if a statistician were trying to determine the difference in average earnings between two programs, and just sampled a portion of the students in both programs (or just one year's worth of student earnings rather than many years), the statistician would not know whether the difference in the programs' earnings in that sample represented the true earnings difference between the two programs or was due to the randomness inherent in sampling (such as the idiosyncrasies of the students who chose to attend the school in

---

[7] The lack of support in the record for the standard deviation methodology's statistical validity, and the lack of evidence that ED analyzed its statistical validity, alone demonstrate that the Partial Relief Rule is arbitrary and capricious. To the extent the Court has any questions about whether ED was required to support the validity of the methodology it was adopting, however, plaintiffs submit Professor Matsudaira's declaration to demonstrate that ED could not assume that the test it was adopting was statistically valid. Although that declaration is not part of the administrative record, the Court may consider it to elucidate the meaning of terms used by ED and as "background information in order to determine whether the agency considered all of the relevant factors." *Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 611 (D.C. Cir. 2017) (internal quotation marks and citation omitted). Moreover, the Court may consider it because "the agency failed to explain administrative action so as to frustrate judicial review," *id*. (citation omitted), and because the statistical issues may be sufficiently "complex that [the] court needs more evidence to enable it to understand the issues clearly." *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989). Because the agency failed to engage in notice-and-comment rulemaking, *see infra* pp. 35–40, plaintiffs had no opportunity to explain the invalidity of the standard deviation methodology before ED adopted the Partial Relief Rule.

that particular year). *See id*. ¶¶ 18–19. Taking into account the number of students in each sample and the variation of earnings within each sample, the statistician could estimate the distribution of differences in average earnings between the two programs that would be observed if the statistician took multiple samples and if the difference in average earnings between the two programs were actually zero. *See id*. ¶¶ 19–20, 25. The statistician could then use that estimated distribution—called a "sampling distribution"—to determine whether the observed difference between programs is statistically significant. *See id*. ¶ 20. An observed difference in the average earnings of two programs that fell two standard deviations below the mean in this *sampling distribution* would be considered statistically significant, meaning that it would be unlikely that the observed difference was due to chance. *See id*.

The Partial Relief Rule's methodology uses the terminology of this test, but calculates the standard deviation of the wrong distribution. *See id*. ¶ 21. The Rule calculates the standard deviation of the *observed distribution of median earnings* across a set of comparison programs. *See id*.; AR-A-0005. This distribution is not the same as the sampling distribution, and calculating the standard deviation of this distribution, rather than the sampling distribution, leads to incorrect conclusions about whether a program's earnings differ in a statistically significant way from those of other programs. *See* Matsudaira Decl. ¶ 21; *see also id*. ¶¶ 22–31 (demonstrating that applying ED's methodology and the conventional statistical methodology for establishing whether program earnings differ in a statistically significant way can lead to different conclusions about whether a program's earnings differ in a statistically significant way from those of other programs). Because the Partial Relief Rule's methodology does not test whether a program's median earnings are statistically significantly different from those of the comparison programs in a statistically valid manner, the Partial Relief Rule is arbitrary and capricious.

## 2. The earnings data do not follow a normal distribution.

ED's explanation of and reliance on the standard deviation methodology also fails because "[s]tandard deviation assumes a normal distribution," AR-A-0241, but the earnings data do not fall along such a distribution.

To justify its methodology, ED states that, in a normal distribution, approximately 95% of data points will fall within two standard deviations from the median. *See* AR-A-0007 (citing the statistic and then saying that, "[t]herefore, median earnings at or below the earnings that are two standard deviations from the median should result in full relief to successful [borrower defense] applicants since it is at this point where differences between data points is considered to be statistically significant"); AR-A-0217 (citing the statistic and then expressing the "belie[f] that wages at or lower than the lowest 2.5% of earnings in a sample would be outliers and should qualify a successful BD applicant for full relief"); AR-A-0231 (in explaining the methodology, stating that "[s]tatistically, those programs with earnings among the lowest 2.5% of all programs (i.e., 2 standard deviations from the average) will be used to establish floor earnings, below which 100% relief will be warranted"). As noted above, ED has not demonstrated that earnings must fall within the lowest 2.5% of a distribution of median earnings to differ from the median of that distribution in a statistically significant manner. And to the extent that ED simply decided that it only wanted to provide full relief to borrowers who attended 2.5% of programs, that decision is arbitrary. *See Ass'n of Private Colls. & Univs. v. Duncan*, 870 F. Supp. 2d 133, 154 (D.D.C. 2012) (holding that ED acted arbitrarily in adopting a particular standard for determining whether a program led to gainful employment where ED "simply explained that the chosen rate would identify the worst-performing quarter of programs"); Matsudaira Decl. ¶ 8 (explaining that there

is no scientific consensus among statisticians that outliers in a distribution can be identified based only on their relative position in a distribution).

Even putting those problems aside, however, ED's reliance on the number of datapoints that fall within two standard deviations of the median in a normal distribution does not exhibit reasoned decisionmaking because the median earnings data do not fall along such a distribution.

A spreadsheet ED released in December 2019 that calculates comparison programs' median earnings and standard deviations for Corinthian programs shows that the earnings data do not fall along a normal distribution. *See* AR-A-0198–09. In a normal distribution, approximately 2.5% of datapoints will fall at or below two standard deviations below the mean. For nearly 40% of Corinthian programs, however, two standard deviations below the comparison group median is a negative number. *See id*. It is impossible for the median earnings of a programs' graduates to be negative. Accordingly, in those distributions, *no* programs will fall at or below the two standard deviation mark. Thus, the data do not fall along a normal distribution. S*ee also* Matsudaira Decl. ¶¶ 9–15 (demonstrating that the earnings data do not follow a normal distribution, and explaining that applying the standard deviation test using College Scorecard data will most often lead to no borrowers receiving full relief); *compare* AR-A-0237 (using the Corinthian Dental Assisting Certificate Program as an example to demonstrate how calculations work under the Partial Relief Rule, and drawing an imaginary normal distribution curve around the non-Corinthian Dental Assisting Programs median) *with* Matsudaira Decl. ¶¶ 11–12 & Figure 2 (showing that the non-Corinthian Dental Assisting Programs data do not in fact fall along a normal distribution curve).

The record does not demonstrate that ED took the actual distribution of the relevant data into account in developing the Partial Relief Rule or analyzed whether the standard deviation methodology is appropriate given that the data do not fall along a normal distribution. *See Owner-*

*Operator Independent Drivers Ass'n*, 494 F.3d at 206 (holding that agency's failure to provide explanation why a model it created did not account for a relevant factor rendered part of a rule arbitrary and capricious). By failing to demonstrate that its chosen methodology is appropriate given the distribution of the data at issue, ED has failed to demonstrate a "rational connection" between the facts and its choice to use the standard deviation methodology. *State Farm*, 463 U.S. at 43.

### 3.   Standard deviations measure distribution of data from the mean, not the median.

As noted in the Investopedia.com document in the record, "standard deviation is a statistic that measures the dispersion of a dataset relative to its *mean*." AR-A-0239 (emphasis added). Rather than calculating standard deviation from the mean, however, the Partial Relief Rule calculates standard dispersion from the *median* of the data it is considering. ED's decision memo states that ED chose to look at median program earnings because the College Scorecard includes only median program earnings and because mean values can be heavily influenced by outsiders. AR-A-0215. However, although the record contains a graph showing that mean and median are not always in the same place, AR-A-0303, nothing in the record demonstrates that ED gave any consideration to whether substituting median for mean in calculating a statistic that is defined based on the mean changes the validity of the calculation, or explains why the calculation is statistically valid in light of ED's switch. *See* Matsudaira Decl. ¶ 22 (noting that the Partial Relief Rule's methodology is not a valid measure of the difference in medians of different groups).

ED's substitution of median for mean in the standard deviation methodology without considering or explaining the effect of the substitution underscores that the Partial Relief Rule is arbitrary and capricious. For this reason as well, the Rule should be vacated and set aside.

### C. The Partial Relief Rule conflicts with governing regulations.

The 2016 Rule established procedures for "determin[ing] the appropriate amount of relief to award" a borrower who has established a borrower defense. 34 C.F.R. § 685.222(i)(1). Those procedures specify factors that ED must take into account in determining the amount of relief to award borrowers with certain types of borrower defenses. *Id*. § 685.222(i)(2). In particular, when a borrower defense is based on a substantial misrepresentation, ED must factor into the determination of relief "the borrower's cost of attendance to attend the school," along with a factor related to the value of the education, and "may consider any other relevant factors." *Id*. § 685.222(i)(2)(i). When the borrower defense is based on a judgment against the school, ED must base the amount of relief either on "the amount of the judgment that remains unsatisfied," subject to specified limitations and other reasonable considerations, or "on the holding of the case and applicable law to monetize the judgment," if the judgment does not award specific financial relief. *Id*. § 685.222(i)(2)(ii). And when the borrower defense is based on a breach of contract, ED must determine relief "according to the common law of contracts," subject to specified limitations and other reasonable considerations. *Id*. § 685.222(i)(2)(iii).

The Partial Relief Rule ignores these regulatory requirements, *see* AR-A-0012, requiring the ED official deciding the claim to award relief to borrowers based solely on the Rule's earnings comparison, without taking into account the cost of attendance of the program, the amount of a judgment on which a borrower defense may be based, or the common law of contracts, and without considering other relevant factors. *See* AR-A-0005; AR-A-0011. Because the Partial Relief Rule establishes a method for determining the amount of relief to afford all borrowers to whom it applies that is different from the methods required by 34 C.F.R. § 685.222(i)(2) with respect to borrower

defenses based on a substantial misrepresentation, judgment, or breach of contract, the Rule conflicts with those regulations.

More generally, by specifying how relief is to be determined for borrower defenses based on a substantial misrepresentation, judgment, and breach of contract, the regulations make clear that the basis of the underlying borrower defense affects what relief is appropriate, and that the methodology for determining relief should not be the same for all borrower defenses. By adopting a one-size-fits all methodology that applies without any consideration of the basis of the borrower defense—and without any consideration of the nature of the wrongful acts or omissions of the school at issue—the Partial Relief Rule is inconsistent with 34 C.F.R. § 685.222(i)(2), arbitrary, and capricious.

## III. The Partial Relief Rule Was Adopted Without Observance of Procedure Required by Law.

The APA requires an agency to undertake notice-and-comment rulemaking to issue a new substantive, or legislative, rule. *See* 5 U.S.C. § 553(b)–(c). The HEA adds to these procedures and requires ED to "obtain public involvement in the development of proposed regulations" under Title IV, and to "submit such regulations to a negotiated rulemaking process." 20 U.S.C. § 1098a(a)(1), (b). Here, the Partial Relief Rule is a legislative rule: It has the "force and effect of law," *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 92 (2015) (citation omitted), "determining the level of a relief [to which] a successful [borrower defense] applicant is entitle[d]." AR-A-0222. Accordingly, the Partial Relief Rule should have gone through notice-and-comment rulemaking. And because it should have gone through notice-and-comment rulemaking, it also should have gone through the public participation and negotiated rulemaking process that the HEA requires for the development of "regulations" under Title IV. 20 U.S.C. § 1098a(a)(1), (b).

The APA exempts from its notice-and-comment requirements "interpretative rules, general statement of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b). None of these exemptions applies here.

### A.  The Partial Relief is not a "general statement of policy."

Although ED announced the Partial Relief Rule through a memorandum that it titled a "Policy Statement," AR-A-0002, the Partial Relief Rule does not constitute a "general statement[] of policy" within the meaning of the APA. The D.C. Circuit has set out "two lines of inquiry to guide the determination of whether an action constitutes a legislative rule or a general statement of policy." *Clarian Health W., LLC v. Hargan*, 878 F.3d 346, 357 (D.C. Cir. 2017) (internal quotation marks and citations omitted). The first line of inquiry "considers the effects of an agency's action," including whether it imposes rights and obligations or genuinely leaves agency decisionmakers free to exercise discretion, and the second looks "to the agency's expressed intentions," including how the agency characterized the action, whether it published the action in the Federal Register or Code of Federal Regulations, and whether "the action has binding effects on private parties or on the agency." *Id.* (citation omitted). "[T]he two lines of analysis overlap at the inquiry into whether the action has binding effect," and the D.C. Circuit has "consistently emphasized that this factor is the most important." *Id.*

Here, the Partial Relief Rule "has binding effect" and does not "genuinely [leave] the agency and its decisionmakers free to exercise discretion." *Id.* (citation omitted). The Rule is "determinative" of the amount of relief ED affords borrowers who have successfully established a borrower defense. *Batterton v. Marshall*, 648 F.2d 694, 706 (D.C. Cir. 1980). It sets forth the methodology that agency officials deciding borrower defense applications must follow to determine whether the borrower will obtain relief, and if so how much. *See* AR-A-0222 (approving

36

the Partial Relief Rule's methodology as "the method for determining the level of relief a successful [borrower defense] applicant is entitle[d] to"); AR-A-0002 (explaining that the Rule "provides the framework within which the Department will determine relief for meritorious cases"); AR-A-0011 (detailing clams to which the methodology "will be applied"). And ED officials have been applying the Partial Relief Rule to determine the amount of relief to award borrowers. *See* AR-A-0030 (announcing that ED had "implemented" the Rule); *see*, *e.g.*, AR-B-0975 ("To calculate the amount of your discharge, we compared the earnings of those who completed the same or a similar program at your school ... to the earnings of those who completed the same or a similar program at other schools" and "used a statistical tool called 'standard deviation' to identify the range of program earnings that would qualify for loan relief"); *see also Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec. (EPIC)*, 653 F.3d 1, 7 (D.C. Cir. 2011) ("[A]n agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." (quoting *Gen. Elec. Co. v. Envtl. Prot. Agency,* 290 F.3d 377, 383 (D.C. Cir. 2002))).

ED's characterization of the Partial Relief Rule as establishing a "rebuttable presumption" that "preserv[es] its flexibility and the opportunity to make individualized determinations" does not make the Rule a statement of policy. AR-A-0007. A rebuttable presumption leaves the decisionmaker "free to exercise his informed discretion." *Panhandle Producers & Royalty Owners Ass'n v. Econ. Regulatory Admin.*, 822 F.2d 1105, 1110 (D.C. Cir. 1987) (citation omitted). The Partial Relief Rule, however, does not leave ED officials who are making determinations that are "final as to ... any relief that may be granted," 34 C.F.R. § 685.222(e)(5), free to base the amount of relief they award on anything besides the Rule's methodology. Moreover, the Rule does not provide borrowers with any opportunity to "rebut[]" the earnings they would receive under that

methodology before they receive that final decision. The only opportunity borrowers have to challenge the award made under the Partial Relief Rule's methodology is through the initiation of a new process that *follows* a final decision and that is not available to all borrowers because it requires the "identification of new evidence in support of the borrower's claim." *Id.* § 685.222(e)(5)(i).

"[A] so-called policy statement [that] in purpose or likely effect ... narrowly limits administrative discretion, [must] be taken for what it is"—"a binding rule of substantive law." *Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 666–67 (D.C. Cir. 1978). The Partial Relief Rule requires agency officials who are adjudicating borrower defense claims to determine the amount of fees awarded in accordance with the Rule's methodology; it is not a statement of policy.

### B. The Partial Relief Rule is not an "interpretative rule."

The Partial Relief Rule is also not an "interpretative rule[]." 5 U.S.C. § 553(b). "An 'interpretative rule' describes the agency's view of the meaning of an existing statute or regulation." *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014) (quoting *Batterton*, 648 F.2d at 702 n. 34). Whereas legislative rules "effect[] a substantive regulatory change to the statutory or regulatory regime," interpretative rules "clarify a statutory or regulatory term, remind parties of existing statutory or regulatory duties, or merely track preexisting requirements and explain something the statute or regulation already required." *Id.* (cleaned up; citations omitted).

Here, rather than explaining existing statutory or regulatory terms, the Partial Relief Rule effects a "substantive regulatory change," *id.*, adopting a new methodology "to adjudicate current and future borrower defense claims." AR-A-0002. ED does not assert that the Rule is an interpretation of the HEA and its implementing regulations. Rather, ED asserts that the statute and

regulations provide it with discretion and that the Partial Relief Rule is how it is exercising that discretion. AR-A-0011. "Where Congress has specifically declined to create a standard, the Department cannot claim its implementing rule is an interpretation of the statute." *Mendoza*, 754 F.3d at 1022. Likewise, if a regulation does not set forth a standard, an agency cannot claim its implementing rule is an interpretation of that regulation. *Id.*

Moreover, as discussed above, 34 C.F.R. § 685.222(i)(2) *does* set forth factors that ED must consider in determining the amount of relief to award certain successful borrower defense claimants, and the Partial Relief Rule conflicts with those standards. *See supra* pp. 33–34. The inconsistency between the Partial Relief Rule and 34 C.F.R. § 685.222(i)(2) further underscores that the Partial Relief Rule is a legislative rule, not an interpretative one. *See Mendoza*, 754 F.2d at 1021 (explaining that a rule is legislative if it "adopts a new position inconsistent with existing regulations").

### C.  The Partial Relief Rule is not a "procedural rule."

Finally, the Partial Relief Rule does not fall within the APA's exemption for "rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b). "'Procedural rules,' the general label for rules falling under this exemption, are 'primarily directed toward improving the efficient and effective operations of an agency, not toward a determination of the rights [or] interests of affected parties.'" *Mendoza*, 754 F.3d at 1023 (alteration in original) (quoting *Batterton*, 648 F.2d at 702 n.34). "Procedural rules 'do not themselves alter the rights or interests of parties[.]'" *Id.* (quoting *Batterton*, 648 F.2d at 707). "[T]he distinction between substantive and procedural rules is one of degree depending upon whether the substantive effect is sufficiently grave so that notice and comment are needed to safeguard the policies underlying the APA." *Id.* (alteration in original) (quoting *EPIC*, 653 F.3d at 5–6). "The exception for procedural rules is narrowly construed and

cannot be applied 'where the agency action trenches on substantial private rights and interests.'"
*Id.* (citation omitted) (quoting *Batterton*, 648 F.2d at 708).

The Partial Relief Rule is a substantive, rather than procedural, rule because it is "primarily directed … toward a determination of the rights … of affected parties." *Id.* (citation omitted). Indeed, ED has described the Rule's methodology as an "adjudicatory process to determine relief." AR-A-0007. The Partial Relief Rule does not just "alter the manner in which the parties present themselves or their viewpoints to the agency"; it "alter[s] the rights and interests of parties," determining the amount of relief they will receive. *Mendoza*, 754 F.3d at 1023 (citation omitted). Accordingly, the APA's narrow exemption for procedural rules does not apply.

*****

Because the Partial Relief Rule is a legislative rule, ED was required to undertake notice-and-comment rulemaking before adopting it. *See* 5 U.S.C. § 553(b)–(c). Moreover, because ED was required to go through notice-and-comment procedures it was also required to "obtain public involvement in the development" of the rule, and submit a proposed rule "to a negotiated rulemaking process." 20 U.S.C. § 1098a(a)(1), (b). By failing to do so, ED adopted the Partial Relief Rule "without observance of procedure quired by law," and the Partial Relief Rule should be held unlawful and set aside. 5 U.S.C. § 706(2)(D).

## IV.   The Court Should Vacate Relief Determinations Based on the Partial Relief Rule.

Named plaintiffs and members of the class have received relief determinations based on the Partial Relief Rule under which they were granted no or only partial relief from their federal student loans. Because those determinations were based on a rule that is unlawful, those relief determinations should be vacated. *See*, *e.g.*, *D.A.M. v. Barr*, No. 20-CV-1321 (CRC), 2020 WL 5525056, at *8 (D.D.C. Sept. 15, 2020) (noting "the uncontroversial proposition that, when a court

40

with jurisdiction finds that the plaintiffs before it were harmed by an agency decision issued under an illegal rule, the court should vacate that wrongful decision as a remedy"); *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 36 (D.D.C. 2020) (after setting aside two agency directives related to credible-fear interviews, also setting aside the plaintiffs' negative credible-fear determinations made under those directives). As part of that vacatur, where the determination resulted in the borrowers' loans being removed from forbearance or stopped collection status, the Court should vacate those removals, resulting in the loans being placed back into forbearance or stopped collection status.

## CONCLUSION

The Court should vacate the Partial Relief Rule. The Court should also vacate named plaintiffs' and the class members' determinations based on the Partial Relief Rule, and order that, if the named plaintiffs' and class members' loans were in forbearance or collection had been stopped before they received their relief determinations, their loans should be returned to forbearance or stopped collection status.

Dated: November 2, 2020               Respectfully submitted,

/s/ Adina H. Rosenbaum
Adina H. Rosenbaum (D.C. Bar No. 490928)
Adam R. Pulver (D.C. Bar No. 1020475)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th St. NW
Washington, DC 20009
(202) 588-1000
arosenbaum@citizen.org

Michael N. Turi (New York Bar No. 5385745)
*Pro hac vice*
Eileen M. Connor (Mass. BBO No. 569184)
(application for admission forthcoming)
Toby R. Merrill (Mass. BBO No. 601071)
PROJECT ON PREDATORY STUDENT
LENDING,
LEGAL SERVICES CENTER OF HARVARD
LAW SCHOOL
122 Boylston Street

41

Jamaica Plain, MA 02130
(617) 522-3003
mturi@law.harvard.edu

*Counsel for Plaintiffs and the Class*